**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| OPAWL – BUILDING AAPI FEMINIST LEADERSHIP, NORTHEAST OHIO COALITION FOR THE HOMELESS, ELISA BREDENDIEK, PETER QUILLIGAN, and JOHN GERRATH, | Case No. |
| Plaintiffs, | Judge |
| v. | Magistrate Judge |
| DAVE YOST, in his official capacity as Ohio Attorney General, and FRANK LAROSE, in his official capacity as Ohio Secretary of State, |  |
| Defendants. |  |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs OPAWL – Building AAPI Feminist Leadership, Northeast Ohio Coalition for the Homeless, Elisa Bredendiek, Peter Quilligan, and John Gerrath file this complaint against Defendants Dave Yost, in his official capacity as Ohio Attorney General, and Frank LaRose, in his official capacity as Ohio Secretary of State, and allege as follows:

### NATURE OF THE CASE

1.      The First Amendment protects against laws that abridge the freedoms of speech or association. Central to the First Amendment's protections is the foundational principle that allowing for free and robust debate about salient issues of the day is among our most cherished constitutional values. With House Bill 1 ("HB 1"), which was signed by the Governor on June 2, 2024, and will take effect on September 1, Defendants stand poised to unconstitutionally impede public debate through the enforcement of new broad and sweeping prohibitions on spending related to advocacy for or against ballot issues—and even spending in support of nonprofit

organizations that do *not* have a primary purpose of supporting or opposing candidates, political parties, or ballot issues.

2.      HB 1's proponents claimed that it would make Ohio's campaign finance law consistent with federal law and prevent foreign billionaires from interfering in Ohio's elections. In reality, no new legislation was needed to bring Ohio in line with federal law. And by extending candidate-related election spending regulations to the ballot issue context, HB 1 ignores decades of binding U.S. Supreme Court and Sixth Circuit precedent establishing that the state cannot regulate the latter consistent with the First Amendment. *See, e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 795 (1978); *Citizens Against Rent Control/Coal. For Fair Hous. v. City of Berkeley*, 454 U.S. 290, 296 (1981); *Michigan State Chamber of Com. v. Austin*, 823 F.2d 947, 949 (6th Cir. 1987). HB 1's proponents similarly ignored that federal prohibitions on contributions and spending by "foreign nationals" in relation to *candidate*-related elections are only permitted because of compelling interests that are unique to the *candidate* context.

3.      Specifically, the Supreme Court and the Sixth Circuit have found that the government may impose certain limited restrictions on candidate-related contributions and spending specifically to guard against potential *quid pro quo* corruption, where a candidate feels beholden to a donor once in office and may make policy decisions accordingly. *See, e.g.*, *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 305 (2022) ("This Court has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."); *see also Buckley v. Valeo*, 424 U.S. 1, 26–27 (1976); *Austin*, 823 F.2d at 949.

4.      As the Supreme Court recognized in *Bellotti* nearly fifty years ago, "[t]he risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." 435 U.S. at 791 (internal citations omitted); *see also Austin*, 823 F.2d at 949

(quoting the same). This should be self-evident: if the majority of voters endorse a ballot issue at the ballot box, the policy approved by the voters becomes law; no amount of spending—regardless of its source—can change that policy, which is set forth in the text that the voters themselves approved. And there is no legitimate basis for dampening the discussion surrounding the issue as the people consider it. To the contrary, as the Supreme Court has recognized, "the direct participation of the people in a referendum, if anything, *increases the need for the widest possible dissemination of information from diverse and antagonistic sources*." *Bellotti*, 435 U.S. at 791 n.29 (cleaned up) (emphasis added). Yet HB 1's broad and sweeping prohibitions take direct aim at this full and free discussion. The Supreme Court has been clear that "the First Amendment rejects the 'highly paternalistic' approach of statutes like [HB 1] which restrict what the people may hear." *Id.* at 791 n.31.

5.     HB 1 is also directly at odds with Supreme Court precedent (and federal campaign finance law) in its sweeping inclusion of anyone who is not a U.S. citizen in its broad prohibitions on issue-related speech by "foreign nationals." The definition of this key term in HB 1 is so broad that it includes lawful permanent residents, threatening them with criminal prosecution and substantial fines for *any* amount of election-related spending—no matter how *de minimus* or indirect. In contrast, federal campaign finance law permits lawful permanent residents to contribute even to candidates. *See* 52 U.S.C. § 30121(b).

6.     As then-Judge Kavanaugh recognized in a decision that was summarily affirmed by the Supreme Court, a state's interest in "preventing foreign influence over the U.S. political process" raises different questions when applied to lawful permanent residents. *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 288, 292 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). This is because the Supreme Court has long held that the First Amendment's protections apply to

noncitizen residents, *see Bridges v. Wixon*, 326 U.S. 135, 148 (1945), with "substantial connections with this country," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).

7.     HB 1 targets *anyone* who is not a U.S. citizen—including lawful permanent residents who have made their homes in Ohio, are raising their families here, are deeply committed to their communities and a future here, and are excepted from federal campaign finance restrictions. Because of HB 1, *all* noncitizens are now threatened with investigation, criminal prosecution, and mandatory fines if they even indicate they intend to engage in *any* election-related spending or contributions—including to support or oppose ballot questions in virtually any capacity.

8.     Plaintiff John Gerrath, a Canadian citizen and lawful permanent resident who intends to apply for U.S. citizenship when he is eligible, could be criminally prosecuted if the Attorney General concludes that he "implicitly promised" to make a contribution, expenditure, or even *independent* expenditure in any amount to support a ballot issue, or that he made a contribution to a nonprofit organization that was then used to influence an election. These are all activities that directly further the societal interest in the free flow of information about matters of public concern, an interest that is at the heart of the First Amendment and entitled to its fullest and most robust protection. *See, e.g.*, *Bellotti*, 435 U.S. at 783. Yet, once HB 1 takes effect, Mr. Gerrath—and *all* noncitizens—will be prohibited from engaging in this core protected activity.

9.     HB 1 will also have devastating effects on a broad array of citizens', companies', and organizations' ability to exercise their fundamental speech and associational rights because the law's broad, sweeping prohibitions threaten them, too, with criminal investigation, prosecution, and large mandatory fines if they aid in or facilitate any prohibited spending; "directly or indirectly" accept funds for ballot issue advocacy that were "directly or indirectly" contributed by

4

noncitizens; or if they contribute or expend any such funds on ballot issue advocacy. Plaintiff and nonprofit organization OPAWL – Building Asian American Feminist Leadership, for instance, could face crippling financial and criminal penalties for receiving contributions from its members, which include noncitizens, and spending even modest amounts of money to support ballot issues that affect its constituent community—simply because, as is fundamental to its organizational purpose, it has long been inclusive of all Asian American and Pacific Islander ("AAPI") and Asian women and nonbinary people residing in Ohio, regardless of their citizenship status.

10. Because HB 1 imposes unjustified burdens on individuals' and entities' speech and associational rights, contains overbroad and vague provisions, and impermissibly classifies noncitizens based on citizenship status, it violates the First and Fourteenth Amendments to the U.S. Constitution. Unless enjoined, HB 1 will have devastating effects for free debate and association in Ohio.

## JURISDICTION AND VENUE

11. Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution.

12. This Court has original jurisdiction over this action because the matters in controversy arise under the U.S. Constitution. 28 U.S.C. § 1331. The Court also has original jurisdiction because this action seeks redress from the deprivation, under color of state law, of a right secured by a provision of the U.S. Constitution providing for equal rights of U.S. citizens. *Id.* § 1343.

13. This Court has personal jurisdiction over Defendants, who are sued in their official capacities.

14. Venue is proper in the U.S. District Court for the Southern District of Ohio because (1) Defendants reside in this judicial district, and (2) a substantial part of the events that give rise to Plaintiffs' claim occurred, and will occur, in this judicial district. 28 U.S.C. § 1391(b).

15. This Court has the authority to enter a declaratory judgment and provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

## PARTIES

16. Plaintiff OPAWL – Building AAPI Feminist Leadership ("OPAWL") is a nonprofit grassroots member-led community organization whose mission is to build collective power to advance social justice and elevate the voices, visibility, and progressive leadership of Asian and AAPI women and nonbinary people across Ohio. OPAWL was originally founded in 2016 and has grown to include more than 350 members statewide, all of whom identify as Asian or AAPI women and nonbinary people. Although OPAWL does not require its members to disclose their citizenship status or the status of others in their households, OPAWL knows that many of its members are noncitizen immigrants or have noncitizen family members.

