**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| OPAWL – BUILDING AAPI FEMINIST LEADERSHIP et al., | Case No. 2:24-cv-3495 |
| Plaintiffs, | Judge Michael H. Watson |
| v. | Magistrate Judge Kimberly A. Jolson |
| DAVE YOST, in his official capacity as Ohio Attorney General et al., | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Introduction ............................................................................................................................... 1

Background ............................................................................................................................... 1

Legal Standard.......................................................................................................................... 4

Argument.................................................................................................................................. 4

I.      HB 1 infringes on core political speech in violation of the First Amendment. .................. 4

        A.      Ballot issue-related spending is core political speech, infringements upon which
                cannot be justified like candidate-related contributions. ......................................... 4

        B.      HB 1 infringes on core political speech. ................................................................. 7

        C.      HB 1 cannot survive strict scrutiny or any applicable standard of review............. 8

II.     HB 1 is an impermissible content-based restriction. ........................................................11

III.    HB 1 violates Plaintiffs' First Amendment associational rights. ..................................... 12

IV.     HB 1 is unconstitutionally overbroad. .............................................................................. 14

V.      HB 1 is void for vagueness. .............................................................................................. 15

VI.     HB 1 violates the equal protection clause.......................................................................... 18

VII.    The other applicable factors weigh in favor of issuing an injunction............................... 18

        A.      HB 1 irreparably harms Plaintiffs. ....................................................................... 19

        B.      The equities and public interest weigh in favor of injunctive relief. .................... 20

Conclusion................................................................................................................................ 21

## INTRODUCTION

Nearly fifty years ago, the Supreme Court held that spending to promote or oppose direct democracy measures is expression at the heart of the First Amendment's protections. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 775 (1978). The only state interest that can sustain political spending limitations is the interest in preventing actual or perceived *quid pro quo* corruption between large donors and political *candidates*. That interest "does not support limits on contributions to ballot question committees." *Michigan State Chamber of Com. v. Austin*, 832 F.2d 947, 949 (6th Cir. 1987). Because elections on ballot questions are "on issues, not candidates," "[t]he risk of corruption perceived in cases involving candidate elections simply is not present." *Bellotti*, 435 U.S. at 790 (citations omitted).

HB 1's sweeping and total bans on contributions, expenditures, and independent expenditures by any noncitizen—whether "directly or indirectly"—to support or oppose ballot issues, and on noncitizen contributions to continuing associations, infringe egregiously on First Amendment rights. Unless enjoined, HB 1 will broadly chill discussion of ballot issues and impede the fundamental right to advocate collectively, threatening both noncitizens and those who associate with them with substantial criminal penalties. HB 1's prohibitions are also facially overbroad and vague, offending basic notions of due process. And its clear attack on speakers based solely on their citizenship status separately facially violates the Equal Protection Clause.

Under binding precedent, there is no realistic hope of the law's survival. If it takes effect, it will cause immediate and irreparable harm to Plaintiffs. The motion should be granted.

## BACKGROUND

For more than a century, Ohioans have had the right "to propose to the general assembly laws and amendments to the constitution, and to adopt or reject the same at the polls." Ohio Const. art. II, § 1. They have used their direct democracy powers to secure a wide variety of citizen-

1

approved policy outcomes. *See, e.g.*, *id.* art. I, § 22 (right to reproductive freedom, 2023); *id.* art. I, § 10a (crime victims' rights, 2017); *id.* art. II, § 2 (term limits for state legislators, 1992).

This year, members of the General Assembly repeatedly introduced legislation to limit ballot issue-related spending. *See, e.g.*, Ex. B, S.B. 215, 135th Gen. Assemb., Reg. Sess. (Ohio 2024); Ex. C, H.B. 114, 135th Gen. Assemb., Reg. Sess. (Ohio 2024); Ex. D, H.B. 305, 135th Gen. Assemb., Reg. Sess. (Ohio 2024); Ex. E, H.B. 271, 135th Gen. Assemb., Spec. Sess. (Ohio 2024).[1] After several bills failed to pass in the regular session, the Governor called a special session on May 23. Ex. F (Governor's Proclamation). HB 1 was introduced on the first day, *see* Ex. I (May 28 House Committee Tr.), and quickly passed both chambers. Ex. A (Enrolled H.B. 1) at 6. It was signed into law by the Governor on June 2 and will be effective September 1. *Id.* at 4-5.

HB 1 targets issue advocacy from three different directions:

- Division (B) prohibits any "foreign national" from engaging in broad categories of political spending, including "directly or indirectly" making any "contribution, expenditure, or independent expenditure in support of or in opposition to a statewide ballot issue or question," regardless of whether it "has yet to be certified to appear on the ballot," H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(B), (B)(2) (Ohio 2024) ("HB 1"); making any "contribution . . . to any committee created to support or oppose a ballot issue or question, or, to the maximum extent permitted by law and by the [U.S. and Ohio] constitutions . . . to a continuing association," *id.* § 3517.121(B)(4); or making a "[p]romise, either expressly or implicitly, to" engage in any of the political spending prohibited in other provisions of division (B), *id.* § 3517.121(B)(5). "Foreign national" is broadly defined to include "any . . . individual who is not a United States citizen or national," *id.* § 3517.121(A)(2), meaning it includes even lawful permanent residents who have made their homes in Ohio.

