# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| OPAWL – BUILDING AAPI FEMINIST LEADERSHIP, NORTHEAST OHIO COALITION FOR THE HOMELESS, ELISA BREDENDIEK, PETER QUILLIGAN, and JOHN GERRATH,<br><br>    Plaintiffs,<br><br>  v.<br><br>DAVE YOST, in his official capacity as Ohio Attorney General, and FRANK LAROSE, in his official capacity as Ohio Secretary of State,<br><br>    Defendants. | Case No. 2:24-cv-3495<br><br>Judge Michael H. Watson<br><br>Magistrate Judge Kimberly A. Jolson |

## DECLARATION OF CHRIS KNESTRICK

I, Chris Knestrick, in accordance with 28 U.S.C. § 1746, declare the following:

1. I am over the age of 18. I am competent to make this sworn declaration. The following is based on my personal knowledge.

2. I am the Executive Director of the Northeast Ohio Coalition for the Homeless ("NEOCH"), a 501(c)(3) nonprofit charitable organization operating in the City of Cleveland. I have 20 years of experience working on issues related to homelessness in the Cleveland area.

3. NEOCH's mission is to eliminate the root causes of homelessness while loving our diverse community through organizing, advocacy, education, and street outreach. In support of our mission, NEOCH advocates on behalf of and side by side with people experiencing homelessness, including by providing direct services and expending resources to engaged in nonpartisan advocacy for or against policies that impact the unhoused community in Ohio.

1

4. Some of the policies that NEOCH advocates for or against include Ohio ballot issues that stand to impact our mission or the communities that we serve. For example, in 2019 NEOCH participated in a ballot to make housing lead safe and in 2023, NEOCH made monetary contributions to local ballot initiatives for participatory budgeting.

5. NEOCH also engages in educational campaigns, in which NEOCH's staff and volunteers speak with our community members about how ballot issues on the state and local level, and other policies, will affect their daily lives. In doing so, NEOCH may be seen as advocating for or against certain ballot issues through those programs and efforts.

6. NEOCH and our advocacy efforts are funded through a combination of grants and individual donations.

7. I am deeply concerned about the provisions in HB 1 that, read together, broadly prohibit anyone, including specifically continuing associations like NEOCH, from being able to "solicit, accept, or receive any funds from a foreign national" or "[m]ake a contribution, expenditure, or independent expenditure using any funds the person knows were received from a foreign national" for the following purposes: "mak[ing] a contribution, expenditure, or independent expenditure in support of or opposition to a statewide ballot issue or question, regardless of whether the ballot issue has yet been certified to appear on the ballot" or "[m]ak[ing] a contribution to . . . any committee created to support or oppose a ballot issue or question, or, to the maximum extent permitted by law and by the constitutions of the United States and of this state, to a continuing association." H.B. 1, 135th Gen. Assemb., Spec. Sess. § 3517.121(B), (C) (Ohio 2024). It also prohibits NEOCH from "knowingly aid[ing] or facilitate[ing] a violation of" HB 1. *Id.* § 3517.121(D).

2

8. This language would appear to prohibit NEOCH from receiving or using funds from any noncitizen that we then might use to make contributions to ballot issue committees or even to support our educational campaigns, which involve some discussion and advocacy around statewide ballot issues—even those that have not yet been certified for the ballot. Exactly what HB 1 means to cover with these sections is far from clear. In (B)(2), refers specifically to "statewide ballot issue[s] or question[s]" in broadly prohibiting "contribution[s], expenditure[s], or independent expenditure[s]," but then in (B)(4) it separately prohibits "contributions" to "any committee created to support or oppose a ballot issue or question." Thus, (B)(4) would on its face prohibit use from using funds received from a noncitizen to contribute to committees organizing local ballot initiatives like the ones we contributed to in 2023.

9. Although I have no reason to believe that we receive any significant contributions from noncitizens, I am aware of noncitizens who have made contributions to NEOCH in the past, just as a result of knowing them personally. That said, we have no process for tracking or asking about the citizenship status of our donors, nor do we ask our grant funders to track the citizenship status of their own contributors. And we have no system to segregate funds received from noncitizens.

10. Undertaking these new processes and systems would be incredibly burdensome to NEOCH. To even be able to segregate funds, we would need to—for the first time—solicit information on citizenship status from any contributors to our organization. That would require creating questionnaires or otherwise paying for background checks to verify citizenship status information. We would also need to set up new bank accounts or otherwise pay for professional accounting services to keep the money entirely separate, and we would need to implement new tracking systems to allow us to monitor exactly what ends up in each account and which accounts

3

we're using for any activities that could be related to ballot issue advocacy. Relatedly, we would need to be careful to avoid transferring funds between our own accounts because of HB 1's prohibitions on "indirect" as well as "direct" spending. *Id*. § 3517.121(B), (C).

11. Setting up new systems for soliciting citizenship information and keeping separate accounts would pull resources such as staff time away from our core work, including our education campaigns and our direct services to people experiencing homelessness.

12. Probing into citizenship status of individuals who want to support our work would foster distrust within our community. We operate our organization to be welcoming to all, and suddenly monitoring citizenship status could itself result in a loss of resources, including volunteer time and funding, and make a wide variety of individuals unwilling to associate with us.

13. If we decide that it is too burdensome to segregate funds and instead request that noncitizens not participate in NEOCH financially or otherwise, we will not only lose members of our community and the financial support they provide, but also operate counter to our own mission: to welcome all.

14. In addition to the terms mentioned above, I find other terms in HB 1 unclear and confusing and am not sure what they prohibit or what NEOCH would have to do to avoid violating them. For example, I am not sure what it means to "knowingly" "directly or indirectly through any other person or entity" accept or expend funds from a foreign national "to support or oppose a ballot issue or question," *id.* § 3517.121(B)(4), (C)(1)-(2), and how far back we need to monitor a funding trail.

15. HB 1 is also unclear about what NEOCH may do with funds already received from individuals whose citizenship status is unknown to the organization. I have no way to know

4

whether any funds previously received from a noncitizen, or someone whose citizenship status I do not know, must now also be segregated to avoid serious penalties.

16. We cannot risk tens of thousands of dollars in civil penalties that would defund key parts of our operations, and I do not want to put myself or any of my staff at risk of criminal prosecution. Because the law is written in such broad and sweeping terms, NEOCH and our staff and volunteers will need to err on the side of caution to avoid potential liability. The clearest way to do that will be to cease entirely, scale back, or reorient our ballot-issue advocacy activities, and we are still considering which of these bad options is best for our organization.

17. HB 1 severely frustrates NEOCH's mission to promote policies that directly affect the communities we serve, in particular our core constituency of people experiencing homelessness. Participating in debates surrounding ballot issues and questions is an important way that NEOCH elevates the voices of unhoused individuals and the matters most important to them and furthers its mission. These voices are already underrepresented, and HB 1 will only make it worse by forcing NEOCH to stop engaging in ballot issue advocacy to avoid overhauling our financial structures with new onerous funding segregation and invasive questioning of funders.

18. Unless it is enjoined, HB 1 will directly impact how NEOCH operates in advocating for ballot issues and questions and how we spend and monitor our funding. We are still evaluating whether it is feasible for us to make changes to our ballot issue operations in order to comply with the law. If HB 1 goes into effect, at the very least, we will need to cease ballot issue-related activities while we complete our evaluation. We may ultimately conclude not to engage in ballot issue advocacy at all. The result will be increased silencing of NEOCH and the unhoused communities we represent in important debates over public policies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  6/27/2024

*Chris Knestrick* (signature)

Chris Knestrick