# Declaration of Brian Katz

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OPAWL – BUILDING AAPI FEMINIST LEADERSHIP, et al., | : : : | |
| Plaintiffs, | : : | |
| v. | : : : | CASE NO. 2:24-cv-3495 |
| | : : | JUDGE WATSON |
| DAVE YOST, et al., | : : | |
| Defendants. | : | |

## DECLARATION OF BRIAN KATZ

I, Brian Katz, hereby state that I am over the age of eighteen years and am competent to testify to the following on the basis of personal, firsthand knowledge:

1. I currently serve as the Director of the Public Integrity Division of the Ohio Secretary of State's Office. I have served in this position since October 2022. I previously served as the Director of Campaign Finance beginning in January 2019.

2. In my capacity as Director of the Public Integrity Division, I lead the office's Campaign Finance Unit, Safe at Home Unit, Election Integrity Unit, National Voter Registration Act efforts, and Board of Voting Machine Examiners administration.

3. Both Ohio and federal law have imposed accounting requirements on corporations wishing to engage in political advocacy since before the passage of HB 1.

4. For instance, Ohio law has long prohibited corporations (including nonprofit corporations) from directly making contributions to any candidate, political action committee, and certain political party funds. R.C. 3599.03(A)(1). Corporations are permitted, however, to establish, administer, and solicit contributions to a separate segregated fund ("SSF") or political action committee ("PAC") of the corporation for Ohio state and local elections, or for both federal elections and Ohio state or local elections. R.C. 3517.082. The former is known as an Ohio corporate PAC, and the latter as a combined federal, state, and local PAC ("FSL PAC"). Ohio Adm. Code 111:2-3-01.

5. When a PAC is sponsored by a corporation, the corporation's name must be in the name of the PAC. Ohio Adm. Code 111:2-1-04. Prior to receiving a contribution or making an expenditure, an Ohio corporate PAC must appoint a treasurer and file a "Designation of Treasurer" form which includes the full name and address of the treasurer. R.C. 3517.10; Ohio Adm. Code 111:2-3-03. An Ohio corporate PAC must provide the name of its sponsoring corporation on its "Designation of Treasurer" form as well as on all finance reports filed pursuant to sections 3517.10 and 3517.105 of the Revised Code.

6. Because they are prohibited from making direct contributions, corporations participating in the foregoing system must keep corporate funds and contributions to SSFs and PACs separate. Corporations may directly pay the establishment, administrative, and solicitation expenses of its Ohio corporate PAC, or it may transfer funds to an administrative account of the PAC, or both—but funds in the administrative account may not be commingled with funds in the PAC. Ohio Adm. Code 111:2-3-05(A).

7. Corporations are further required to report to their SSF or PAC certain costs expended by the corporation which are associated with establishing, administering, and soliciting contributions to their SSF or PAC. R.C. 3517.082(C). The SSF or PAC must itemize those costs and file them with the Secretary of State as part of the statements of contributions and expenditures required by Ohio and federal law. *Id.*; R.C. 3517.10(A).

8. Restrictions on election spending by foreign nationals are also not new to HB 1.

9. Prior to its passage, Ohio law already prohibited foreign nationals from directly or indirectly making contributions, expenditures, or independent expenditures, in support of or opposition to a candidate for any elective office. R.C. 3517.13(W)(1). Foreign nationals were also prohibited from expressly or implicitly promising to make such contributions or expenditures. *Id.* Likewise, candidates and their campaign committees, political action committees, and separate segregated funds were concurrently prohibited from soliciting or accepting contributions or expenditures from foreign nationals. R.C. 3517.13(W)(2).

10. The foregoing prohibition on foreign-national spending under Ohio law mirrored that of the Federal Election Campaign Act ("FECA"), which also prohibits foreign nationals, directly or through any other person, from making contributions or express or implied promises to make contributions in connection with an election to any political office in Ohio or in connection with any primary election held to select candidates. 2 U.S.C. 441e(a). It similarly prohibited any person from soliciting, accepting, or receiving any such contribution from a foreign national. *Id.*

11. Thus, before the passage of HB 1, Ohio and federal law required corporations to implement accounting systems to ensure compliance with state and federal restrictions on corporate political advocacy in the context of elections for federal, state, and local office. Corporations were and are prohibited from making direct contributions of corporate funds in that context, but could spend corporate funds on establishing, administering, or soliciting contributions to their SSF or PAC—provided those funds are kept separate and accounted for.