17. As a fiscally sponsored project of a 501(c)(3) organization, OPAWL operates as a continuing association under Ohio law and is subject to any applicable 501(c)(3) regulations. *See* Ohio Rev. Code § 3517.01(C)(4). OPAWL receives its funding from—and funds and supports its engagement and advocacy with the use of money from—foundation grants and donations from individual donors, including its individual members. Neither external donors nor members who donate are required to disclose their citizenship status or affiliation with foreign nationals when donating to OPAWL.

6

18.     OPAWL's civic engagement work is core to its mission and includes nonpartisan organizing in support of or opposition to ballot issues, including by hosting voter outreach events, translating voter education materials into Asian languages, and collecting signatures for ballot issues. OPAWL's members, too, are active in their communities and dedicated to using the power of their voices to make collective change by donating to causes they care about, hosting voter outreach and education events, and volunteering for and attending issue-related demonstrations. As noted above, many of OPAWL's members make regular donations to OPAWL specifically, and even those who do not make direct financial contributions often expend some of their own funds to support OPAWL's ballot issue advocacy—whether by purchasing snacks for an event or providing materials for a phone bank.

19.     HB 1 will completely silence some of OPAWL's members—noncitizens, those whose finances are closely associated with noncitizen family members, and those who would otherwise work in coordination with or with support from noncitizens—from speaking and associating on issues they care about through ballot issue advocacy and nonprofit contributions, putting them at risk of investigation, criminal prosecution, and significant fines, including returning the total amount accepted in violation of the law, if they violate any of its broad provisions.

20.     HB 1 will likewise put OPAWL itself, its leadership, and its members at risk of prosecution if it "aids or facilitates" any such activity, accepts contributions in violation of, or engages in any of its own spending in violation of the law's broad and vague provisions. In order to try to avoid violating HB 1, OPAWL will need to start collecting citizenship information from its members and donors, which is contrary to the organization's inclusive mission—indeed, is antithetical to the values that brought most of OPAWL's members to the organization in the first

place—and would place a significant and costly administrative burden on the organization, which has limited resources and staff capacity. This diversion of resources would make it harder for OPAWL to conduct other mission-critical programs like community building and storytelling. In the meantime, HB 1 will force OPAWL to cease its ballot issue advocacy altogether, for fear of being caught in the crosshairs of an investigation by the Attorney General. In this and in so many other ways, HB 1 will severely chill OPAWL's protected speech and associational rights.

21.     Plaintiff Northeast Ohio Coalition for the Homeless ("NEOCH") is a 501(c)(3) nonprofit charitable organization operating in the City of Cleveland. As a result, NEOCH qualifies as a continuing association under Ohio law and is subject to any applicable 501(c)(3) regulations. *See* Ohio Rev. Code § 3517.01(C)(4). NEOCH's mission is to eliminate the root causes of homelessness while supporting its diverse community through organizing, advocacy, education, and street outreach. It is a coalition of service providers, housing activists, and homeless people, all working together to advance this shared mission.

22.     In support of this mission, for many years, NEOCH has worked to help and advocate on behalf of homeless people, including by providing direct services and contributing and expending resources to advocate for or against nonpartisan policies that impact the homeless community in Ohio. For example, in 2023, NEOCH contributed to support local ballot issues in Cleveland about participatory budgeting and lead safety initiatives. And, as part of its voter education and outreach, NEOCH educates the communities it serves about how statewide ballot issues will affect their daily lives. This includes education and communications that could be viewed as advocating for or against any number of statewide ballot issues.

23.     NEOCH funds and supports its work—including its issue advocacy work—through grants and individual donations. NEOCH does not inquire about the citizenship status of donors,

nor does it require foundations to monitor the citizenship status of their own contributors before issuing grants to NEOCH. NEOCH is aware that noncitizen individuals have made contributions in the past, and NEOCH does not currently segregate or track funding from noncitizens.

24.    HB 1 threatens NEOCH in multiple ways. It puts the organization at risk of investigation, criminal prosecution, and significant fines, including returning the total amount accepted in violation of the law, if NEOCH violates any of its broad and often vague provisions, including those that prohibit NEOCH from accepting *any* funds that came "directly or indirectly" from a noncitizen, H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(C)(1) (Ohio 2024), from contributing or expending funds on the essential issue advocacy that is a core part of NEOCH's work, *id.* § 3517.121(C)(2), and from "aid[ing] or facilitat[ing]" any of HB 1's restrictions, *id.* § 3517.121(D).

25.    To attempt to avoid violations, NEOCH will have to, for the first time, request citizenship information from its donors and, to minimize the risks of violating HB 1, the same information about its donors' donors, *ad infinitum*. Doing so will create new costly administrative burdens for NEOCH, which will divert resources from its direct community services and other projects and likely deter certain individuals from contributing or associating with the organization at all. Even with efforts to minimize the risk of violating HB 1, the speech and association rights of NEOCH will be substantially chilled by HB 1.

26.    Plaintiffs Elisa Bredendiek—a German citizen—and Peter Quilligan—a U.S. citizen and native of Northeast Ohio—are a married couple who reside together with their two U.S. citizen children in Cleveland, Ohio. Ms. Bredendiek has deep ties to Ohio, having lived here for nearly two decades. She is authorized to work and live in the United States under federal law, as a lawful permanent resident. Like many married couples, Ms. Bredendiek and Mr. Quilligan

share finances and pay taxes together. Both Ms. Bredendiek and Mr. Quilligan care deeply about what happens in Ohio and in their local community, and about laws and public policies that impact them as Ohio residents. In order to support, advance, and hopefully influence others to also support and advance their policy preferences, they regularly contribute to NEOCH and other organizations that sometimes engage in ballot issue-related advocacy. They have also periodically attended rallies and demonstrations for issues that affect them and communities they care about, and they have paid small amounts of money for gas, parking, and supplies in the process of doing so.

27. Absent relief, HB 1 will chill Ms. Bredendiek's and Mr. Quilligan's First Amendment freedoms of speech and association because they will cease their contributions and advocacy rather than risk prosecution and steep civil penalties, not to mention the threat of mandatory investigation if any Ohio elector decides to allege that they are in violation of HB 1.

28. John Gerrath is a Canadian citizen who resides in Silver Lake, Ohio with his family. Mr. Gerrath has deep ties to his community, where he has lived and worked for seven years; he became a lawful permanent resident in 2019. In addition to working as a botanist and conservation biologist, he is active in his local community. In fact, he currently serves on his village's Park Board as Tree Commissioner. Mr. Gerrath sees his future—and the future of his family—here in the United States and intends to apply for U.S. citizenship when he becomes eligible. Mr. Gerrath cares deeply about what happens in Ohio and in his local community and about laws and public policies that impact him as an Ohio resident. As a result, he has supported ballot issues in the state. This support included paying for yard signs advocating the passage of both of last year's citizen-initiated ballot issues—for reproductive freedom and legalizing adult cannabis use.

29. Absent relief, HB 1 will chill Mr. Gerrath's First Amendment freedoms of speech and association because he will cease his contributions and advocacy rather than risk prosecution

and steep civil penalties, not to mention the threat of mandatory investigation if any Ohio elector decides to allege that he is in violation of HB 1.

30.     Defendant Dave Yost is the Attorney General of the State of Ohio. Attorney General Yost is charged under Ohio Revised Code Section 3517.121 with investigating and prosecuting violations of HB 1. H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(G) (Ohio 2024).

31.     Defendant Frank LaRose is the Secretary of State of Ohio and the State's chief election officer. Ohio Rev. Code § 3501.04. Secretary LaRose is responsible for overseeing the State's entire elections process. Specifically, he is responsible for issuing rules and instructions regarding the proper methods of conducting elections and investigating and reporting violations of the election laws. *See id*. § 3501.05. Secretary LaRose is tasked with consulting with Attorney General Yost on investigations of violations of HB 1. H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(G)(2) (Ohio 2024).

## LEGAL BACKGROUND

32.     The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014) (cleaned up). As a result, central to the First Amendment's core protections are the "right to participate in the public debate through political expression and political association." *Id.*

33.     Restrictions that threaten core First Amendment interests, including in the election-related spending context, are generally reviewed using strict scrutiny.

34.     To survive strict scrutiny, the government must show that the restriction (1) furthers a compelling state interest and (2) is narrowly tailored to achieve that interest. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340, 343 (2010); *see also Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, No. 1:23-CV-00450-NT, 2024 WL 866367, at *7, *11 (D. Me. Feb. 29, 2024) (applying strict scrutiny to state statute prohibiting political campaign spending by a "foreign government-influenced entity").[1]

35.     Nearly fifty years ago, the Supreme Court recognized in *Bellotti* that spending to promote or oppose ballot measures was expression that was at the very heart of the First Amendment's protections. 435 U.S. at 775. "It is the type of speech *indispensable* to decisionmaking in a democracy." *Id*. at 777 (emphasis added).