- Division (C) prohibits "solicit[ing], accept[ing], or reciev[ing] any funds from a foreign national for any purpose described in division (B)" of HB 1, *id.* § 3517.121(C), (C)(1), as well as from "mak[ing] a contribution, expenditure, or independent expenditure using any funds the person knows were received from a foreign national for any purpose described in division (B)," *id.* § 3517.121(C)(2).

- Division (D) prohibits anyone from "knowingly aid[ing] or facilitat[ing] a violation of division (B) or (C)." *Id.* § 3517.121(D)

---

[1] Exhibits A-M are to the Declaration of Jyoti Jasrasaria, attached to this motion as Ex. 7.

Penalties for violations include criminal liability, beginning at a misdemeanor for a first offense and a felony for subsequent offenses, in addition to mandatory fines, which in some cases will be up to "three times the amount involved in the violation or ten thousand dollars, whichever amount is greater." *id.* § 3517.121(F). The Attorney General has exclusive enforcement authority over violations of HB 1, *id.* § 3517.121(G)(1), and is *required* to "investigate an alleged violation . . . in consultation with the secretary of state" on a complaint from the Governor, the Secretary, the General Assembly, the Ohio Elections Commission, or any Ohio elector, *id.* § 3517.121(G)(2).

Plaintiffs include OPAWL, a nonprofit member-led community organization that qualifies as a continuing association under Ohio law. Ex. 1 (OPAWL Decl.) ¶¶ 3, 5. It has more than 350 members across Ohio, including noncitizens or persons with noncitizen family members, many of whom donate to support OPAWL's ballot issue advocacy work. Ex. 1 ¶¶ 4, 11, 16, 17. Plaintiff NEOCH is a Cleveland-based 501(c)(3) charitable organization with staff and volunteers who advocate for and alongside unhoused people to eliminate the root causes of homelessness; NEOCH has contributed to ballot issue committees and spent funds to advocate for or against ballot issues. Ex. 2 (NEOCH Decl.) ¶¶ 2-5. Both OPAWL and NEOCH are funded by grants and donations, and neither inquires about the citizenship of its donors or requires its donors to do the same before issuing grants. Ex. 1 ¶ 18; Ex. 2 ¶¶ 6, 9. Plaintiffs also include three longtime Ohio residents—two lawful permanent residents and one U.S. citizen who is married to a lawful permanent resident. Ex. 3 (Gerrath Decl.) ¶¶ 3, 6; Ex. 4 (Bredendiek Decl.) ¶¶ 2-6; Ex. 5 (Quilligan Decl.) ¶¶ 2-3.

Each of the Plaintiffs—and in the case of OPAWL, its individual members—will have their speech and associational rights chilled by HB 1's broad prohibitions. *See* Ex. 1 ¶¶ 26-28; Ex. 2 ¶¶ 16-18; Ex. 3 ¶¶ 16-22; Ex. 4 ¶¶ 15-18; Ex. 5 ¶¶ 12-16; Ex. 6 (Imran Decl.) ¶¶ 14-18. The organizational Plaintiffs will also have to divert resources to ameliorate the harms that will follow

3

from HB 1's enforcement, which poses threats to their missions. Ex. 1 ¶¶ 20-22; Ex. 2 ¶¶ 10-11.

## LEGAL STANDARD

In considering a preliminary injunction, courts balance: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether . . . the injunction would cause substantial harm to others; and (4) whether the public interest would be served by . . . the injunction." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014). When irreparable harm is caused by governmental entities, the equities and public interest "factors merge," *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Ohio v. Becerra*, 87 F.4th 759, 768 (6th Cir. 2023). And "when a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits" is often "determinative." *Schimmel*, 751 F.3d at 430.

## ARGUMENT

The Court should enjoin HB 1. Under binding precedent, its prohibitions on issue advocacy-related spending violate the First Amendment. HB 1 is also constitutionally infirm because it is overbroad and vague in violation of due process, and an unjustifiable classification based on citizenship status, violating equal protection. Absent an injunction, Plaintiffs will suffer irreparable harm, and both the equities and the public interest weigh heavily in their favor.

**I.    HB 1 infringes on core political speech in violation of the First Amendment.**

HB 1 violates the First Amendment because it impermissibly infringes on Plaintiffs' core political speech rights and the State has no interest that can justify that infringement. This conclusion is mandated by binding precedent from both the Supreme Court and the Sixth Circuit.

**A.    Ballot issue-related spending is core political speech, infringements upon which cannot be justified like candidate-related contributions.**

The First Amendment forbids Congress and the states from making any law that abridges

4

the freedom of speech. U.S. Const. amend. I. Central to its core protections is the "right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election* Comm'n, 572 U.S. 185, 203 (2014). Spending to facilitate that debate has long been recognized as core First Amendment activity. *E.g*., *Buckley v. Valeo*, 424 U.S. 1, 57 (1976) (per curiam). "Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (quotation marks and citation omitted). Courts "consistently err[]" toward "permitting more political speech than less," *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016), mindful of the "risk that parties will self-censor, thereby chilling speech[]" and limiting their "ability . . . to take a particular political position freely." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd*., 172 F.3d 397, 407 (6th Cir. 1999).