2

12. Corporate contributions and expenditures in support of or in opposition to ballot issues are treated differently than those in support of or in opposition to candidates. Neither Ohio nor federal law prohibits a corporation from making direct contributions or expenditures in support of or in opposition to a ballot issue.

13. However, following the passage of HB 1, a corporation may not receive or accept funds from a foreign national for the purpose of making a contribution or expenditure in support of or in opposition to a ballot issue. R.C. 3517.121(C)(1). Nor may it make a contribution or expenditure for that purpose using funds it knows were received from a foreign national. R.C. 3517.121(C)(2).

14. In effect, the foregoing prohibitions set forth in HB 1 act to implement accounting requirements for corporations who wish to engage in political spending on ballot issues. A corporation remains free to make direct contributions or expenditures in support of or in opposition to ballot issues. But if it knowingly receives funds from a foreign national it must separate them from funds it wishes to use on ballot-issue spending to ensure compliance with HB 1.

15. This new requirement is similar to the pre-HB 1 accounting requirements with respect to SSFs, Ohio corporate PACs, and FSL PACs formed in support of or in opposition to a candidate for elective office. Just as corporations may not commingle corporate funds with the funds of a corporate PAC seeking to make candidate contributions, HB 1 prevents corporations from commingling funds received from foreign nationals with corporate funds intended for ballot-issue spending. HB 1 does not introduce any new concepts, but rather applies a ban on commingling funds in a new context.

16. HB 1 is necessary to prevent foreign influence over Ohio's political processes by limiting the participation of foreign citizens in a quintessential activity of American democratic self-government: Ohio's citizen initiative process. Ohio's 2023 August special and November general elections supplies a case study to help illustrate why.

17. The 2023 August special election had a statewide issue: Elevating the Standards to Qualify for an Initiated Constitutional Amendment (Issue 1). In total, more than $79,000,000.00 in spending supporting and opposing Issue 1 was reported to the Ohio Secretary of State.

18. Leading up to the 2023 August special election, media reports began expressing concerns regarding foreign spending aiming to influence Issue 1.

19. Two statewide issues were on the ballot in the 2023 general election: A Self-Executing Amendment Relating to Abortion and Other Reproductive Decisions (Issue 1) and To Commercialize, Regulate, Legalize, and Tax the Adult Use of Cannabis (Issue 2). In total, more than $120,000,000.00 in spending supporting and opposing Issues 1 and 2 was reported to the Ohio Secretary of State.

20. Following the 2023 general election, media outlets reported an influx of foreign spending

3

aimed at influencing the outcome of Issues 1 and 2. As reported by the Associated Press:

> "Nearly $11 million in donations favoring passage of Issue 1 rolled in during the final reporting period before the Nov. 7 election. That included $2.2 million from the Tides Foundation and an additional $1.65 million from the progressive Sixteen Thirty Fund, based in Washington, D.C., which had already given $5.3 million. The fund counts among its funders Hansjörg Wyss, a Swiss billionaire who has given the group more than $200 million since 2016."[1]

As reported by NBC News:

> "Yet the numbers, while large, may also show how money in politics has tightened up somewhat in the last few years after a period of rapid growth. Political nonprofits often see their spending jump significantly in election years, but Sixteen Thirty Fund's outlays in 2022 were similar to its levels in 2021.
>
> And the filing demonstrates how abortion rights moved to the center of politics — and political fundraising — in 2022, as the Supreme Court overturned Roe v. Wade and abortion became a state-by-state policy battle. Millions of dollars that the Sixteen Thirty Fund collected flowed into funding policy and political battles over abortion around the country, like successful ballot measure campaigns in Kansas and Michigan.
>
> The 2022 filing doesn't even include a more recent outlay: $12 million that the fund spent in Ohio this year, according to state campaign finance records there. That money helped finance twin ballot measure efforts, which culminated last week in passage of a state constitutional amendment guaranteeing abortion rights, superseding a legislative ban.
>
> . . .
>
> While the Sixteen Thirty Fund does not name its donors, filings in past years have detailed some of its biggest supporters prior to 2022. It has received tens of millions in past years from groups including the Open Society Policy Center, part of the nonprofit network funded by Democratic megadonor George Soros. Berger Action Fund, the nonprofit founded by the Swiss-born billionaire Hansjörg Wyss, has also given significant sums to Sixteen Thirty Fund in the past. (Berger Action Fund has previously said it does not allow its

---

[1] Ex. A, Julie Smyth & Samantha Hendrickson, *Ohio's 2023 abortion fight cost campaigns $70 million*, APNews.com, Dec. 15, 2023.