36.     The Supreme Court has been especially protective of spending in the ballot issue context, because "[c]ontributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression." *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 298 (1981). "Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate or a candidate's committees *there is no significant state or public interest in curtailing debate and discussion of a ballot measure*." *Id.* at 299 (emphasis added).

---

[1]     When evaluating contributions limits (as opposed to expenditure limits), courts have applied a slightly lower but still rigorous standard of review, under the theory that contributions "permit the symbolic expression of support evidenced by a contribution but do not in any way infringe the contributor's freedom to discuss candidates and issues." *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 21) (cleaned up). Even under that less-than-strict review, the State must show that the challenged contribution limit (1) furthers a "sufficiently important interest" and (2) "employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.* at 197 (quoting *Buckley*, 424 U.S. at 25).

37.    While the Supreme Court has found that the government may impose certain specific limited restrictions on contributions and spending in the candidate-election context, it has done so based on its conclusion that such restrictions are carefully tailored to advance the state's compelling interest in preventing real or apparent "quid pro quo" corruption—that is, the possibility that officeholders would carry political debts to their donors, who would thus exercise outsized influence over public policy. *See, e.g.*, *Buckley*, 424 U.S. at 26–27.

38.    But both the Supreme Court and the Sixth Circuit have explained that the same interest does not exist in the ballot issue context, where the people themselves vote on the policy at issue, and where that policy will remain whatever the voters approve, irrespective of donor influence. *Bellotti*, 435 U.S. at 790 ("The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue."); *Austin*, 832 F.2d at 949 (same); *see also Bellotti*, 435 U.S. at 787 n.26 (explaining that "speak[ing] on issues of general public interest" is a "quite different context" from "participation in a political campaign for election to public office"); *Bluman*, 800 F. Supp. 2d at 288, 291 (Kavanaugh, J.) (recognizing that the state's interest in "preventing foreign influence over the U.S. political process" raises different questions when applied to ballot issue advocacy), *aff'd*, 565 U.S. 1104 (2012).

39.    Indeed, "the direct participation of the people in a referendum, if anything, increases the need for the widest possible dissemination of information from diverse and antagonistic sources." *Bellotti*, 435 U.S. at 790 n.29 (cleaned up). And "[t]he inherent worth of the speech in terms of its capacity for informing the public *does not depend on the identity of its source* . . . ." *Id*. at 777 (emphasis added).

40.    The Supreme Court has also made clear that First Amendment protections extend not just to individual U.S. citizens, but also to corporations and to noncitizens residing in the

United States. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *Bellotti*, 435 U.S. at 783) ("Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster."); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country.").

41. Federal campaign finance law's candidate-related regulations reflect this difference: while federal law prohibits foreign nationals from directly or indirectly making a "contribution or donation of money or other thing of value . . . in connection with a Federal, State, or local election," 52 U.S.C. § 30121(a)(1)(A); 11 C.F.R. § 110.20(b), it does *not* include lawful permanent residents in its definition of "foreign national." 52 U.S.C. § 30121(b).

42. Similarly, the Federal Election Commission has generally interpreted "federal, state or local election" to require some nexus to a candidate. *See* Statement of Reasons, MUR 7523 (Stop I-186) (Nov. 2, 2021).[2]

43. Because ballot issues ask the voters to decide whether to approve or reject a policy and not to elect or defeat a candidate, federal campaign finance law as interpreted by the Federal Election Commission—which has exclusive jurisdiction over its enforcement, *see Fed. Election Comm'n v. NRA Pol. Victory Fund*, 513 U.S. 88, 91 (1994)—does not limit foreign national spending on ballot issues.

---

[2] Available at https://www.fec.gov/files/legal/murs/7523/7523_28.pdf.

## FACTUAL BACKGROUND

**I.    Ohio voters have long had the power to approve or reject policy using direct democracy, but their elected officials have increasingly moved to impede that right.**

44.    The Ohio Constitution reserves to the people the power "to propose to the general assembly laws and amendments to the constitution, and to adopt or reject the same at the polls." Ohio Const. art. II, § 1.

45.    For more than a century, Ohioans have exercised their reserved power to direct democracy by joining together to speak on issues they care about, enshrining constitutional amendments ranging from establishing term limits to protecting reproductive freedom.

46.    Recently, there has been a growing divergence between the policy preferences of the majority party and the majority of the Ohio electorate, particularly on some highly contentious issues, and the people have responded by securing for themselves rights and policies that they overwhelmingly support through the use of direct democracy. In response, some of Ohio's elected officials have become fixated on curbing the power of Ohioans to successfully approve policy provisions and enshrine new rights.

47.    For example, just last year, the General Assembly approved Senate Joint Resolution Number 2 ("S.J.R. 2"), which submitted to the people a proposed constitutional amendment that would have made it far more difficult for the people to successfully use their constitutionally-guaranteed rights of direct democracy—most notably by increasing the threshold for ratification of future amendments by the voters from a simple majority to sixty percent.

48.    In the normal course, amendments proposed by the General Assembly are submitted to the people for a vote at the next regularly scheduled general or primary election, which occurs in November, May, or (in presidential election years) March. Ohio Rev. Code § 3501.02.

49.     Indeed, the General Assembly had eliminated statewide August special elections by statute earlier in the very same session, *see id.* §§ 3501.01(D), 3501.022 (amended by Substitute House Bill 458 in December 2022), citing concerns that such elections are expensive to run and typically have very low voter turnout.

50.     Nevertheless, the General Assembly was committed to increasing the threshold for ratification of future amendments *before* any citizen-initiated amendments were due to appear on the ballot in November 2023.

51.     S.J.R. 2 therefore provided that the increased threshold amendment would be submitted to the voters at a single-issue statewide August special election and that it would take effect immediately if ratified.

52.     Despite bipartisan opposition from former statewide officeholders and local election officials, Ohio's statewide executive branch officials supported the General Assembly's actions.

53.     Secretary LaRose was one of S.J.R. 2's primary proponents, Governor DeWine signed legislation setting the special election, and Attorney General Yost defended the special election and the amendment's misleading ballot language in court.

54.     Ultimately, more than three million Ohio voters cast ballots in the August special election, defying turnout expectations. And they overwhelmingly rejected the General Assembly's increased threshold amendment—by a decisive 14-point margin.

55.     In doing so, Ohioans preserved the longstanding democratic order and made clear that they would not easily cede or acquiesce to efforts to undermine their constitutionally-reserved power to engage in direct democracy.

**II.     HB 1 broadly threatens the free and unfettered exchange of ideas related to issues of public concern and the right to association.**

56.     With HB 1, the General Assembly makes another attempt to undercut Ohioans' ability to engage in direct democracy, this time not by targeting the mechanism for approving ballot issues, but instead by enacting broad, strict, and vague restrictions that threaten to significantly chill public discussion on issues of importance affecting Ohioans.

**A.     The General Assembly considered several bills this year to impede spending by noncitizens related to ballot issues.**

57.     From the beginning of the year, it was clear that certain members of the General Assembly were again set on targeting ballot issue advocacy, indirectly this time, under the guise of curbing "foreign influence" in Ohio's elections.

58.     Consistent with the restrictions set forth in federal campaign finance law, Ohio had long prohibited certain noncitizens—but not lawful permanent residents—from contributing or making expenditures in support of or opposition to candidates for elective office in Ohio, and it prohibited candidates, campaign committees, and political parties from accepting the same noncitizen contributions or expenditures.

59.      Although noncitizens like Plaintiffs Elisa Bredendiek and John Gerrath cannot vote in the state's elections, until now they have been free to advocate for issues they care about and that may impact them or others in their lives through financial contributions, expenditures, and independent expenditures in support of or against ballot issues and questions.

60.     Ohio has also not historically forbidden noncitizens from contributing to nonprofits organized under 501(c)(3), (c)(4), and (c)(6) of the Internal Revenue Code.

61.     Both of these facts changed with HB 1, which represented the culmination of a legislative session—and then special session—in which the General Assembly considered no less

than five different pieces of proposed legislation that targeted issue advocacy spending by noncitizens.

62.     The first of these related bills was Senate Bill 215 ("SB 215"), which the Ohio Senate considered and passed on February 28, 2024.