The Supreme Court has held that the government may impose limited restrictions on *contributions* to *candidates*, *Buckley*, 424 U.S. at 1–14, but in the decades since, it has made clear that this represents, "a single narrow exception to the rule that limits on political activity were contrary to the First Amendment," justified solely by concerns related "to the perception of undue influence of large contributors to a candidate" and the risk they may be "given to secure a political *quid pro quo* from . . . office holders." *Citizens Against Rent Control*, 454 U.S. at 296–97; *see also FEC v. Nat'l Conservative Pol. Action Comm*. ("*NCPAC*"), 470 U.S. 480, 496–97 (1985) ("We held in *Buckley* and reaffirmed in *Citizens Against Rent Control* that preventing corruption" or its appearance "are the only legitimate and compelling government interests thus far identified for restricting campaign finances."). The Court has also recognized that "*Buckley* does not support limitations" on "contributions to committees formed to favor or oppose ballot

measures," because its anti-corruption rationale is inapplicable in that context. *Citizens Against Rent Control*, 454 U.S. at 297; *see also Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 645 (1996) (recognizing holding). The Court could not have been clearer: "Whatever may be the state interest or degree of that interest in regulating and limiting contributions to or expenditures of a candidate or a candidate's committees[,] ***there is no significant state or public interest in curtailing debate and discussion of a ballot measure***." *Citizens Against Rent Control*, 454 U.S. at 299 (emphases added).

Applying this precedent in *Michigan State Chamber of Commerce v. Austin*, the Sixth Circuit wasted no time in affirming the district court's conclusion that the plaintiffs were entitled to a permanent injunction forbidding the Michigan Secretary of State from enforcing a state law that prohibited most corporations from making contributions "in excess of $40,000.00 to each ballot question committee for the qualification, passage, or defeat of a particular ballot question." 832 F.2d at 948 (quoting Mich. Comp. Laws § 169.254(3) (Supp. 1987)). In doing so, it applied the above Supreme Court precedent, finding that the quid-pro-quo corruption concern "'simply is not present in a popular vote on a public issue.'" *Id*. at 949 (quoting *Bellotti*, 435 U.S. at 790). Indeed, the Supreme Court has emphasized the importance of allowing as many voices as possible to participate in discussions related to ballot issues, recognizing that "the direct participation of the people in a referendum . . . increases the need for the widest possible dissemination of information from diverse and antagonistic sources." *Bellotti*, 435 U.S. at 790 n.29 (cleaned up).[2]

---

[2] Because the Michigan law involved only direct contribution limits, the Sixth Circuit applied a slightly more forgiving test, finding that: "[a] state may limit contributions to ballot question committees *only if* it 'demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms.'" *Austin*, 832 F.2d at 949 (quoting *Buckley*, 424 U.S. at 25). That more permissive law failed even that more permissive test.

The law at issue in *Austin* was far less restrictive than HB 1. It was not a complete ban on corporate contributions to ballot issue committees, and it did "not limit the amount of independent, *direct expenditures* a corporation may make" in support or against a ballot question. *Austin*, 832 F.2d at 948. While Defendants may argue that this case is different because HB 1 restricts political spending by noncitizens rather than corporations, first, that distinction is not necessarily true (as HB 1's prohibitions on "indirect" spending would seem to reach organizations with noncitizen decisionmakers, owners, or funders), and, second, the Supreme Court has held that the First Amendment's protections extend *at least* to noncitizens residing in the United States. *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Perhaps even more importantly, the Supreme Court has emphasized that, in evaluating a restriction on political speech, the proper question is *not* whether the speakers who are regulated are entitled to the First Amendment's full and unfettered protections, but whether the challenged provision "abridges expression that the First Amendment was meant to protect." *Bellotti*, 435 U.S. at 775-76. This is because of concerns of chill as well as the Court's recognition that "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend on the identity of its source . . . ." *Id.* at 777.[3]

**B.      HB 1 infringes on core political speech.**

Nearly fifty years ago, the Supreme Court recognized that ballot issue-related spending is core First Amendment-protected expression because "it is the type of speech indispensable to decision making in a democracy." *Id*. The Court has continued to be highly protective of this type

---

[3] Federal campaign finance law reflects this: it restricts most foreign nationals—but not lawful permanent residents—from contributing directly to candidates or their campaign committees, 52 U.S.C. § 30121, but does not prohibit ballot issue-related spending. In a decision that was summarily affirmed by the Supreme Court, then-Judge Kavanaugh explained some of the well-grounded constitutional rationale for these differences. *See Bluman v. FEC*, 800 F. Supp. 2d 281, 290–91 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012).