4

funds to be used on partisan political activity.)"[2]

21. Exhibits A and B are true and accurate copies of the news reports quoted in paragraph 19.

22. In December of 2023, such reports further drew the attention of the Office of the Ohio Secretary of State, which continued their ongoing investigation into the issue.

23. I led that investigation. I began the investigation by examining the campaign finance reports filed by the committees seeking to oppose Issues 1 in the 2023 August Special Election, in order to identify the entities making notable contributions. I identified Indivisible Project, National Redistricting Action Fund, and Sixteen Thirty Fund as having made contributions of more than $5,000,000.00 to the committee seeking to oppose Issue 1. I further identified Sixteen Thirty Fund as having made contributions exceeding $6,900,000.00 in support of Issue 1 and Issue 2 in the November General Election.

24. Due to gaps in the law before HB 1, organizations like Indivisible Project, National Redistricting Action Fund, and Sixteen Thirty Fund did not need to report the identity of their donors. This meant that organizations like Indivisible Project, National Redistricting Action Fund, and Sixteen Thirty Fund could receive money that originates from foreign nationals and funnel that money to petition committees seeking to pass certain ballot issues. Before HB 1, my Office had no reasonable way to detect—let alone prevent—organizations like Indivisible Project, National Redistricting Action Fund, and Sixteen Thirty Fund from receiving money originating from foreign nationals and contributing that money to petition committees.

25. Because of the publicity surrounding the statewide issues in 2023, various news outlets conducted investigations into the spending on those ballot issues. Our Office learned from news reporting that funds associated with foreign nationals, namely the Berger Action Fund, spent millions in support of these ballot issues. I next examined IRS filings by the Berger Action Fund. Those filings identified donations/grants in an amount exceeding $207,000,000.000 made to Indivisible Project, National Redistricting Action Fund, and Sixteen Thirty Fund between 2017 and 2021, the last year publicly available. Again, because Indivisible Project, National Redistricting Action Fund, and Sixteen Thirty Fund were not required to report the identity of their donors, my Office would not have been able to link the Berger Action Fund to Ohio's statewide issues without the news reporting.

26. Neither the Sixteen Thirty Fund nor the Berger Action Fund are required to publicly disclose their donors. While news media reporting suggests that foreign nationals provide them many millions in funding, my Office cannot detect or prevent foreign nationals from donating money to these funds that is then used to support or oppose ballot issues.

27. The foregoing illustrates the necessity of HB 1. The ease of creating layers of corporate entities which can take advantage of lax disclosure requirements facilitates an untraceable influx of foreign money meant to influence the outcome of American political processes—including the outcome of statewide issues on the Ohio ballot. Ohio has a compelling interest in excluding

---

[2] Ex. B, Scott Bland, *Left-leaning nonprofit poured $196 million of secret money into political world in 2022*, NBCNews.com, Nov. 15, 2023.

5

that foreign money from influencing its activities of democratic self-government. The opacity of campaign finance makes this a tall order.

28. HB 1 draws bright lines to prevent foreign-national participation in Ohio's democratic self-government processes. First, its definition of foreign national comprehensively applies to *all* non-citizens and is clear about its reach. Second, by mirroring federal prohibitions of both direct and indirect spending, HB 1 closes gaps in the law that permit the concealment of foreign national election spending via intermediaries. Third, under HB 1, foreign nationals can no longer surreptitiously influence the outcome of statewide ballot issues in Ohio by funneling contributions and expenditures through corporate entities. With HB 1 in place, foreign nationals fund Ohio elections at their own risk of prosecution—as do the entities knowingly accepting and spending foreign national funds. Ultimately, the law provides valuable deterrence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Brian Katz
Public Integrity Division Director
Office of the Ohio Secretary of State

Executed on 7/26/24 .

# JURAT CERTIFICATE

State of Ohio, County of __FRANKLIN__

Sworn to or affirmed and subscribed before me by __BRIAN KATZ__ (name of person making oath/affirmation) on this date of __7-26-24__ (date).

(Notary Seal)

_____
Signature of Notary Public – State of Ohio

My commission expires: __2-7-27__
                                       (date)

PETER GRAYBEAL
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES 2-7-27