63.     SB 215 as passed by the Senate would have, among other things, prohibited direct or indirect spending by any noncitizen in the ballot issue space and imposed new registration, disclosure, and reporting requirements on ballot issue committees.

64.     SB 215's co-sponsors, Senators Theresa Gavarone and Robert McColley, testified that the purpose of the bill's restrictions was: (a) to ensure that foreign billionaires could not influence Ohio's elections; (b) to make regulation of ballot issue campaigns consistent with that of candidate campaigns under federal and state law; and (c) to impose large penalties on violators to provide effective deterrence.

65.     When the House failed to take up SB 215, the Senate proceeded to include versions of its restrictions as amendments to other bills that the House had already passed. These bills included House Bill 114, House Bill 305, and House Bill 271. Senator McColley testified in favor of each iteration of the provisions.

66.     Over the course of his testimony, Senator McColley repeatedly failed to substantiate the justifications that he and the bills' other sponsors and supporters offered as explanations for why their new restrictions were necessary.

67.     For example, despite repeatedly referring to foreign money writ large as a "clear and present threat to the upcoming election," neither Senator McColley nor any of the bills' supporters could explain what was so threatening about spending and contributions that simply facilitates more speech on issues that Ohio voters care about.

68. Senator McColley further admitted that the contributions by noncitizens probably did not ultimately affect ballot issue election results in 2023.

69. And although most of the bills included lawful permanent residents among their definition of the "foreign nationals" whose spending and contributions they would prohibit, neither Senator McColley nor any of the bills' supporters ever explained what would be improper about these Ohioans contributing to or spending to support or oppose policies that they care about and that stand to impact them directly.

70. The bills' supporters also failed to explain why it was necessary or even advisable to attempt to make regulation of ballot issue campaigns consistent with that of candidate campaigns under federal and state law.

71. Senator McColley's assertion that the new bills would make regulation of ballot issue campaigns consistent with that of candidate campaigns under federal and state law is flatly incorrect. Lawful permanent residents can contribute to candidate campaigns under federal law— and before HB 1, could do the same under Ohio law. *See* Ohio Rev. Code § 3517.13(W)(3).

72. And, despite the repeated focus on the influence of "foreign billionaires," and Senator McColley's related claim that the bills were meant to target "those who [] actively conspire and set up a method by which to accomplish" foreign election interference—not those involved in small-dollar transactions—none of the bills limited their restrictions based on any order of magnitude: each prohibited any and all contributions and spending by noncitizens. *See* S.B. 215, 135th Gen. Assemb., Reg. Sess. (Ohio 2024); H.B. 114, 135th Gen. Assemb., Reg. Sess. (Ohio 2024); H.B. 305, 135th Gen. Assemb., Reg. Sess. (Ohio 2024); H.B. 271, 135th Gen. Assemb., Spec. Sess. (Ohio 2024); H.B. 1, 135th Gen. Assemb., Spec. Sess. (Ohio 2024).

73.     The Senate ultimately passed four versions of SB 215 between February and May of this year—all over the objections of Senators from the minority party, who argued that the bills would make it harder for Ohioans to organize and were redundant of existing provisions that addressed foreign election interference. These bills were SB 215, House Bill 114, House Bill 305, and House Bill 271.

74.     The House did not consider any version of SB 215's provisions during its regular session.

**B.      The General Assembly ultimately enacted HB 1 in a special session.**

75.     On May 24, 2024, Governor Mike DeWine called a special session of the General Assembly, in part to ensure that it passed legislation that would prohibit campaign spending by foreign nationals. In response to the Governor's request, both legislative chambers quickly considered and passed HB 1. It was signed into law by the Governor on June 2, 2024.

*1.      HB 1 broadly defines "foreign national" to include any noncitizen.*

76.     HB 1 imposes broad and sweeping restrictions on spending related to issue advocacy by anyone who is not a U.S. citizen, regardless of their immigration status.

77.     The bill's definition of "foreign national" is expressly defined to include, "[i]n the case of an individual, an individual who is not a United States citizen or national." H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(A)(2)(a) (Ohio 2024).

78.     There is no carveout or exception in HB 1 for lawful permanent residents, or any other noncitizens who may have substantial connections to the United States.

79.     HB 1's broad definition of "foreign national" is different from the definition of "foreign national" under federal campaign finance law, which, as to an individual, is defined as someone "who is not a citizen of the United States or a national of the United States (as defined in

20

section 1101(a)(22) of title 8) and who is not lawfully admitted for permanent residence, as defined by section 1101(a)(20) of title 8." 52 U.S.C. § 30121(b)(2).

80.     Prior to the enactment of HB 1, Ohio defined the term "foreign national" the same way that it is defined in federal campaign finance law, explicitly stating that "'foreign national' has the same meaning as in section 441e(b) of the Federal Election Campaign Act." Ohio Rev. Code. § 3517.13(W)(3).

### 2.     HB 1 imposes broad restrictions on issue advocacy by noncitizens.

81.     Division (B) of HB 1 sets forth the bill's broad prohibitions on contributions, expenditures, and independent expenditures by any and all noncitizens. The portions of this division that expressly relate to advocacy regarding ballot issues and questions, as well as contributions to continuing associations, are discussed below.

82.     First, subdivision (B)(2) of HB 1 broadly prohibits any noncitizen from "directly or indirectly through any person or entity" making a "contribution, expenditure, or independent expenditure in support of or opposition to a statewide ballot issue or question." H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(B)(2) (Ohio 2024). This restriction applies "regardless of whether the ballot issue or question has yet been certified to appear on the ballot." *Id*. There is no limiting language that makes clear at what point in time this restriction becomes triggered, making it potentially temporally limitless.

83.     Ohio law defines "contribution" as "a loan, gift, deposit, forgiveness of indebtedness, donation, advance, payment, or transfer of funds or anything of value, including a transfer of funds from an inter vivos or testamentary trust or decedent's estate, and the payment by any person other than the person to whom the services are rendered for the personal services of

another person, which contribution is made, received, or used for the purpose of influencing the results of an election." Ohio Rev. Code § 3517.01(C)(5).[3]

84.     Ohio law defines "expenditure" as "the disbursement or use of a contribution for the purpose of influencing the results of an election or of making a charitable donation." *Id.* § 3517.01(C)(6).

85.     Ohio law defines "independent expenditure" as an "expenditure by a person advocating the election or defeat of an identified candidate or candidates, that is not made with the consent of, in coordination, cooperation, or consultation with, or at the request or suggestion of any candidate or candidates or of the campaign committee or agent of the candidate or candidates." *Id.* § 3517.01(C)(17).

86.     There is no exception for *de minimus* spending in HB 1. As a result, HB 1 could prohibit a noncitizen from contributing five dollars to a campaign to raise the minimum wage or buying gas to travel to a rally in support of reproductive rights, or bar a coalition of religious organizations from passing out flyers in support of a religious freedom amendment with money originating from the offering plate at a congregation that includes noncitizens.

87.     Subdivision (B)(4) of HB 1 contains further restrictions. First, it expressly prohibits any noncitizen from "directly or indirectly through any person or entity" "mak[ing] a contribution to . . . any committee created to support or oppose a ballot issue or question." H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(B)(4) (Ohio 2024).

---

[3]     In *Buckley*, the Supreme Court found that similar language—"for the purpose of . . . influencing" an election—would be unconstitutionally overbroad unless narrowly interpreted as electioneering communications, or expressly advocating for or against a specific federal candidate. 424 U.S. at 80.

88.     This language only further underscores that the broader spending restriction in (B)(2) is meant to be read as broadly as it is written: if the law only intended to limit direct contributions to ballot issue committees, the contributions prohibitions in (B)(2) and (B)(4) would not both be necessary.

89.     Subdivision (B)(4) moves even further from election-related spending in its last clause, which prohibits any noncitizen from, "directly or indirectly through any person or entity" "to the maximum extent permitted by law and by the constitutions of the United States and of this state," making a contribution "to a continuing association." *Id.* § 3517.121(B)(4).

90.     A "continuing association" is defined in Ohio code as "an association, other than a campaign committee, political party, legislative campaign fund, political contributing entity, or labor organization, that is intended to be a permanent organization *that has a primary purpose other than supporting or opposing specific candidates, political parties, or ballot issues*, and that functions on a regular basis throughout the year." Ohio Rev. Code § 3517.01(C)(4) (emphasis added).

91.     The Ohio definition for continuing association also expressly "includes organizations that are determined to be not organized for profit under subsection 501 and that are described in subsection 501(c)(3), 501(c)(4), or 501(c)(6) of the Internal Revenue Code." *Id.* These types of organizations include a broad array of organizations, including charities, religious organizations, scientific organizations, educational organizations, social welfare organizations, business leagues, chambers of commerce, and boards of trade.