of expression. *See, e.g.*, *Citizens Against Rent Control*, 454 U.S. at 298. HB 1 infringes on core political speech on its face, with its broad prohibitions on noncitizens—and those who have close financial relationships with or receive funds from them—spending to support or oppose ballot issues. *See, e.g.*, HB 1, § 3517.121(B), (C), (D). Indeed, HB 1 goes so far as to prohibit noncitizens from even *implicitly* promising to engage in its prohibited expression, or to contribute to a continuing association—organizations that include charities, religious, scientific, educational, or social welfare organizations, business leagues, chambers of commerce, and boards of trade, with a "primary purpose *other than* supporting or opposing specific candidates, political parties, or ballot issues," Ohio Rev. Code § 3517.01(C)(4). These restrictions—and HB 1's related prohibitions on soliciting, accepting, receiving, or spending funds from noncitizens for prohibited purposes, as well as knowingly aiding in or facilitating a violation of HB 1, HB 1, § 3517.121(C)(1), (2), (D), will broadly suppress a wide array of issue advocacy, as few will remain willing to risk investigation or prosecution. *See, e.g.*, *Bellotti*, 435 U.S. at 786; *see also* Ex. 1 ¶¶ 26-28; Ex. 2 ¶¶ 16-18; Ex. 3 ¶¶ 16-22; Ex. 4 ¶¶ 15-18; Ex. 5 ¶¶ 12-16, Ex. 6 ¶¶ 14-18 (Plaintiffs' declarations describing chilling effects of HB 1).

### C. HB 1 cannot survive strict scrutiny or any applicable standard of review.

Because HB 1 targets speech related to pure issue advocacy—not just candidate contributions—it is subject to strict scrutiny and cannot survive unless Defendants show that its restrictions (1) further a compelling state interest and (2) are narrowly tailored to achieve it. HB 1 fails on both fronts. Indeed, its restrictions cannot survive even the exacting scrutiny test that the Court has applied in reviewing candidate contribution restrictions. *See Austin*, 832 F.2d at 949–50.

**Lack of compelling interests.** The Supreme Court has already found that "there is *no significant state or public interest* in curtailing debate and discussion of a ballot measure." *Citizens Against Rent Control*, 454 U.S. at 299. This is because the only state interest that can justify

restrictions on political spending is the interest in preventing actual or perceived *quid pro quo* corruption between a donor and a candidate. *Austin*, 832 F.2d at 949. The Supreme Court has consistently struck down political spending laws that do not serve this singular interest. *See, e.g.*, *Colo. Republican Fed. Campaign Comm.*, 518 U.S. at 645 n.10 (collecting authority). That this interest is not present in ballot issue elections should be self-evident: if the majority of voters endorses an issue at the ballot box, its text becomes law; no amount of spending, regardless of its source, can change the policy that the voters themselves approved. And, indeed, the Sixth Circuit has found that there is not even a *legitimate or important* interest in restricting contributions to ballot issue committees—much less a compelling one. *Austin*, 832 F.2d at 949–50.

The justifications offered by the law's proponents only confirm that Ohio has no such interest in HB 1. Legislators claimed the bill: (1) would make Ohio law, including for ballot issue elections, consistent with federal law's foreign spending restrictions, (2) was intended to prevent foreign billionaires from interfering in Ohio's elections, and (3) imposed large penalties designed to deter would-be violators. *See* Ex. I at 5; Ex. M (May 31 Senate Floor Tr.) at 8-14, 44-48. As to the first: Ohio was *already* in line with federal law; HB 1 imposes *a wide array of different* and oppressive restrictions on noncitizen spending, beginning with its broad definition of "foreign national" to include any person who is not a U.S. citizen, unlike federal law, which defines the term to exempt lawful permanent residents. *Compare* HB 1, § 3517.121(A)(2)(a) *with* 52 U.S.C. § 30121(b)(1)-(2). Moreover, federal restrictions do not extend to ballot issues or contributions to nonprofits. *See Bluman v. FEC,* 800 F. Supp. 2d 281, 288, 291 (D.D.C. 2011) (Kavanaugh, J.) (recognizing that state's interest in "preventing foreign influence over the U.S. political process" raises different questions when applied to ballot issue advocacy), *aff'd*, 565 U.S. 1104 (2012).

Second, Ohio's express interest in restricting spending by wealthy individuals on pure issue advocacy collides directly with the First Amendment. More funding means *more* speech—as the Amendment is meant to encourage. *See Susan B. Anthony List*, 814 F.3d at 476. Thus, "[s]pending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to . . . *quid pro quo* corruption" and is not a compelling—or even legitimate—basis to restrict it. *McCutcheon*, 572 U.S. at 207–08. That voters may hear more public discussion and debate, and even may ultimately be persuaded, "can hardly be called corruption, for one of the essential features of democracy is the presentation to the electorate of varying points of view." *NCPAC*, 470 U.S. at 498. This is all the more so in direct democracy, where "the direct participation of the people . . . if anything, *increases the need for the widest possible dissemination of information from diverse and antagonistic sources*." *Bellotti*, 435 U.S. at 790 n.29 (cleaned up) (emphasis added).