92.     Subdivision (B)(5) of HB 1 prohibits any noncitizen, "directly or indirectly through any person or entity," from "promis[ing], either expressly or implicitly" to do any of the things described above. H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(B)(5) (Ohio 2024).

93. Persons who "knowingly violate" any of these prohibitions set forth in division (B) of HB 1, are "guilty of a misdemeanor of the first degree on a first offense and . . . of a felony of the fifth degree on a second or subsequent offense." *Id.* § 3517.121(F)(1).[4] Additionally, any violator "shall be fined an amount equal to three times the amount involved in the violation or ten thousand dollars, whichever amount is greater." *Id.*

94. Finally, HB 1 also expressly prohibits anyone from "knowingly aid[ing] or facilita[ting] a violation of" the restrictions set forth in division (B). *Id.* § 3517.121(D). Violation of the "aiding or facilitating" prohibition is punishable as a misdemeanor in the first degree and a mandatory fine of one thousand dollars. *Id.* § 3517.121(F)(3).

### 3. HB 1 also expressly broadly prohibits any individual and a broad array of entities from seeking or receiving support—directly or indirectly— from any noncitizen.

95. HB 1 not only restricts the rights of noncitizens; in division (C), it imposes correspondingly broad restrictions on other individuals and entities who might associate with noncitizens, particularly in relation to issue advocacy. The portions of this division that expressly relate to advocacy regarding ballot issues and questions, and contributions to continuing associations, are discussed below.

96. First, subdivision (C)(1), prohibits any "individual," as well as any "committee created to support or oppose a ballot issue or question and, to the maximum extent permitted by law and by the constitutions of the United States and of this state, . . . [or any] continuing association," from "directly or indirectly through any other person or entity, knowingly"

---

[4] Under Ohio law, incarceration is possible even for the misdemeanor offense, Ohio Rev. Code § 2929.24(A)(1), and prison sentences for the felony offense range from six to twelve months. *Id.* § 2929.14(A)(5).

"[s]olicit[ing], accept[ing], or receiv[ing] any funds from" any noncitizen "for any purpose described in" division (B) of HB 1. *Id.* § 3517.121(C)(1).

97.     Subdivision (C)(2) prohibits the same actors from "directly or indirectly through any other person or entity, knowingly" "mak[ing] a contribution, expenditure, or independent expenditure using any [of the] funds" from any noncitizen "for any purpose described in" division (B) of HB 1. *Id.* § 3517.121(C)(2).

98.     There are no exceptions set forth in (C)(2), including for *de minimus* spending. As a result, under the provision's plain text, an individual U.S. citizen in Ohio could not use a $20 bill they received from their noncitizen family member to purchase posterboard and markers to make a sign opposing a ballot issue.

99.     Persons who "knowingly violate" the prohibitions set forth in division (C) are "guilty of a misdemeanor of the first degree on a first offense and . . . of a felony of the fifth degree on a second or subsequent offense." *Id*. § 3517.121(F)(2). Additionally, any violator "shall be fined an amount equal to three times the amount involved in the violation or ten thousand dollars, whichever amount is greater, and shall be required to return the total amount accepted in violation . . . to the foreign national from whom it was accepted." *Id*.

100.    HB 1 also expressly prohibits anyone from "knowingly aid[ing] or facilita[ting] a violation of" the restrictions set forth in division (C). *Id.* § 3517.121(D). Violation of the "aiding or facilitating" prohibition is punishable as a misdemeanor in the first degree and a mandatory fine of one thousand dollars. *Id*. § 3517.121(F)(3).

### 4.     HB 1 confers on the Attorney General broad and mandatory enforcement powers.

101.    HB 1 grants the Ohio Attorney General "exclusive authority to prosecute a violation of this section" and "exclusive supervision and control of all investigations, prosecutions, and

enforcement proceedings under this section," unless he is involved as a victim or witness and then should refer the matter to another prosecutor. *Id.* § 3517.121(G)(1).

102.    HB 1's plain text goes so far as to *require* that the Attorney General "shall investigate an alleged violation of this section in consultation with the secretary of state" whenever the office receives a complaint from the governor, the secretary of state, the general assembly, the Ohio elections commission, or *any* elector. *Id.* § 3517.121(G)(2).

103.    Notably, division (B)—unlike division (C)—does not include a *mens rea* requirement for the prohibition on noncitizen spending. *Compare id.* § 3517.121(B) *with id.* § 3517.121(C). It therefore follows that any Ohio elector could complain that a noncitizen violated the spending prohibitions in division (B) without even alleging that the noncitizen did so "knowingly"; and the Attorney General would be *required* to investigate the alleged violation. *Id.* § 3517.121(G)(2).

104.    Under HB 1, any complaints of violations of the pre-existing law which previously banned foreign nationals (but not lawful permanent residents) from candidate-related election spending are now treated as allegations of violations of the new code section created by HB 1. *Id.* § 3517.121(E).

### C.    HB 1 was enacted over objections that it would chill free speech and run afoul of the First Amendment.

105.    Despite HB 1's sweeping changes to Ohio campaign finance law, its consideration, amendment, and passage through the General Assembly was fast and furious.

106.    On Friday, May 24, 2024, Governor DeWine called a special session of the General Assembly. HB 1 was introduced on Tuesday, May 28; passed by the House on Thursday, May 30; passed by the Senate on Friday, May 31; and signed by the Governor on Sunday, June 2.

107. When HB 1 was first introduced in House Government Oversight Committee on May 28, it excluded lawful permanent residents from the bill's restrictions on foreign nationals. H.B. 1, 135th Gen. Assemb., Spec. Sess. (Ohio 2024) (as introduced).

108. The bill's sponsor Representative Bill Seitz testified that HB 1 was intended to make Ohio law consistent with federal law banning foreign spending in campaigns and a 2021 Ohio Elections Commission opinion setting forth that such spending was already illegal in Ohio.

109. However, when an opponent of the bill, Representative Dani Isaacsohn, asked whether its restrictions would apply to a foreign student who spent ten dollars on a poster to demonstrate in favor of a ballot issue, Representative Seitz could point to no language in the bill that would protect the student from facing the bill's steep penalties. Instead, Representative Seitz avoided the question, responding, "please read the whole bill and we can talk offline about your going down a rat hole that is not there."

110. Despite the break-neck pace by which the bill was considered, HB 1 drew considerable opposition in the short, special session. Many citizens and representatives of nonprofit and other community-focused organizations testified before the House Government Oversight Committee that the bill would chill their organizing activities.

111. A representative of Doctors Organized for Health Care Solutions explained to the House Government Oversight Committee that, while the stated purpose of the legislation was to limit the influence of foreign nationals in elections, the bill's plain text was so sweeping and broad that it would limit even the speech of individuals married to lawful permanent residents with comingled finances.

112.    Multiple other witnesses, including one from the Ohio Environmental Council Action Fund, testified that HB 1 would chill ballot issue activity going forward and limit who would be able to participate in that process.

113.    Other witnesses testified about the threat posed by the Attorney General's exclusive authority to investigate and prosecute violations of the bill, warning that it would discourage Ohioans from participating in ballot issue advocacy in the future.

114.    HB 1 was nonetheless favorably reported out of committee to the full House by a vote of 6 to 5.

115.    On the House floor, Representative Seitz again asserted that HB 1 was "clear and concise" and contended that "[w]e're trying to just go after with a fairly narrow brush of what we're really trying to prohibit."

116.    In the very same remarks, however, Representative Seitz acknowledged that the bill's regulation of "continuing associations" included an express caveat, because there was still "some residual question as to [] the General Assembly's power to regulate this aspect of a continuing association's [] activities."

117.    Representative Seitz also conceded that Ohio law already prohibits foreign money in candidate elections.

118.    During floor debate, Representative Brian Stewart introduced an amendment to extend HB 1 prohibitions on "foreign nationals" to lawful permanent residents.

119.    Representative Seitz opposed the amendment, based on his concerns that if HB 1 were to reach lawful permanent residents, that would make it particularly vulnerable to constitutional challenge.

120. Nevertheless, the amendment was approved by a majority of the House, and HB 1—like every similar piece of legislation that the Senate had considered earlier in the year—was modified to reach all noncitizens, including lawful permanent residents. *See* S.B. 215, 135th Gen. Assemb., Reg. Sess. (Ohio 2024); H.B. 114, 135th Gen. Assemb., Reg. Sess. (Ohio 2024); H.B. 305, 135th Gen. Assemb., Reg. Sess. (Ohio 2024); H.B. 271, 135th Gen. Assemb., Spec. Sess. (Ohio 2024).