Finally, the admission that the large penalties were meant to "deter" this type of core political activity simply confirms that HB 1 was *designed* to chill speech. *See* Ex. J (May 29 House Committee Tr.) (public testimony).

**HB 1 is not narrowly tailored**. Given the lack of a state interest that could justify its restrictions, the Court can and should find HB 1 unconstitutional. It is also not narrowly tailored—to achieve any constitutionally-adequate ends or even the General Assembly's purported ends.

As noted above, the bill does not track federal election law. And at no point did any of its proponents explain what is wrong with allowing noncitizen residents who have made their home here and have significant interests in the policies that govern their lives contributing to or spending to support or oppose these policy issues. *But see* Ex. 1 ¶¶ 10-17; Ex. 2 ¶ 12; Ex. 3 ¶¶ 5-6, 9-10, 13-14; Ex. 4 ¶¶ 9-14; Ex. 5 ¶¶ 3, 5.

And, despite the proponents' repeated focus on the influence of "foreign billionaires," *see, e.g.*, Ex. G (Feb. 21 Senate Committee Tr.) at 4, and their claim that they meant to target "those who [] actively conspire and set up a method by which to accomplish" foreign election interference—not small-dollar transactions, Ex. H (May 8 Senate Floor Tr.) at 8—HB 1's restrictions are not limited based on magnitude: as opponents pointed out, HB 1 reaches a college student who spends gift money from their noncitizen grandfather on markers and signs to protest for their rights. *See* Ex. L at 13-14.

And HB 1's sweeping penalties and mandatory investigation obligation, HB 1, § 3517.121(G)(2), will do far more than deter "foreign influence"; they will chill citizens and noncitizens alike—including lawful permanent residents—from broadly engaging in core protected expression. Ex. 3, ¶ 21; Ex. 4, ¶¶ 13, 16-17.

## II.     HB 1 is an impermissible content-based restriction.

HB 1 is separately subject to strict scrutiny because it targets speech about certain topics (ballot issues) associated with a particular form of expression (spending). *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."); *see also City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 70 (2022) ("[T]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic"). Thus, courts have held that when a law "singles out particular political speech . . . for negative treatment that the state applies to no other variety of speech," that law "'by [its] terms distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed,' and . . . it cannot be content-neutral." *Day v. Holahan*, 34 F.3d 1356, 1360–61 (8th Cir. 1994) (quoting *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 643 (1994)). The same is true of

HB 1.[4] Whether this Court evaluates it through a political speech or content-based restriction lens, the result is the same: strict scrutiny applies, and HB 1 cannot satisfy it. *See supra* Arg. § I.C.

## III. HB 1 violates Plaintiffs' First Amendment associational rights.

HB 1 also infringes on Plaintiffs' freedom of association. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). The freedom to advocate for the advancement of one's preferred policies "could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622 (citing *Citizens Against Rent Control*, 454 U.S. at 294). In the area of political spending related to issue advocacy specifically, the Court has recognized that the right of association and the right of expression "overlap and blend; to limit the right of association places an impermissible restraint on the right of expression." *Citizens Against Rent Control*, 454 U.S. at 300.

The Sixth Circuit in *Lichtenstein* recently applied a three-step inquiry to an expressive-association claim. That test asks: "First: Does the First Amendment apply to the group because it engages in speech? Second: If the group engages in speech, does a law 'significantly burden' its ability to express its message? Third: If this burden exists, can the government satisfy the scrutiny that applies?" *Lichtenstein v. Hargett*, 83 F.4th 575, 602 (6th Cir. 2023) (citations omitted). Here, the answer to each of these questions compels the conclusion that HB 1 imposes an

---

[4] The Supreme Court has also cautioned courts to be "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 777-78 (2018) (quotation marks omitted). Such laws, like HB 1, "run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Id.* (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)).

unconstitutional burden on the right of association.

*First*, Plaintiffs engage in protected speech and wish to continue doing so. Plaintiffs OPAWL and NEOCH are precisely the kind of advocacy groups whose "raison d'être is speaking" and to which "[t]he Supreme Court's expressive-association cases apply most obviously." *Id*.; *see also see also* Ex. 1, ¶¶ 6-9; Ex. 2, ¶¶ 3-5, Similarly, individual Plaintiffs are associated with and wish to continue associating with such groups—with NEOCH specifically, in Plaintiffs Bredendiek's and Quilligan's case—and their fellow Ohio residents to speak collectively about issues they care about. *See, e.g.*, Ex. 3, ¶¶ 21-22; Ex. 4, ¶¶ 13-16, 22; Ex. 5, ¶¶ 9-11, 13, 17.

*Second*, HB 1 burdens Plaintiffs' ability to express their message in the most significant and severe way possible: it outright bans groups like organizational Plaintiffs from associating with people with whom they want to associate—noncitizens and their family members with comingled finances—and vice versa. In this way, it is the direct corollary of cases like *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), in which the government compelled a group to associate with people whom the group did not want to associate, and a stronger form of regulation than the compelled disclosure regimes at issue in *Americans for Prosperity Foundation*, 594 U.S. 595, which serve to deter—but not prevent—individuals from associating with a group out of fear of harassment. Here, the government is simply *not allowing* Plaintiffs to continue associating with those with whom it wants to associate through key avenues of expression, and, as a result, limiting organizational and individual Plaintiffs from expressing their messages.