121. The amended bill then passed the full House on a vote of 64 to 31, over strong opposition from the minority party's members.

122. In explaining his opposition, Representative Isaacsohn pointed out that HB 1 includes "vague language to create a culture of fear and confusion around engaging in political activity."

123. For example, he asked, "What is even an indirect contribution? If a board member of the restaurant association, for example, or another corporation is a foreign national, are all of the political contributions from that association or company's attendant PACs or committees subject to violations?"

124. He similarly wondered, "What about a college student whose grandfather sends them $100 from Ireland for their birthday, and then they go and they buy some markers and some signs and they go and protest for their rights, for their reproductive rights at an issue campaign?"

125. Ultimately, he concluded, "This bill is an affront to the people of Ohio. It attacks their right to organize, to advocate for causes they believe in, and to engage in the deeply American activity of coming together to fight for a better future."

126. Representative Bride Rose Sweeney similarly objected that the House's sudden concern with money in elections, arguing it appeared to be pretextual, and noting that the General

Assembly had failed to consider other bills concerning dark money and instead only acted "to change the rules of the game to benefit power hungry politicians that are up against the will of the voters."

127. Minority Leader Allison Russo accused the majority of having "crated a fear factor around so-called foreign money," describing it as "a fantasy that has been concocted as a Trojan horse to once again attack the people's fundamental freedom to direct democracy."

128. The following day, HB 1 moved to the Senate for consideration. In speaking in support of the bill, Senator McColley again characterized foreign money as a "clear and present danger" without explanation and asserted that it was meant to target "international white-collar schemes" and multi-million dollar donations—in direct contrast to the bill's broad terms.

129. Multiple senators from both parties testified in opposition to portions of the bill. For example, Senator Bill DeMora asserted that HB 1 would make it harder for citizens to participate in ballot issues and would aggrandize the Attorney General's power.

130. Senator Niraj Antani unsuccessfully sought to amend HB 1 to *remove* its regulation of lawful permanent residents, echoing Representative Seitz's concerns about the provision's legal vulnerability.

131. Despite this opposition and these doubts, the Senate passed HB 1 on Friday, May 31 by a vote of 24 to 7.

132. Governor DeWine signed it into law on Sunday, June 2.

133. Contemporaneous news articles reported that Governor DeWine stated, "I don't think anybody is worried about the average green card holder. But we are worried about somebody who's got enough money to tilt the scales in an election in the state of Ohio and who can't vote.

30

But they can come in here and they don't even live here, but they can come in here and dump a bunch of money."

134.    HB 1 will go into effect on September 1.

**D.    HB 1 will impact Plaintiffs' ability to participate in the political process.**

135.    Absent judicial relief, HB 1 will directly harm Plaintiffs by (1) prohibiting them from spending on ballot issues and contributing to nonprofit organizations who may do ballot issue advocacy, and (2) prohibiting organizational Plaintiffs OPAWL and NEOCH from receiving and using funds from noncitizens in support of any ballot issue advocacy or related to any purpose to influence an election.

136.    Under the plain terms of HB 1, Plaintiffs Elisa Bredendiek and John Gerrath reasonably fear that any contribution, expenditure, or independent expenditure they make in support of a ballot issue is illegal and could lead to their investigation and even prosecution, which may jeopardize their lawful permanent resident status or any future naturalization.

137.    Plaintiffs Bredendiek and Gerrath similarly reasonably fear that any contributions they make to nonprofits—for any purpose—could cause them to become the subject of an investigation for violating HB 1, even if they are not ultimately prosecuted.

138.    But for these fears, Plaintiffs Bredendiek and Gerrath would continue supporting causes they care about through contributions, expenditures, and independent expenditures. Once HB 1 goes into effect, however, they will be unwilling to do so out of fear of investigation and prosecution.

139.    Plaintiff Bredendiek will be chilled from attending rallies and demonstrations, as she does not know whether the issues she is supporting or opposing will one day end up on the ballot, and she would unavoidably make small expenditures, like paying for parking and gas, to

31

attend. Plaintiff Gerrath will be chilled from similar activities, including paying for and displaying signs in his yard in support of ballot questions in the state.

140.    Plaintiff Peter Quilligan, a United States citizen, has the same reasonable fears of investigation, prosecution, and penalties as shared by Plaintiffs Bredendiek and Gerrath, because he is married to a noncitizen and has comingled his finances with hers.

141.    Should Plaintiff Quilligan still want to contribute to causes and organizations he cares about once HB 1 goes into effect, he would need to develop a system to segregate money within his own household.

142.    Even segregating their accounts may not be enough to shield Plaintiff Quilligan and his wife from investigation under the broad and mandatory investigatory requirements contained in section 3517.121(G)(2) of HB 1, which require Defendants to investigate any complaints made by government officials or any individual elector that a violation has occurred.

143.    Because the terms of HB 1 are unclear, Plaintiffs have little guidance on the parameters of the prohibited conduct.

144.    For example, HB 1 expressly law does not require a ballot issue to be certified before the ban on contributions, expenditures, or independent expenditures in support of or in opposition to a statewide ballot issue or question kicks in, and it ambiguously conditions its ban on nonprofit contributions to whatever the U.S. Constitution allows.

145.    Without clarity, Plaintiffs will need to read the law in its broadest sense to avoid violating its terms, broadly chilling their political speech.

146.    Noncitizen Plaintiffs face additional harm from HB 1 due to its unjustified alienage classification, infringing upon their right to equal treatment under the law.

147.    HB 1 not only harms individuals but also organizations who previously received contributions and associated with noncitizens in the context of their own advocacy work.

148.    Organizational Plaintiffs OPAWL and NEOCH are aware of noncitizen contributors and members that help fund their community advocacy projects, but monitoring the citizenship of their contributors is not something these organizations have done as a matter of course in the past.

149.    Now, these organizations will need to implement complicated new citizenship status verification procedures and segregate funds accordingly, which will likely erode trust within their communities and with key stakeholders.

150.    Even then, OPAWL and NEOCH will be more likely to steer clear of ballot issue and other advocacy work out of a reasonable fear of being investigated, fined, and/or prosecuted by the Attorney General.

151.    Plaintiffs' fears and the resulting chill of their speech and associational conduct are the direct consequences of HB 1, including its severe criminal and civil penalties. Indeed, the consequences of even an alleged violation—by *any elector* in the state—is mandatory investigation by the Attorney General. And if found guilty, Plaintiffs would face five-figure penalties and prison time.

## CLAIMS FOR RELIEF

### COUNT I
**Infringement of Free Speech**
**U.S. Const. amends. I & XIV, 42 U.S.C. § 1983**
**Against All Defendants**

152.    Plaintiffs reallege and reincorporate by reference paragraphs 1–151 of this Complaint as though fully set forth herein.

153.     The First Amendment protects against the promulgation of laws "prohibiting the free exercise [of] or abridg[ment] [of] freedom of speech." U.S. Const. amend. I.

154. The First Amendment applies to the states through the Fourteenth Amendment.

155. Spending to promote or oppose ballot issues is at the very heart of the First Amendment's protections. *Belotti*, 435 U.S. at 775. "It is the type of speech indispensable to decisionmaking in a democracy." *Id*. at 777. And the Supreme Court has recognized that, "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend on the identity of the source." *Id.*

156. HB 1 includes several provisions that prohibit spending on ballot issues and therefore implicate the First Amendment—both for noncitizens and for those who have close financial relationships with them or receive funds from them. H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(B), (C), (D) (Ohio 2024).

157. Specifically, section 3517.121(B)'s prohibitions on noncitizens making direct or indirect contributions, expenditures, or independent expenditures to support or oppose ballot issues and on contributing to nonprofits; section 3517.121(C)'s prohibitions on committees and nonprofits knowingly accepting or using funds received from noncitizens; and section 3517.121(D)'s prohibitions on aiding or facilitating violations of division (B) or (C) all infringe upon protected First Amendment speech.

158. The Supreme Court has long recognized that "[c]ontributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression." *Citizens Against Rent Control*, 454 U.S. at 298; *see also Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) ("Independent expenditures are indisputably political speech.").

159. HB 1 limits noncitizens', including Plaintiffs Elisa Bredendiek's and John Gerrath's, ability to speak through contributions and expenditures to ballot issues and other causes.

34

HB 1 similarly limits Plaintiff Peter Quilligan's speech as someone married to and with finances comingled with a noncitizen.