*Third*, as in *Dale*, where the government's action directly controlled who could and could not associate with a particular group, strict scrutiny applies. *Lichtenstein*, 83 F.4th at 602; *see also Roberts*, 468 U.S. at 623 (holding that infringements on the right of association "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas,

that cannot be achieved through means significantly less restrictive of associational freedoms"). As already explained, HB 1 cannot survive this test, or even the slightly less rigorous test of exacting scrutiny. *See supra* Arg. § I.C.

**IV.    HB 1 is unconstitutionally overbroad.**

HB 1 is also unconstitutional because it is facially overbroad. First Amendment "freedoms need breathing space to survive," because "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521-22 (1972) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). The "government may regulate in the area only with narrow specificity," and such regulations must "be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* at 522 (quoting *Button*, 371 U.S. at 433). Even "[a] clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).

HB 1 "create[s] a criminal prohibition of alarming breadth," pulling within its prohibitions a significant amount of protected speech and association. *United States v. Stevens*, 559 U.S. 460, 474 (2010). For example, it targets ballot issue-related speech *even on issues that have not yet been certified for the ballot* and contributions to continuing associations whose primary purpose is, by definition, not election-related. HB 1, § 3517.121(B)(2), (4); Ohio Rev. Code § 3517.01(C)(4). And it imposes blanket prohibitions on any spending by any noncitizen, whether "directly or indirectly," sweeping in not only lawful permanent residents, but also noncitizens' U.S. citizen family members who have comingled finances, and potentially even organizations that may have just a single noncitizen donor or shareholder. HB 1, § 3517.121(B); Ex. 3, ¶¶ 17-18, Ex. 4 ¶ 22; Ex. 5 ¶¶ 11-12, 14; Ex. 6, ¶ 14; *cf. Minn. Chamber of Com. v. Choi*, No. 23-CV-2015, 2023 WL

14

8803357, at *4 (D. Minn. Dec. 20, 2023) ("There is no support for the proposition that corporations lose their First Amendment protections merely because a foreign national purchases some share or interest, no matter how small."). And for the same reasons that HB 1 is not narrowly tailored, it goes far beyond even the General Assembly's purported interest in prohibiting "foreign billionaire" influence in Ohio elections. *See NCPAC*, 470 U.S. at 498 (finding challenged provision "a fatally overbroad response" to evil threatened by "multimillion dollar war chests," noting that the law's terms were not so limited and "apply equally to informal discussion groups that solicit neighborhood contributions to publicize their views about a particular Presidential candidate"); *see also see also* Ex. 1, ¶¶ 18-20; Ex. 2, ¶¶ 7-8; Ex 3, ¶¶ 12, 16-18; Ex. 4, ¶¶ 17-18, 21-22; Ex. 5, ¶ 14; Ex. 6, ¶¶ 14-16.

HB 1 is an unnecessarily blunt instrument that criminalizes issue advocacy and has no discernable relation to its stated goals. *See supra* Arg. § I.C. Its overbreadth renders it invalid.

## V. HB 1 is void for vagueness.

HB 1 is also unconstitutionally vague. A statute is vague "for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). HB 1 does both. Moreover, where laws "interfere[] with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 499 (1982); *see also Button*, 371 U.S. at 432 (same).

HB 1 fails to provide sufficient notice of what it prohibits, leaving Plaintiffs to guess at what could land them in jail. For example:

- Division (B)'s restrictions on political spending by "foreign nationals" lack a *mens rea* requirement, unlike division (C), which includes a "knowingly" requirement. HB 1,

§ 3517.121(C). The "lack of scienter [can] have a profound chilling effect." *Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 205–06 (6th Cir. 1997).

- It is not clear what HB 1 means to prohibit by forbidding foreign nationals from "*directly or indirectly through another person or entity*" engaging in the prohibited activity. *See* H.B. 1, § 3517.121(B). This could be applied to the spending of any entity with a noncitizen in a decision-making or contributing role.

- It is not clear what HB 1 prohibits by targeting "independent expenditure[s] in support of or opposition to" ballot issues, *id.* § 3517.121(B)(2)**,** as "independent expenditure" is defined elsewhere in Ohio law as "an expenditure by a person advocating the election or defeat of an identified *candidate or candidates*." Ohio Rev. Code § 3517.01(C)(17) (emphasis added).

- The prohibition on foreign nationals engaging in political spending "in support of or opposition to a statewide ballot issue or question, *regardless of whether the ballot issue or question has yet been certified to appear on the ballot*," is potentially limitless. *See* HB 1, § 3517.121(B)(2).