160.    The Supreme Court and Sixth Circuit have also "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Citizens United*, 558 U.S. at 343 (quoting *Bellotti*, 435 U.S. at 776). "Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co.*, 475 U.S. at 8 (quoting *Bellotti*, 435 U.S. at 783). "A state cannot prohibit corporations any more than it can preclude individuals from making contributions advocating views on ballot measures." *Austin*, 832 F.2d at 949 (quoting *Citizens Against Rent Control*, 454 U.S. at 297–98) (cleaned up).

161.    HB 1 also infringes organizational Plaintiffs OPAWL's and NEOCH's speech rights because organizations engage in forms of political and issue-based advocacy, and both receive funds from noncitizens for this work.

162.    The threat that a provision will operate to chill speech is itself a constitutional harm. *See Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 658 (2004) ("Extraordinary harm and a serious chill upon protected speech may result where, as here, a prosecution is a likely possibility").

163.    HB 1's enforcement provisions are also extraordinarily broad—and that breadth further threatens to chill Plaintiffs' core political speech. Indeed, whenever *any* elector in the state of Ohio files a complaint with the Attorney General alleging a violation of HB 1, the Attorney General is *required* by the plain terms of HB 1 to investigate it. H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(G)(2) (Ohio 2024).

164.    Because of the risk that statutory provisions that could be read to reach protected speech will operate to chill core political activities, courts have typically applied "strict scrutiny" to such restrictions, where the law may only survive if the government can show that the restriction (1) furthers a compelling state interest and (2) is narrowly tailored to achieve that interest. *Citizens United*, 558 U.S. at 340; *see also Cent. Me. Power Co.*, 2024 WL 866367, at *7, *11 (applying strict scrutiny to state statute prohibiting political campaign spending by a "foreign government-influenced entity").

165.    Even under the less-than-strict scrutiny that courts sometimes apply to contribution (as opposed to expenditure) limits, the State must show that the challenged contribution limit (1) furthers a "sufficiently important interest" and (2) "employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 25); *see also Austin*, 832 F.2d at 949.

166.    "[T]here is no significant state or public interest in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control*, 454 U.S. at 299.

167.    Unlike candidate-related elections, ballot issue elections do not raise the risk of "quid pro quo" corruption, where a candidate's ongoing and post-election policy decisions may be implicitly influenced by their donors. *See, e.g.*, *Buckley*, 424 U.S. at 26–27; *Bellotti*, 435 U.S. at 791 (1978) ("The risk of corruption perceived in cases involving candidate elections simply is not present in a popular vote on a public issue." (internal citations omitted)); *Austin*, 832 F.2d at 949 (same).

168.    And Ohio already prohibits foreign spending in the candidate-related election context. Ohio Rev. Code § 3517.13(W); *see also* 52 U.S.C. § 30121.

36

169.    Furthermore, "the fact that advocacy may persuade the electorate is hardly a reason to suppress it." *Bellotti*, 435 U.S. at 790.

170.    Rather, "the direct participation of the people in a referendum, if anything, increases the need for the widest possible dissemination of information from diverse and antagonistic sources." *Id.* at 790 n.29 (cleaned up).

171.    Indeed, HB 1's regulation of "independent expenditures" in the ballot issue context is nonsensical and contrary to both the definition of the term as defined in Ohio law, *see* Ohio Rev. Code § 3517.01(C)(17), and decades of Supreme Court precedent, which make clear that "independent expenditures" may *only* be regulated when they contain "express advocacy" for or against a *candidate's* election, *see, e.g.*, *Wis. Right To Life*, 551 U.S. at 476 ("This Court has never recognized a compelling interest in regulating ads . . . that are neither express advocacy [promoting a candidate's election or defeat] nor its functional equivalent.").

172.    Even if the State *could* have a compelling interest in preventing foreign billionaires from interfering in Ohio's elections, HB 1 is not narrowly tailored to serve that goal.

173.    HB 1 separately violates the First Amendment right to speech because it is an impermissible content-based restriction: it prohibits certain disfavored speakers (noncitizens) and speech about certain topics (ballot issues and questions) associated with a particular form of expression (contributions and expenditures).

174.    Other federal courts considering similar regulations have held that when a law "singles out particular political speech—that which advocates the defeat of a candidate and/or supports the election of her opponents—for negative treatment that the state applies to no other variety of speech," it "'by [its] terms distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed,' and thus it cannot be content-neutral." *Day v. Holahan*, 34

F.3d 1356, 1360–61 (8th Cir. 1994) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994)). As a result, such laws are subject to strict scrutiny. *Id.*

175.     The same is facially true of HB 1, and it cannot survive judicial review.

176.     HB 1 unconstitutionally restricts the First Amendment speech rights of Plaintiffs and others like them because it burdens core political speech and is a content-based restriction; and it is not narrowly tailored or sufficiently related to any compelling, or even legitimate or important, government interest.

**COUNT II**
**Infringement of Associational Rights**
**U.S. Const. amends. I & XIV, 42 U.S.C. § 1983**
**Against All Defendants**

177.     Plaintiffs reallege and reincorporate by reference paragraphs 1–176 of this Complaint as though fully set forth herein.

178.     The "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); *see also Hadnott v. Amos*, 394 U.S. 358, 364 (1969) ("First Amendment rights [] include the right to band together for the advancement of political beliefs.").

179.     HB 1 infringes on the associational rights of noncitizens, as well as those individuals and organizations who wish to associate with them. Political spending is not just an individual act of expression, but "enables like-minded persons to pool their resources in furtherance of common political goals." *Buckley*, 424 U.S. at 22. This is especially true in the ballot issue advocacy context, where individuals are using the collective power of their voices and votes to write their views into law.

180. Specifically, section 3517.121(B)'s prohibitions on noncitizens making direct or indirect contributions, expenditures, or independent expenditures to support or oppose ballot issues and on contributing to nonprofits; section 3517.121(C)'s prohibitions on committees and nonprofits knowingly accepting or using funds received from noncitizens; and section 3517.121(D)'s prohibitions on aiding or facilitating violations of division (B) or (C) all infringe upon associational rights because they prohibit noncitizens from associating with individuals and organizations, and vice versa.

181. Plaintiffs Elisa Bredendiek and John Gerrath are now severely chilled from associating with nonprofit organizations that share their values by contributing money; they are even chilled from making minor expenditures to show their association with others who support or oppose the same ballot issues, for example, by making or displaying a sign. Peter Quilligan, too, is impacted as the spouse of a noncitizen, as he cannot use funds that he and his wife share to facilitate his own associations.

182. Correspondingly, Plaintiffs OPAWL and NEOCH can no longer freely associate with noncitizens—and in some cases, family members of noncitizens like Peter Quilligan—who wish to support their causes and ballot advocacy work, without fear that it will make them, their employees or volunteers, and the noncitizens vulnerable to invasive government investigation and even potentially prosecution.

183. Here, too, HB 1's extraordinarily broad enforcement provisions further threaten to chill Plaintiffs' associational rights. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618– 19 (2021) ("When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First Amendment

freedoms need breathing space to survive.'" (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963))).

184.    Again, whenever *any* elector in the state of Ohio files a complaint with the Attorney General alleging a violation of HB 1, the Attorney General is *required* by the plain terms of HB 1 to investigate it. H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(G)(2) (Ohio 2024).

185.    The threat of investigation alone entitles Plaintiffs to seek relief. *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1226 (9th Cir. 2000) (holding that defendants' "eight-month investigation into the plaintiffs' [associational] activities and beliefs chilled the exercise of their First Amendment rights" and entitled the plaintiffs "to seek a remedy for this constitutional violation"); *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1530 (10th Cir. 1994) (holding an organizational plaintiff could premise claim seeking damages for First Amendment associational rights violation upon overzealous investigative procedures that had a chilling effect on its members' associational rights).

186.    Infringements on the right of association "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Bonta*, 594 U.S. at 610 ("The government may regulate in the [First Amendment] area only with narrow specificity'") (quoting *Button*, 371 U.S. at 433).

187.    None of the provisions in HB 1 is supported by a state interest sufficient to justify the resulting restrictions on the associational rights of noncitizens and their associates or Ohio entities. And the law is not narrowly tailored, or even sufficiently related, to serve any interests, as the new regulations dramatically change the status quo.

## COUNT III
### Overbreadth
### U.S. Const. amends. I & XIV, 42 U.S.C. § 1983
### Against All Defendants

188. Plaintiffs reallege and reincorporate by reference paragraphs 1–187 of this Complaint as though fully set forth herein.