- It is unclear what (B)(4)—and the parallel receipt provisions in division (C)—which prohibits noncitizens from contributing to continuing associations "*to the maximum extent permitted by law and by the constitutions of the United States and of this state*," *id.* § 3517.121(B)(4), means. Even HB 1's chief sponsor seemed unsure when he explained this language was included because there was "some residual question as to [] the General Assembly's power to regulate this aspect of a continuing association's [] activities."[5] Ex. L at 5; Ex. K at 6-8.

- Division (B)'s prohibition on noncitizens making any "promise, *either expressly or implicitly*," to engage in any of the spending that HB 1 prohibits, *id.* § 3517.121(B)(5), is also unclear. Could a simple statement like "I will support your work" be deemed an "implicit[]" "promise" to violate some provision of HB 1? No one can say with certainty.

---

[5] HB 1's use of the term "contribution" is itself confusing, particularly as it relates to continuing associations. Under Section 3517.01(C)(5) of the Ohio Code, the term "contribution" is limited to contributions "for the purpose of influencing the results of an election." Continuing associations are defined as associations *other* than a campaign committee, political party, or legislative campaign fund, including "organizations that are determined to be not organized for profit under subsection 501 and that are described in subsection 501(c)(3), 501(c)(4), or 501(c)(6) of the Internal Revenue Code." Ohio Rev. Code 3517.01(C)(4). Elsewhere in the Code, "contribution" is defined in the charitable organization context as "the promise, pledge, or grant of any money or property, financial assistance, or any other thing of value in response to a solicitation." *Id.* § 1716.01(E). Given that the election-related definition of "contribution" does not make sense in giving to non-political nonprofits, Plaintiffs and others are left to guess whether their non-political charitable contributions will put them at risk of criminal exposure.

Division (C) is also littered with vague provisions. It repeats many of the same vague terms or constructions found in division (B). In addition:

- It is unclear what it would mean for an entity to "knowingly" "solicit, accept, or receive" funds from a "foreign national" "directly or indirectly through any other person or entity." *Id.* § 3517.121(C), (C)(1). Is it enough for an entity to accept funds from an organization that it knew had connections to noncitizens? Must entities take affirmative steps to inquire as to the citizenship status of donors or even donors' donors?

- Division (C)(2)'s restrictions could also be read to criminalize the use of noncitizen funds that were "received" *prior* to HB 1 taking effect. *Id.* § 3517.121(C)(2). This retroactive application is contrary to the basic principle of notice and leaves Plaintiffs and others guessing at what to do with existing funds that may or may not be implicated by HB 1.

Finally, Division (D)'s "aid[ing] and facilitat[ing]" provision, *id.* § 3517.121(D), is facially vague because it fails to explain what aiding or facilitating means in this context, particularly when incorporating division (B)'s and (C)'s vague terms. *Id.* § 3517.121(D). The plain meaning of "facilitate" is simply "to make easier." *Facilitate*, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/facilitate (last visited June 28, 2024). Could the restriction apply to a nonprofit employee who fails to collect donor citizenship information, thus making it easier for a "foreign national" to inadvertently contribute? What about a citizen who drives a noncitizen to buy materials to make a sign to support or oppose a statewide ballot issue? Have they facilitated a violation of HB 1?

HB 1's terms are so confusing that, when asked, even its chief sponsor could not point to any language that would protect from HB 1's crosshairs a foreign student who spent ten dollars on a poster to demonstrate in favor of a ballot issue. *See* Ex. I at 37-39; Ex. 1, ¶¶ 24-25, Ex. 2, ¶¶ 7-8, 15; Ex. 3, ¶¶ 15-18; Ex. 4, ¶¶ 18, 21; *but cf. Snyder v. United States*, No. 23-108, 2024 WL 3165518, at *9–10 (U.S. June 26, 2024) ("It is unfathomable that Congress would authorize a 10-year criminal sentence for gifts to 19 million state and local officials without any coherent federal guidance (or any federal guidance at all) about how an official can distinguish the innocuous from

17

the criminal."). These ambiguities lend themselves to "arbitrary and discriminatory enforcement," *Hill*, 530 U.S. at 732—something HB 1 further encourages by *requiring* the Attorney General to investigate any complaint filed by *any* elector alleging a violation of HB 1, § 3517.121(G)(2).

## VI.     HB 1 violates the equal protection clause.

HB 1 is also unconstitutional because it unjustifiably discriminates against noncitizens in violation of the equal protection clause, which prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Courts apply strict scrutiny when, as here, "a classification infringes on a class of people's fundamental rights or targets a . . . suspect class." *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010) (cleaned up).

As already discussed, HB 1 burdens fundamental rights. It is also subject to strict scrutiny because it targets a suspect class—specifically, noncitizens based on their alienage. The Supreme Court has consistently held that "[a]s a general matter, a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984). In so holding, the Supreme Court has recognized that "aliens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. 365, 376 (1971) (citation omitted). Here, HB 1 facially discriminates based on citizenship status, broadly prohibiting all noncitizens from engaging in core protected First Amendment activity, and thus strict scrutiny applies. For the reasons already discussed *supra* at Arg. § I.C, HB 1 fails review under that standard.