189. HB 1 is unconstitutional under the First Amendment and the Due Process Clause of the Fourteenth Amendment because it is facially overbroad.

190. "[A] statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). That is because "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *Id.* Even if a law is constitutional in some of its applications, it is facially unconstitutional if it is substantially overbroad relative to its "plainly legitimate sweep." *Id.*

191. Overbreadth challenges have also been successful where associational rights were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations in addition to speech. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

192. HB 1 is substantially overbroad because it regulates far more than spending in candidate-related elections, applying also to spending on issue advocacy, including in the ballot issue context.

193. As the Supreme Court has held, ballot issue related spending is speech entitled to the First Amendment's highest protections; thus, HB 1's infringement upon it sweeps in an enormous amount of not just innocent speech—but speech entitled to the constitution's most profound and significant protections.

194. Even if the State had an important interest in preventing foreign interference in candidate-related elections, HB 1 extends far broader than is necessary to further that interest. And, as alleged above, foreign contributions and expenditures to candidate-related elections are already prohibited under other provisions of Ohio and federal law.

195. HB 1's regulation of ballot issue-related speech is on its own fatal, but it is also notable that its attempt to muzzle this speech is as broad as it could possibly be—targeting ballot issue-related speech *even on issues that have not yet been certified for the ballot* and continuing associations like nonprofit organizations whose primary purpose has nothing to do with politics.

196. HB 1 is also substantially overbroad because it imposes blanket spending and contribution prohibitions on all noncitizens, sweeping in lawful permanent residents, noncitizens' U.S. citizen family members who have comingled finances, and organizations that may have even a single noncitizen donor or shareholder. All of these individuals are entitled to engage in that type of speech without undue restriction from the government; thus, in this way, too, HB 1 sweeps in a large amount of core protected speech.

197. HB 1 unnecessarily chills the core speech and associational rights of Plaintiffs and others similarly situated who seek to engage in issue advocacy or nonprofit organizations.

198. In short, HB 1 is an unduly blunt instrument aimed at addressing a narrow state interest that is already addressed by more appropriately tailored laws.

## COUNT IV
### Vagueness
### U.S. Const. amends. XIV, 42 U.S.C. § 1983
### Against All Defendants

199. Plaintiffs reallege and incorporate by reference paragraphs 1–198 of this Complaint as though set forth fully within.

200. HB 1 is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

201. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Laws can be vague either because they (1) fail to inform people of what they prohibit or (2) lend themselves to arbitrary and discriminatory enforcement. *See Chicago v. Morales*, 527 U.S. 41, 58–59 (1999); *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972).

202. Laws have heightened requirements for clarity when laws invoke criminal penalties, especially when there is not a scienter requirement. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982); *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) ("[W]here a statute imposes criminal penalties, the standard of certainty is higher.").

203. Where laws—as HB 1—"interfere[] with the right of free speech or of association, a more stringent vagueness test should apply." *Flipside*, 455 U.S. at 499; *see also Button*, 371 U.S. at 432 ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.").

204. Multiple parts of HB 1 are unconstitutionally vague. For example, it is unclear when the prohibition on spending in relation to ballot issues would kick in, given that HB 1 does not require the issue be approved to appear on the ballot. H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(B)(2) (Ohio 2024).

205. Nor is it clear what an "independent expenditure" means in the ballot issue context, when "independent expenditure" is defined as "an expenditure by a person advocating the election or defeat of an identified candidate or candidates." Ohio Rev. Code § 3517.01(C)(17).

206. Likewise, it is unclear what it means for a noncitizen or foreign entity to "indirectly" contribute to a ballot issue or nonprofit organization "through any person or entity,"

H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(B), (C) (Ohio 2024), or for a person to "aid or facilitate" such a violation, *id.* § 3517.121(D). And HB 1 provides no clarity on what it means to "implicitly" promise to contribute or make an expenditure. *Id*. § 3517.121(B)(5).

207.    HB 1 also confusingly uses the term "for any purpose" multiple times in division (C), and its use restrictions could be read to criminalize the use of noncitizen funds that were "received" even prior to HB 1 taking effect, which leaves Plaintiffs and others guessing at what they need to do with existing funds that may or may not be implicated given the layers of HB 1's vague restrictions.

208.    Additionally, HB 1's restrictions on individual noncitizens and foreign entities lack any kind of *mens rea* requirement, *see id.* § 3517.121(B), in contrast to HB 1's limitations on those receiving foreign funds, *see id.* § 3517.121(C).

209.    In attempting to add caveats to save the law, the General Assembly only introduced more confusion. *See id.* § 3517.121(B)(4), (C) (applying HB 1's restrictions to continuing continued associations "to the maximum extent permitted by law and by the constitutions of the United States and of this state").

210.    And HB 1's failure to clarify which definition of "contribution" applies opens that term up to the broadest possible meaning. *See* Ohio Rev. Code § 3517.01(C)(5) (defining "contribution" in political party context); *see also id.* § 1716.01(E) (defining "contribution" in charitable organization context).

211.    At the same time, these ambiguities lend themselves to selective enforcement, as the Attorney General or Secretary can decide, after the fact, what conduct is prohibited. HB 1 creates confusion for individuals of ordinary intelligence, leaving them guessing how to avoid significant criminal penalties. *Cf. Snyder v. United States*, No. 23-108, 2024 WL 3165518, at *9–

10 (U.S. June 26, 2024) ("It is unfathomable that Congress would authorize a 10-year criminal sentence for gifts to 19 million state and local officials without any coherent federal guidance (or any federal guidance at all) about how an official can distinguish the innocuous from the criminal."). HB 1 is thus unconstitutionally vague and violates the Fourteenth Amendment to the United States Constitution.

### COUNT V
### Equal Protection Clause
### U.S. Const. amend. XIV, 42 U.S.C. § 1983
### Against All Defendants

212. Plaintiffs reallege and reincorporate by reference paragraphs 1–211 of this Complaint as though fully set forth herein.

213. The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

214. HB 1 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by prohibiting noncitizens, including individual Plaintiff Elisa Bredendiek, Plaintiff John Gerrath, and organizational Plaintiff OPAWL's members and supporters, from making contributions, expenditures, or even independent expenditures in support of ballot issues, as well as contributions to continuing associations that are made, received, or used for the purpose of influencing an election, without any legitimate justification for doing so, thus denying noncitizens equal protection of the law.

215. "Classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a

'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. 365, 372 (1971).

216.    A state law that delineates based on a suspect classification—like noncitizens— "bears a heavy burden of justification." *In re Griffiths*, 413 U.S. 717, 721 (1973). Where a state law adopts a suspect classification like this one, "a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary to the accomplishment of its purpose or the safeguarding of its interest." *Id*. at 721–22 (alterations and footnotes omitted).

217.    "Resident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society. It is appropriate that a State bear a heavy burden when it deprives them of [] opportunities." *Id*. at 722.

218.    HB 1 singles out noncitizens and prohibits them from spending money on ballot issues and nonprofit organizations without compelling justification, claiming only that they should not be able to do so because they are not able to vote. This is a wholly insufficient reason to deprive them of the opportunity to engage in their communities by contributing to issues that they care about and, in many cases, directly impact them.

219.    That noncitizens are refused certain privileges has nothing to do with their right to associate and engage in protected speech. *See Verdugo-Urquidez*, 494 U.S. at 271 (noncitizen U.S. residents receive constitutional protections, including under the First Amendment). Nor does it justify infringing organizations like OPAWL's associational and speech rights. *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972) (recognizing protected First Amendment right to associate with noncitizen).

220.     Defendants cannot satisfy their heavy burden of explaining why excluding noncitizens from making any direct or indirect contributions to a sweeping range of issues and entities is narrowly tailored to further a sufficiently weighty state interest.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that HB 1 violates the First and Fourteenth Amendments to the U.S. Constitution;

B. Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from taking any steps to implement and enforce HB 1;

C. Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

D. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ C. Benjamin Cooper
C. Benjamin Cooper     (0093103)
  *Trial Attorney*
Kaela King              (0100098)
COOPER ELLIOTT
305 West Nationwide Boulevard
Columbus, Ohio 43215
(614) 481-6000
(614) 481-6001 (fax)
benc@cooperelliott.com
kaelak@cooperelliott.com

Elisabeth C. Frost*
Jyoti Jasrasaria*
Melinda K. Johnson*
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
(202) 968-4490
efrost@elias.law
jjasrasaria@elias.law
mjohnson@elias.law
*Attorneys for Plaintiffs*
* *Pro hac vice applications forthcoming*