## VII.    The other applicable factors weigh in favor of issuing an injunction.

Without an injunction, Plaintiffs will suffer immediate and irreparable harm, and both the equities and public interest strongly favor protecting Plaintiffs' constitutional rights.

18

### A.    HB 1 irreparably harms Plaintiffs.

It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). HB 1 broadly threatens Plaintiffs' constitutional rights, in every conceivable direction.

For example, if allowed to go into effect, HB 1 will put both OPAWL and NEOCH at risk of investigation, criminal prosecution, and significant fines, including returning any amount accepted in violation of the law, if they violate any of HB 1's broad and often vague provisions, including those that prohibit it from accepting *any* funds that came "directly or indirectly" from a noncitizen, or from "aid[ing] or facilitat[ing]" a violation of HB 1, *id.* § 3517.121(D). Ex. 1, ¶ 26; Ex. 2, ¶ 16. To attempt to avoid violations, OPAWL and NEOCH will have to, for the first time, request citizenship information from donors and, to further minimize risk, the same information about its donors' donors, *ad infinitum*. Ex. 1, ¶ 21; Ex. 2, ¶ 10. Doing so will create costly burdens for both organizations and will likely deter certain individuals from contributing or associating with the organizations at all. Ex. 1, ¶¶ 21-23; Ex. 2, ¶¶ 11-13. In the meantime, both OPAWL and NEOCH will be forced to cease their ballot issue advocacy altogether, including efforts planned to support this year's statewide ballot issues. Ex. 1, ¶ 27; Ex. 2, ¶ 18. And HB 1's broad prohibitions and sweeping penalties will likewise completely silence some of OPAWL's members—including Sarah Imran, a doctoral student at the University of Cincinnati who is not a U.S. citizen but has lived in the United States legally for eight years—from speaking and associating on issues they care about through ballot issue advocacy and nonprofit contributions. Ex. 6, ¶¶ 2-4, 8, 15-18.

Noncitizen Plaintiffs Elisa Bredendiek and John Gerrath also reasonably fear that any contribution, expenditure, or independent expenditure they make in support of a ballot issue could lead to their investigation and even prosecution, which may jeopardize their lawful permanent resident status or any future naturalization. Ex. 3, ¶ 16; Ex. 4, ¶ 20. They similarly reasonably fear

that any contributions they make to nonprofits—for any purpose—could cause them to become the subject of an investigation for violating HB 1, even if they are not ultimately prosecuted. Ex. 3, ¶¶ 18-19; Ex. 4, ¶¶ 15, 17. They would like to continue supporting causes they care about in these ways, but once the law goes into effect, they will be unwilling to do so. Ex. 3, ¶¶ 21-22; Ex. 4, ¶¶ 15-17. And they will also be chilled from attending rallies and displaying yard signs, as they do not know whether the issues they are making expenditures to support or oppose will one day end up on the ballot. Ex. 3, ¶ 17; Ex. 4, ¶ 18.

Plaintiff Peter Quilligan, a lifelong U.S. citizen, has the same reasonable fears because he is married to a noncitizen and has comingled his finances with hers. Ex. 5, ¶¶ 11-12, 14, 16. Should he still want to contribute to causes he cares about, he would need to develop a system to segregate money within his own household. *Id.* ¶ 15. Even that may not be enough to shield him and his wife from investigation, under HB 1's broad and mandatory investigatory requirements. *See id.*

### B. The equities and public interest weigh in favor of injunctive relief.

The public interest favors relief because "protect[ing] . . . constitutional and civil rights" is "a purpose that is always in the public interest." *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016). At the same time, Defendants are not harmed by the "issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted). Moreover, because citizens are currently organizing to certify issues for the 2024 ballot, this is a case where "the granting of the preliminary injunction is in the public interest in preserving the status quo of the parties until a decision on the merits can be reached." *Hypoint Tech., Inc. v. Hewlett-Packard Co.*, 869 F.2d 1491 (6th Cir. 1989).

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' motion.

/s/ C. Benjamin Cooper
C. Benjamin Cooper          (0093103)
    *Trial Attorney*
Kaela King                  (0100098)
COOPER ELLIOTT
305 West Nationwide Boulevard
Columbus, Ohio 43215
(614) 481-6000
(614) 481-6001 (fax)
benc@cooperelliott.com
kaelak@cooperelliott.com

Elisabeth C. Frost*
Jyoti Jasrasaria*
Melinda K. Johnson*
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: 202-968-4490
efrost@elias.law
jjasrasaria@elias.law
mjohnson@elias.law

*Attorneys for Plaintiffs*

*\* Admitted pro hac vice*

21

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 65.1(b), the undersigned hereby certifies that the foregoing Motion

for Preliminary Injunction was filed electronically, and a courtesy copy served electronically on

the following counsel, this 28th day of June, 2024:

> Julie M. Pfeiffer, Esq.
> Section Chief
> Constitutional Offices Section
> Ohio Attorney General
> 30 East Broad Street, 14th Floor
> Columbus, Ohio 43215
> Julie.pfeifer@ohioago.gov

> /s/ C. Benjamin Cooper