**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| OPAWL – BUILDING AAPI FEMINIST LEADERSHIP et al., <br><br> Plaintiffs, <br><br> v. <br><br> DAVE YOST, in his official capacity as Ohio Attorney General et al., <br><br> Defendants. | Case No. 2:24-cv-3495 <br><br> Judge Michael H. Watson <br><br> Magistrate Judge Kimberly A. Jolson |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION**
**FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION. ..................................................................................................................... 1

ARGUMENT. ........................................................................................................................... 1

I.  HB 1 unconstitutionally infringes on core protected political speech. .................................. 1

    A.  HB 1 abridges expression protected by the First Amendment. ...................................... 1

        1.  No case law supports Defendants' position ................................................................ 2

        2.  Defendants' arguments ignore HB 1's actual text and impact. ............................... 5

    B.  HB 1 does not further a legitimate—much less a compelling—state interest................ 6

    C.  HB 1 is not narrowly tailored. ........................................................................ 9

II.  HB 1 violates Plaintiffs' freedom of association. ................................................................. 11

III. HB 1 is overbroad. ................................................................................................................ 12

IV.  HB 1 is vague. ...................................................................................................................... 14

V.  HB 1 violates the Equal Protection Clause. ......................................................................... 16

VI.  The remaining preliminary injunction factors weigh in Plaintiffs' favor. ........................... 17

    A.  Plaintiffs will suffer irreparable harm without an injunction. ..................................... 17

    B.  The equities and public interest favor injunctive relief. ............................................... 19

VII. The scope of Plaintiffs' requested relief is appropriate. ...................................................... 20

CONCLUSION........................................................................................................................ 20

## INTRODUCTION

Defendants do not dispute that ballot issue-related spending is core political speech. Their defense boils down to the extraordinary claim that the Constitution allows a state to prohibit *all* noncitizens from engaging in *any* type of political speech that is related to elections. To make this argument, Defendants ignore decades of precedent and misconstrue the very authority upon which they rely. They also ignore the actual text and impact of HB 1, which not only prohibits noncitizens from engaging in core protected speech (itself unconstitutional), but also abridges the speech rights of *citizens* (a result even Defendants seem to agree would be unconstitutional). Finally, Defendants do not deny—and make no attempt to defend—the broad chilling effect that will follow from HB 1's extraordinary enforcement provisions, which *require* the Attorney General to investigate *any* allegation of a violation made by *any* Ohio elector. There are no standards to restrain this inquiry— no probable cause requirement or threshold showing of wrongdoing that must be met—before the criminal investigatory powers of the state are unleashed against the accused based on nothing more than the accuser's *ipse dixit*. That threat of investigation alone will chill the exercise of First Amendment-protected activity—a constitutional injury in its own right. And the breadth and vagueness of HB 1's provisions only exacerbate the problem. The Court should grant the motion and enjoin Defendants from enforcing HB 1 before its effective date of September 1, 2024.

## ARGUMENT

### I.  HB 1 unconstitutionally infringes on core protected political speech.

#### A.  HB 1 abridges expression protected by the First Amendment.

Defendants acknowledge the "rich tradition of federal courts recognizing that **spending money on ballot issues *is* core political speech**." PI Opp., ECF No. 29 at PageID 1064 (emphases added); *see also id.* at PageID 1063–64 (acknowledging First Amendment right to participate in public debate extends to ballot-issue spending). Defendants also concede that noncitizens in the

U.S. "enjoy some limited constitutional rights," *id.* at PageID 1060, including "many First Amendment protections," *id.* at PageID 1064, as do citizens married to noncitizens and domestic organizations and corporations, *id.* at PageID 1060. But then Defendants declare that HB 1 does not even *implicate* the First Amendment based on their claim that there is an exception for laws that "exclud[e] non-citizens from" any "activities associated with democratic government," *id.* at PageID 1062, including pure issue-related speech in ballot issue elections. No authority supports this breathtaking assertion; and the decision that Defendants rely on contradicts it.

### 1. No case law supports Defendants' position.

The first question the Court must ask in evaluating Plaintiffs' speech claim is whether HB 1 "abridges expression that the First Amendment was meant to protect." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 775–76 (1978). Defendants do not dispute that noncitizens have at least some First Amendment rights. PI Opp., ECF No. 29 at PageID 1064 (citing *Bridges v. Wixon*, 326 U.S. 135, 148 (1945)). They contend, however, that under *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011), the government may ban any political spending by all noncitizens. Not so.

*Bluman* was a challenge to a federal law strikingly different than HB 1. 2 U.S.C. § 441e(a)[1] prohibits "foreign nationals—that is, all foreign citizens *except those who have been admitted as lawful permanent residents ['LPRs'] of the United States*" from (1) "contributing to candidates or political parties," (2) "making expenditures to expressly advocate the election or defeat of a [] candidate," and (3) "making donations to outside groups when those donations in turn would be used to make contributions to candidates or parties or to finance express-advocacy expenditures." *Bluman*, 800 F. Supp. at 284 (emphasis added). For years, Congress had prohibited direct contributions to candidates by foreign nationals (except LPRs); § 441e(a) expanded those

---

[1] 2 U.S.C. § 441e has been transferred to 52 U.S.C. § 30121. Plaintiffs use its original citation here.

restrictions to political party contributions out of concern that such contributions could similarly "buy access to American political officials." *Id.* at 283. Defendants focus on language in *Bluman* describing a state interest in preventing "foreign influence over" U.S. elections, *see, e.g.*, PI Opp., ECF No. 29 at PageID 1062, but as *Bluman* makes clear, what it means more precisely is an interest in preventing foreign influence over *political officials*. This is made evident in several ways.

*First*, *Bluman* interprets § 441e(a) to reach *only* candidate- and political party-related spending—*not* issue spending. 800 F. Supp. 2d at 290 ("Notably, § 441e(a) as we interpret it . . . does not restrain foreign nationals from speaking out about issues or spending money to advocate their views about issues. It restrains them only from . . . providing money for a candidate or political party or spending money in order to expressly advocate for or against the election of a candidate."). This construction is not obvious from § 441e(a)'s text, which prohibits, *inter alia*, "'a contribution or donation of money . . . or to make an express or implied promise to make a contribution or donation, *in connection with a Federal, State, or local election*.'" *Id.* at 284 (quoting 2 U.S.C. § 441e(a)) (emphasis added). But, in line with Supreme Court precedent, *see* PI Mot., ECF No. 16 at PageID 83–87, *Bluman* interprets the language narrowly.

*Next*, *Bluman* stressed "three important limits" to its holding. 800 F. Supp. 2d at 292. First, it was *not* deciding "whether Congress could constitutionally extend" § 441e(a)'s candidate-related spending ban *to LPRs*, noting they "have a more significant attachment to" the U.S., and "[a]ny such extension would raise substantial questions not raised" in *Bluman*. *Id.* **HB 1, of course, reaches LPRs.** The court also stressed that it interpreted § 441e(a) to require the government to have proof that a violator is *aware* of the law's prohibitions to seek criminal penalties. *Id.* **HB 1 has no such heightened** mens rea **requirement in division B.** Finally, the court stressed it was *not* deciding "whether Congress could prohibit foreign nationals" of *any* classification "from engaging

in speech other than" the specific candidate and party spending prohibited by § 441e(a). *Id.* In particular, it was *not* deciding whether Congress could impose *any* restrictions on noncitizens engaging in "issue advocacy and speaking out on issues of public policy," warning its holding "should not be read to support such bans." *Id.* **HB 1 targets exactly this type of speech.**

Defendants read all of this out of *Bluman* in order to claim that one of its "central holdings is that non-citizens do not enjoy a First Amendment right to participate in the processes of democratic self-government." PI Opp., ECF No. 29 at PageID 1062. Defendants claim this means that states may freely restrict noncitizens from participating in "American self-government" writ large, a bucket they conclude must include ballot issue-related spending. *Id.* And they further claim that states may ban ballot issue-related spending "directly or indirectly" by noncitizens, pointing to language in *Bluman* allowing regulation of spending "directly targeted at influencing the outcome of an election," *id.* at PageID 1063 (quoting *Bluman*, 800 F. Supp. 2d at 289). Not only do these arguments ignore *Bluman*'s expressly stated limitations, they evidence Defendants' misunderstanding of decades of First Amendment jurisprudence. Defendants seem entirely unaware that, in *Buckley v. Valeo*, the Supreme Court concluded that the phrase "for the purpose of influencing an election" in the political spending context could *only* be constitutional if it was narrowly construed to mean *candidate*-related spending, holding that taking a broader view would have the impermissible "potential for encompassing both issue discussion and advocacy of a political result." 424 U.S. 1, 78–80 (1976) (cleaned up).

The only other citations Defendants offer to support their argument are a handful of equal protection cases challenging laws excluding noncitizens from very specific types of government employment. *See* PI Opp., ECF No. 29, PageID 1062–63 (citing *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982), *Sugarman v. Dougall*, 413 U.S. 634 (1973), *Foley v. Connelie*, 435 U.S. 291 (1978),

and *Ambach v. Norwick*, 441 U.S. 68 (1979)). These cases involve a "narrow exception" to the general rule that citizenship classifications are subject to strict scrutiny, applicable when a law restricts noncitizen employment for government "officers who 'participate directly in the formulation, execution, or review of broad public policy' and hence 'perform functions that go to the heart of representative government.'" *Bernal v. Fainter*, 467 U.S. 216, 220, 222 (1984) (quoting *Sugarman*, 413 U.S. at 647). None held that the government could restrict noncitizens from speaking freely about their views on *citizen*-initiated policy, or even involved political spending claims. They are simply inapposite.

### 2. Defendants' arguments ignore HB 1's actual text and impact.

Defendants' arguments are also divorced from the text—and predictable impact—of HB 1 itself. Most notably, Defendants ignore that HB 1 restricts the speech of U.S. citizens who share finances with noncitizen family members (like Plaintiff Quilligan), domestic entities (like OPAWL and NEOCH), and domestic corporations that have any noncitizen ownership or involvement in their decision-making related to political spending. Indeed, as Plaintiffs point out in their motion, HB 1 is so broad that it would reach even a college student who spends gift money from their noncitizen grandfather on issue advocacy. *See* PI Mot., ECF No. 16 at PageID 89; PI Ex. L, ECF No. 16-7 at PageID 893–94. Defendants do not dispute this. In fact, they concede that HB 1 prohibits *any* noncitizen "from making ballot-issue spending through the decision-making process of a corporation." PI Opp., ECF No. 29 at PageID 1073.[2] Defendants also do not dispute that, by its terms, HB 1 is a content-based restriction—another independent basis for applying strict

---

[2] Defendants attempt to claim this mirrors federal law, *see* PI Opp., ECF No. 29 at PageID 1073, but they overread federal campaign finance restrictions on "foreign nationals" participating in "decision-making" related to "election-related activities." *See id.* (quoting 11 C.F.R. § 110.20). Indeed, elsewhere they concede that federal law defines "foreign nationals" to *exclude* LPRs, *id.* at PageID 1061, and that it "does not regulate state ballot-issue elections." *Id.* at PageID 1069.

scrutiny. *See* PI Mot., ECF No. 16 at PageID 89–90. Under any possible approach, HB 1 implicates core First Amendment speech and is subject to strict scrutiny.

**B.      HB 1 does not further a legitimate—much less a compelling—state interest.**

Defendants hang their defense of HB 1 on their theory that the state may broadly ban any type of election-related spending by noncitizens to further an "interest in preventing foreign citizens from participating in American self-government," PI Opp., ECF No. 29 at PageID 1067, but that argument relies on their misreading of *Bluman*, which expressly disowns its application to laws that reach LPRs or implicate issue advocacy. *See supra* Section I.A.1.

On issue advocacy specifically, *Bluman* cited to the Supreme Court's holding in *Bellotti*, which recognized that "speak[ing] on issues of general public interest" in issue elections is a "quite different context" than candidate elections. 800 F. Supp. 2d at 290 (citing *Bellotti*, 435 U.S. at 787 n.26). As *Bellotti* explains, they are different because "[t]he risk of corruption perceived in cases involving candidate elections *simply is not present* in a popular vote on a public issue." 435 U.S. at 790 (emphasis added). This is important because, for decades, the Supreme Court has found only one "*single narrow exception* to the rule that limits on political activity [are] contrary to the First Amendment": avoiding the risk of corruption when a candidate is beholden to donors. *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 296–97 (1981). But in ballot issue elections, any speech in favor or against the issue is just more speech. There is no risk that it will alter the *issue* citizens will vote on, and no one is arguing voters are being bribed to vote a certain way; the only "influence" the speech could have is persuasion. But "the fact that advocacy may persuade the electorate is hardly a reason to suppress it." *Bellotti*, 435 U.S. at 790. And the Supreme Court has found that "the direct participation of the people in" an issue-election "*increases the need for the widest possible dissemination of information from diverse and antagonistic sources*." *Id.* at 790 n.29 (emphasis added) (cleaned up).

Against this backdrop, both the Supreme Court and the Sixth Circuit have held that *there is no significant or even legitimate state interest that can justify curtailing speech on direct democracy measures*. *See Citizens Against Rent Control*, 454 U.S. at 299 ("[T]here is no significant state or public interest in curtailing debate and discussion of a ballot measure."); *Michigan State Chamber of Com. v. Austin*, 832 F.2d 947, 949–50 (6th Cir. 1987) (emphasizing the risk of *quid pro quo* corruption is the *only* interest that can justify political spending restrictions and rejecting other interests for corporate ballot issue spending ban as not "legitimate"). Defendants ask this Court to ignore all of this authority to conclude that the Supreme Court silently blessed broad restrictions on any type of election-related political speech by any noncitizen by summarily affirming a decision that expressly caveated that it was holding no such thing. *But see Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182 (1979) ("[T]he precedential effect of a summary affirmance can extend no farther *than the precise issues presented and necessarily decided by those actions*." (emphasis added)). The Court should reject this entirely unwarranted invitation.[3]

Defendants accuse Plaintiffs of attempting to "purposefully misconstrue" the state's interests in HB 1, PI Opp., ECF No. 29 at PageID 1067, but it is Defendants who largely ignore what the General Assembly said about the state's interests in HB 1. In identifying the state interests addressed in their motion, Plaintiffs cited to specific statements in the legislative record, straight

---

[3] *Bluman*'s note that the restrictions challenged in 2 U.S.C. § 441e(a) were not supported by the "anti-corruption interest" that animates the Supreme Court's campaign finance precedent is consistent with it. *See Bluman*, 800 F. Supp. 2d at 288 n.3. Section 441e(a) is already limited in its reach to only candidate and party spending; the court simply found that Congress could prohibit spending in that very narrow context by non-LPR foreign nationals because of a heightened concern about foreign influence over *U.S. politicians*. But as its own express caveats make clear, *Bluman* is not properly read to find that Congress—or the states—may broadly regulate noncitizen spending related to elections in general, outside of the narrow space where it has the potential to influence current or future government officials.

from the mouths of legislators who supported HB 1. That record shows that proponents claimed HB 1: (1) would make Ohio law consistent with federal law's foreign spending restrictions, (2) was intended to prevent foreign billionaires from interfering in Ohio's elections, and (3) imposed large penalties designed to deter would-be violators. PI Mot., ECF No. 16 at PageID 87 (citing PI Ex. I, ECF No. 16-7 at PageID 669; PI Ex. M, ECF No. 16-7 at PageID 953–59, 989–93). Defendants make no effort to defend *any* of these interests, and in fact at times make concessions directly at odds with them.

For example, while HB 1's proponents claimed that it would bring Ohio law in line with federal law, Defendants concede that HB 1 "extends further than federal law." PI Opp., ECF No. 29 at PageID 1068. Now, Defendants claim that the General Assembly intended to broadly curb *any* "foreign interests from interfering in Ohio campaigns." *Id.* at PageID 1067. This assertion contradicts contemporaneous statements from HB 1's proponents, who repeatedly rejected claims that the law was intended to reach small dollar spending. *See, e.g.*, PI Ex. I, ECF No. 16-7 at PageID 702 (when Rep. Isaacsohn asked whether HB 1 would apply to a foreign student who spent ten dollars on a poster to demonstrate in favor of a ballot issue, sponsor Rep. Seitz claimed he was "going down a rat hole that is not there"); PI Ex. M, ECF No. 16-7 at PageID 955 (Senator McColley said HB 1 was meant to target "international white-collar scheme[s]" and multi-million-dollar donations); Karen Kasler, *Ban on Ohio ballot campaigns needed, says DeWine, who anticipated lawsuit*, Statehouse News Bureau (June 4, 2024) (reporting Gov. DeWine stated about HB 1, "I don't think anybody is worried about the average green card holder. But we are worried about somebody who's got enough money to tilt the scales in an election in the state of Ohio and who can't vote").[4] It is doubtful that Defendants can properly create a new interest in litigation,

---

[4] Available at perma.cc/U5SG-PVYY.

see, e.g., *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("[J]ustification[s] must be genuine, not hypothesized or invented post hoc in response to litigation"), but in any event, neither Defendants' "participation in self-government" rationale nor those offered in the legislative record are compelling or even legitimate under longstanding First Amendment precedent.[5]

Finally, at no point have Defendants tried to explain how a state could have even a *legitimate* interest in criminalizing the participation of a broad swath of voices in ballot issue conversations. Such a finding would run contrary to the First Amendment's basic tenets, which favor *more* speech, not less, and trust the "people in our democracy . . . with the responsibility for judging and evaluating the relative merits of conflicting arguments." *Bellotti*, 435 U.S. at 791.[6] A restriction "so destructive of the right of public discussion" as HB 1, "without greater or more imminent danger to the public interest" than has been articulated by the General Assembly or Defendants, is simply "incompatible with the freedoms of the First Amendment." *Id.* at 792.

### C.    HB 1 is not narrowly tailored.

Defendants' tailoring arguments fare no better. In arguing that HB 1 is better tailored than federal law because it extends to LPRs, Defendants are at odds with their otherwise favorite decision. *Bluman* recognized that LPRs "stand in a different relationship to the American political community than other foreign citizens do" due to their "long-term stake in the flourishing of American society" 800 F. Supp. 2d at 290–91. The court found that LPRs "share important rights and obligations with citizens" and that the "carve-out for" LPRs in § 441e(a) made that statute

---

[5] The only other interest Defendants seemingly offer is a concern about "dark money" and donor disclosure. *See* PI Opp., ECF No. 29 at PageID 1066–67. But once again, this is not what HB 1 does. *See* PI Ex. J., ECF No. 16-7 at PageID 913 (Rep. Sweeney). This is both an example of the state's pretextual justifications and of the law's terrible tailoring.

[6] *Bellotti* also implicitly rejects Defendants' insinuation that because noncitizens cannot vote on ballot issues, they may be barred from speaking about them. *See* 435 U.S. at 777, 790. The same was of course true of the corporations whose speech was at issue there. *See id*. at 795.

"*more narrowly tailored* to the precise interest that it is designed to serve." *Id.* at 291. Defendants'
attempt to argue the opposite while relying on *Bluman* in other ways is absurd on its face.

Defendants next claim that including LPRs makes HB 1 better tailored to their purported
interests because all types of noncitizens "are regularly excluded from processes of democratic
self-government." PI Opp., ECF No. 29 at PageID 1068. This is a restatement of their argument
that the government has a compelling interest in excluding noncitizens from anything that
Defendants can conceivably shove under the umbrella of "democratic self-government" (as
Defendants misunderstand that term from *Bluman*); *see supra* Section I.A.1. But Defendants'
analogies to other areas in which the government may permissibly exclude noncitizens only
underscore their dissimilarity from HB 1's prohibitions. Unlike the examples Defendants offer—
jury service, voting, and holding federal office—ballot issue spending is much more akin to
attending a protest, writing an op-ed, or posting on social media. In other words, pure issue-related
speech.

It should also be obvious that HB 1 is not narrowly tailored to advance Ohio's purported
interest in excluding noncitizens from "democratic self-government" (even under Defendants'
expansive definition of the term), because HB 1 implicates speech by citizens and domestic
entities, too. Defendants concede that "the State must narrowly tailor any restriction on citizens
spending money to support or oppose ballot issues," PI. Opp, ECF No. 29 at PageID 1064. Yet at
no point do Defendants deny that HB 1's plain language reaches spending even by citizens.

Plaintiffs are not aware of any other state that has restricted noncitizen speech so broadly,
and it appears neither are Defendants or Proposed Amici. Indeed, Proposed Amici Americans for
Public Trust and Honest Elections Project expressly acknowledge that "Ohio has undeniably gone
farther than any other individual State in pursuit of [its] goal." Proposed Amici Br., ECF No. 30-1

at PageID 1110. And they support this statement with several examples of other states' laws that are meaningfully different from HB 1—notably, none regulates ballot issue-related spending by noncitizens permanently residing in the United States. *See id.* at PageID 1111.[7]

## II.     HB 1 violates Plaintiffs' freedom of association.

As for Plaintiffs' freedom of association claim, Defendants are wrong to argue that it "rises and falls with" the freedom-of-expression claim. PI Opp., ECF No. 29 at PageID 1070. True, the two "overlap and blend" in the political spending context, *Citizens Against Rent Control*, 454 U.S. at 300, but as Defendants concede, the associational claim is evaluated under the three-part inquiry articulated in *Lichtenstein v. Hargett,* 83 F.4th 575 (6th Cir. 2023), which Plaintiffs satisfy in full.

*First*, Defendants do not dispute that Plaintiffs meet the first part of the *Lichtenstein* inquiry, which asks whether the First Amendment applies to the group or individual who claims harm to their associational rights because it or they engage in speech. *Id.* at 602.

*Second*, the Court must evaluate whether HB 1 significantly burdens Plaintiffs' ability to express their message. *Id.* The answer is obviously yes, for reasons already discussed. Defendants suggest that Plaintiffs' argument that "the government is . . . *not allowing* Plaintiffs to continue associating with those with whom it wants to associate . . . limiting organizational and individual Plaintiffs from expressing their messages," PI Mot., ECF No. 16 at PageID 91, is insufficient because Plaintiffs must show that the law "directly or indirectly affect[s] group membership." PI

---

[7] The only one of these laws that has been challenged in court and upheld did not apply to LPRs. *OneAmerica Votes v. State*, 23 Wash. App. 2d 951, 959, 518 P.3d 230, 237 n.8 (2022) (citing RCW 42.17A.005(24)). And to the extent that intermediate state court opined on constitutional protections for ballot issue spending more broadly, it has no precedential value here. On the other hand, federal courts have enjoined laws restricting even foreign-influenced *campaign*-related spending. *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, No. 1:23-cv-00450-NT, 2024 WL 866367, at *11 (D. Me. Feb. 29, 2024); *Minn. Chamber of Com. v. Choi*, No. 23-CV-2015 (ECT/JFD), 2023 WL 8803357, at *4 (D. Minn. Dec. 20, 2023).

Opp., ECF No. 29 at PageID 1070. This assertion is simply wrong. The Supreme Court has recognized that restricting an avenue of a group's expression *is* unconstitutional interference with association. *See NAACP v. Claiborne Hardware* Co., 458 U.S. 886, 911 (1982) (holding restriction on boycotts unconstitutionally interfered with associational rights). And Plaintiffs' representation about the ways in which HB 1 burdens their ability to express their message, PI Mot., ECF No. 16 at PageID 91, is not disputed and must be credited. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000) ("[W]e must . . . give deference to an association's view of what would impair its expression."). That said, Organizational Plaintiffs satisfy even Defendants' narrow "membership" test: they will lose members, volunteers, and donors if, under HB 1, they must monitor the citizenship status of those associated with their organizations. Hilario Decl., ECF No. 16-1 at PageID 106; Knestrick Decl., ECF No. 16-2 at PageID 112 (similar).

*Third*, *Lichtenstein* asks whether, if (1) and (2) are satisfied, the government can satisfy the applicable level of scrutiny. 83 F.4th at 602. As Plaintiffs argued, *see* PI Mot., ECF No. 16 at PageID 91, and Defendants do not dispute, strict scrutiny applies here. Because HB 1 cannot survive strict or any level of scrutiny, *see supra* Sections I.B, C, Plaintiffs are likely to succeed on this claim as well.

## III.    HB 1 is overbroad.

HB 1 is also unconstitutionally overbroad. In response, Defendants repeatedly ask the Court to opine on the constitutionality of a law that the General Assembly did not pass—urging it to read into HB 1 limiting language that is not there and ignore the actual law's facial breadth. But a federal court reviewing a state law may not "adopt a narrowing construction. . . unless such a construction is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988). The limitations Defendants ask the Court to read into HB 1 are anything but.

For example, Defendants attempt to narrow HB 1's broad application to ballot issue

spending "regardless of whether the ballot issue or question has yet been certified on the ballot," claiming that this reflects the General Assembly's "effort to include all the stages of the ballot-issue process." PI Opp., ECF No. 29 at PageID 1071. But that limitation is nowhere in the statute. And Defendants' suggestion that the Court look to Ohio Rev. Code § 3519.01 for this limitation makes no sense: that provision outlines the process for submitting ballot issue petitions to the Attorney General; nothing in it cabins the speech restrictions imposed by HB 1. *See* PI Opp., ECF No. 29 at PageID 1071. Moreover, nothing in § 3519.01 answers the more fundamental question of *when* something becomes a "ballot issue or question" under Ohio law; indeed, the words "ballot issue" or "ballot question" do not appear in § 3519.01 at all.

Next, Defendants suggest that HB 1's ban on contributions to continuing associations is not a problem because "non-citizens do not have a First Amendment right to engage in election-related spending." PI Opp., ECF No. 29 at PageID 1072. This argument is, again, based on Defendants' untenable view of binding First Amendment precedent and their thoroughly misguided reading of *Bluman*. Because Defendants are wrong about noncitizens' right to engage in ballot issue-related speech, *see supra* Section I.A., this argument also fails.

Third, in suggesting that citizens and noncitizens who share household finances have nothing to fear, Defendants rely on a separate regulation that only implicates how political entity treasurers report contributions; it does not limit HB 1's reach, nor does it bind the Attorney General in investigating or even prosecuting violations of HB 1. PI Opp., ECF No. 29 at PageID 1072. All that Ohio Adm. Code 111:2-4-14 establishes is that treasurers can report contributions from joint checking accounts in the name of the person who signed the check. But HB 1 is not limited to contributions or, even more narrowly, to contributions by check—it impacts *all* spending to support or oppose ballot issues, directly or indirectly, of any sort.

Finally, the overbreadth doctrine asks the Court to consider whether the "overbreadth" of the language of the challenged law "is substantial relative to the statute's [] legitimate sweep." PI Opp., ECF No. 29 at PageID 1071 (citing *United States v. Williams*, 553 U.S. 285, 292 (2008)). But Defendants consistently fail to establish that *anything* HB 1 reaches is "legitimate" under the constitutional protections discussed above. As a result, HB 1 is fatally overbroad.

**IV. HB 1 is vague.**

Defendants ignore some of HB 1's most troubling aspects, including its enforcement provision, which on its face *requires* the Attorney General to investigate any complaint filed by *any* elector alleging a violation of HB 1, § 3517.121(G)(2). This in and of itself invites "arbitrary and discriminatory enforcement," *Hill v. Colorado*, 530 U.S. 703, 732 (2000), rendering the law unconstitutionally vague. Beyond that, HB 1's persistent failure to provide any guidance as to where the lines will be drawn to distinguish the innocuous from the criminal, or how to avoid violating its provisions, make the statute vague under both of *Hill*'s alternative grounds, *id.*

Defendants' argument that it is not the state's problem that HB 1 is unclear on how to avoid violations, PI Opp., ECF No. 29 at PageID 1074, ignores that, when a law implicates the First Amendment, states must be especially sensitive to vagueness because vague laws require would-be speakers to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked" and therefore silence more speech than intended. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (citation omitted). Indeed, legislators recognized HB 1's vagueness as it was considered. *See, e.g.*, PI Ex. K, ECF No. 16-7 at PageID 865 (Rep. Isaacsohn describing HB 1 as "poorly drafted, overly broad, incredibly vague, very confusing, hard to understand").

Defendants also ignore Plaintiffs' argument that the term "facilitate" in division (D) is vague, as "facilitate" simply means "to make easier," and a lot of activity could be captured. *See* PI Mot., ECF No. 16 at PageID 95. Defendants' response that the facilitator must act "knowingly"

does not answer the question of what HB 1 criminalizes with the term. *See, e.g., Forbes v. Woods*, 71 F. Supp. 2d 1015, 1020 (D. Ariz. 1999) (quoting *Screws v. United States*, 325 U.S. 91, 105 (1945) (plurality opinion)), *aff'd sub nom. Forbes v. Napolitano*, 236 F.3d 1009 (9th Cir. 2000) ("a scienter requirement 'cannot make definite that which is undefined.'").

And Defendants fail to answer any of the questions about this (or several of HB 1's other vague provisions) posed in Plaintiffs' brief, including whether driving a noncitizen to buy sign-making materials to support a ballot issue, knowing that was the noncitizen's plan, could violate the provision. *See* PI Mot., ECF No. 16 at PageID 95. Defendants do, however, concede that there is no *de minimis* exception, PI Opp., ECF No. 29 at PageID 1069, effectively acknowledging that HB 1's vague provisions could reach the scenarios posed by Plaintiffs.

Defendants' efforts to defend other provisions in HB 1 also fall short. For example:

- Defendants assert that division (B) should be read to impose a "recklessness" requirement, *id.* at PageID 1073, but even if this were clear from the statute, it ignores that *Bluman* itself found that § 441e(a)'s requirement that a violator have specific knowledge of the prohibition was an "important limit[] to [its] holding in the case." 800 F. Supp. 2d at 292.

- Defendants' claim that division (B)'s vague language forbidding foreign nationals from "*directly or indirectly through another person or entity*" engaging in any of the prohibited activity, H.B. 1, § 3517.121(B), "mirrors" federal law, PI Opp., ECF No. 29 at PageID 1073, again ignores material limitations in federal law. Defendants jettison these limitations, creating confusion that is only underscored by the difference between what the legislative proponents thought the bill reached and what Defendants now argue it reaches.

- Defendants' concession that HB 1 "prohibits foreign nationals from making ballot-issue spending through the decision-making process of a corporation," PI Opp., ECF No. 29 at PageID 1073, introduces additional questions about what entities must do to avoid violating this provision that are not answered by HB 1.

- Defendants admit that the definition of "independent expenditure" is confusing within the context of HB 1, *see id.* (referring to it as "ambiguous"), but attempt to remedy this by consulting other parts of the code. The problem is, under HB 1's plain terms, independent expenditures on ballot issues are prohibited *before* the issues are certified, which means that the reporting regulation Defendants claim "clarifies" the issue does not actually apply.

- A similar problem arises with Defendants' defense of HB 1's use of the term "contribution,"

which is entirely unhelpful. Defendants simply point out that HB 1 incorporates an election-specific definition of "contribution," *id.* at PageID 1074, but this response doesn't address that that definition makes no sense when applied to the non-political entities that HB 1 regulates.

- Defendants' explanation that HB 1's prohibitions on contributions to continuing associations "to the maximum extent permitted by law and by the constitutions of the United States and of this state," means the ban "reaches as far as federal and state law allow," *id.* at PageID 1073, is entirely circular. Nor do Defendants ever grapple with the fact that even the General Assembly could not articulate what it was prohibiting here. PI Mot., ECF No. 16 at PageID 94.

- Defendants' attempt to explain what HB 1 bans when it forbids not just explicit but implicit promises is itself unclear. Defendants underscore that HB 1 bans "explicit" action, PI Opp., ECF No. 29 at PageID 1074, but how can one make an implicit promise to do something that is, by Defendants' own claim, explicit?

- Defendants entirely fail to answer the open question of what an organization or entity *may do with noncitizen funds received before HB 1's effective date but that have not yet been used*. This is not answered by the statute and raises serious questions about present—not retroactive—application of the statute.

In sum, in virtually every direction, HB 1 is unconstitutionally vague. Defendants' defenses raise more questions and fail to save the law from vagueness.

## V.      HB 1 violates the Equal Protection Clause.

HB 1 facially classifies individuals based on citizenship; noncitizens are a suspect class; and classifications for suspect classes warrant strict scrutiny, which HB 1 cannot survive. Defendants argue that noncitizens and citizens are not "similarly situated" but misunderstand the "relevant aspects" on which the two sets of individuals should be compared. PI Opp., ECF No. 29 at PageID 1075 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Here, the question is whether noncitizens and citizens are similarly situated to make contributions or expenditures related to ballot issues, not whether they are similarly situated "for purposes of democratic self-government," PI Opp., ECF No. 29 at PageID 1075. As explained *supra* Section I, they are. Indeed, the Sixth Circuit has recognized that "permanent resident aliens" like Plaintiffs Bredendiek and Gerrath "are similarly situated to citizens in economic, social, and civic conditions," *League of United Latin*

16

*Am. Citizens v. Bredesen*, 500 F.3d 523, 533 (6th Cir. 2007), which encompass ballot issue spending. Defendants' cases do not suggest otherwise. In *Sugarman*, *Foley*, and *Ambach*, the Supreme Court considered whether the political function exception to strict scrutiny applied to laws banning noncitizens from working in the New York state civil service, as police officers, and as teachers. It reached each decision based on the specific, relevant facts, just as the Court should here. *Sugarman*, 413 U.S. at 641–42; *Foley*, 435 U.S. at 297–300; *Ambach*, 441 U.S. at 78–80.

## VI. The remaining preliminary injunction factors weigh in Plaintiffs' favor.

### A. Plaintiffs will suffer irreparable harm without an injunction.

Defendants do not deny that infringement on constitutional rights is irreparable harm; they simply repeat their argument that HB 1 *cannot* cause harm to constitutional rights "because it applies to noncitizens who lack a First Amendment right to participate in the process of American democratic self-government." PI Opp., ECF No. 29 at PageID 1075. This is wrong as a matter of both law and fact. Further, most of the Plaintiffs in this litigation are citizens or domestic nonprofits who have described how HB 1 will chill *their* core First Amendment rights. *See* Hilario Decl., ECF No. 16-1 at PageID 107; Knestrick Decl., ECF No. 16-2 at PageID 113; Quilligan Decl., ECF No. 16-5 at PageID 128–29. By failing to rebut or refute these allegations, Defendants concede them. *See, e.g.*, *Freeman v. Spoljaric*, 667 F. Supp. 3d 636, 660 (S.D. Ohio 2023) ("[C]ourts can and often do find parties concede arguments to which they do not respond.").

Next, Defendants argue that, even if the First Amendment applied, any threat to Plaintiffs' rights is not "certain and immediate." PI Opp., ECF No. 29 at PageID 1075. This is also wrong. Plaintiffs' declarations describe in detail the immediate chill HB 1 will have on their protected speech and associations, and Defendants offer no rebuttal. *See* Hilario Decl., ECF No. 16-1 at PageID 107; Knestrick Decl., ECF No. 16-2 at PageID 113; Gerrath Decl., ECF No. 16-3 at PageID 118–20; Brediendiek Decl., ECF No. 16-4 at PageID 123-25; Quilligan Decl., ECF No. 16-5 at

PageID 128–29. And it is "well-settled" "that a chilling effect on one's constitutional rights constitutes a present injury," *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994) (collecting cases).

Perplexingly, Defendants again point to Ohio Adm. Code 111:2-4-14, which governs only how campaign treasurers treat contributions from joint checking accounts and neither insulates anyone from investigation nor rebuts Plaintiffs' showing of irreparable harm. There is no dispute that HB 1's plain text *requires* the Attorney General to investigate *any* allegations of a violation from *any* Ohio elector. HB 1, § 3517.121(G)(2). Similarly, Defendants' claim that any harm can be avoided by complying with HB 1's "require[ments] to adopt separate-accounting systems," PI Opp., ECF No. 29 at PageID 1075, not only reads yet another requirement into HB 1's text that isn't there, but ignores that there is no basis for finding that adopting separate accounting systems will operate to preclude an investigation under HB 1's plain terms.[8]

HB 1's wide-ranging and unrestrained threat of investigation alone threatens to broadly chill Plaintiffs' core First Amendment activity absent an injunction, and the law's predictable chilling effect was a major part of the discussion in the legislative proceedings. *See, e.g.*, PI Ex. J,

---

[8] This assertion is also contrary to Defendants' admission elsewhere that HB 1 "has not instructed [companies or organizations on] how to put internal controls in place to ensure that [they] do not spend foreign-national money on elections. Those decisions are for the plaintiff organizations, not the State." PI Opp., ECF No. 29 at PageID 1074; *see also id.* (stating organizations may refer to "segregated-fund requirements on organizations in the contribution context . . . as a guide"). It also ignores OPAWL's and NEOCH's sworn declarations, which explain that because they do not engage in candidate-related spending, they do not have separate accounting systems at the ready. Hilario Decl., ECF No. 16-1 at PageID 105–06; Knestrick Decl., ECF No. 16-2 at PageID 111–12. As a result, even if separate accounting systems could insulate them from ultimate prosecution (though not the threat and burden of an investigation), they will still have to pause all ballot issue advocacy if HB 1 goes into effect, including for this November's election. Hilario Decl., ECF No. 16-1 at PageID 107; Knestrick Decl., ECF No. 16-2 at PageID 113. The loss of this opportunity to engage in this speech, during this critical time, indeed, even for a "minimal period[] of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

ECF No. 16-7 at PageID 761 (Rep. Isaacsohn warning that HB 1 "puts a huge chilling effect not only on the individual, who may be a foreign national, but people who are associated with that foreign national and on organizations that have the audacity to try and organize people in the State of Ohio."); *id.* at 766 (Mr. Dirrig of the Ohio Environmental Council testifying: "Signing ourselves up to be referred to the Attorney General simply by being engaged in any way and about an initiative where one other organization may or may not have taken money from certain person who . . . is not a citizen . . . and being forced to undergo that legal action is absolutely a chilling effect."). Yet, strikingly, throughout their response, including in addressing Plaintiffs' claims that this chill causes them irreparable harm, Defendants ignore the issue of chill entirely.

## B.   The equities and public interest favor injunctive relief.

Defendants barely attempt to make the case that the equities and public interest favor denying the injunction, and for good reason. It is well established that "protect[ing] . . . constitutional and civil rights" is "a purpose that is always in the public interest." *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016). Defendants' only argument that the equities weigh in their favor is to rehash their argument that *Bluman* recognized Defendants' asserted interest in prohibiting all noncitizens from speaking on matters of public concerns as "compelling," and that the state has a "prerogative" to enact laws that serve this interest. PI Opp., ECF No. 29 at PageID 1076. *Bluman* did not and Ohio does not.

As for the public interest, Defendants ask that the Court ignore all of the harm to the actual public that HB 1 will bring in favor of "deferring" to the Defendants' "efforts to ensure the integrity of the election." *Id.* It is not clear what Defendants mean. This is the first time that their brief mentions "election integrity," and they do not explain how HB 1—which, once again, simply lessens debate about issues of public concern—contributes to "election integrity." Finally, Defendants claim a general interest in enforcing their own laws because they "give effect to the

will of the people." *Id.* But the First Amendment's mandate is clear: Ohio "*shall make no law . . . abridging the freedom of speech.*" U.S. Const. amend. I. (emphasis added). The public interest certainly doesn't favor the enforcement of laws that violate this decree. *See, e.g.*, *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). HB 1, is, at best, a "highly paternalistic" statute that "restrict[s] what the people may hear." *Bellotti*, 435 U.S. at 791 n.31.

**VII.    The scope of Plaintiffs' requested relief is appropriate.**

Defendants are also wrong to suggest that Plaintiffs' requested injunction is overbroad. As passed by the General Assembly, HB 1 threatens to chill substantial amounts of core First Amendment activity. Defendants seem to argue that Plaintiffs should have asked for a more limited injunction, although limited in what way, it is not clear. In any event, the Supreme Court has made clear that federal courts' "constitutional mandate and institutional competence are limited," and courts accordingly "restrain [them]selves from rewrit[ing] state law to conform it to constitutional requirements even as [they] strive to salvage it." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (citation omitted). Therefore, this Court may not "assume the task of making . . . choices for the state legislature," *Eubanks v. Wilkinson*, 937 F.2d 1118, 1127 (6th Cir. 1991), in crafting an injunction. If the state wishes to "pursue its own policy choices in fashioning new legislation," it may, but in the meantime, an injunction ensures that affected individuals "remain [] free of undue burden while the legislature redesigns its statute." *Id.* Notably, Defendants cite no case that involved a First Amendment claim—or any federal constitutional claim, for that matter—in arguing that Plaintiffs' requested injunction is too broad. It is not.

**CONCLUSION**

Plaintiffs respectfully request that the Court grant Plaintiffs' motion.

20

Respectfully submitted,

/s/ C. Benjamin Cooper
C. Benjamin Cooper (0093103)
   *Trial Attorney*
Kaela King (0100098)
COOPER ELLIOTT
305 West Nationwide Boulevard
Columbus, Ohio 43215
(614) 481-6000
(614) 481-6001 (fax)
benc@cooperelliott.com
kaelak@cooperelliott.com

Elisabeth C. Frost*
Jyoti Jasrasaria*
Melinda K. Johnson*
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: 202-968-4490
efrost@elias.law
jjasrasaria@elias.law
mjohnson@elias.law

*Attorneys for Plaintiffs*

* *Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 65.1(b), I HEREBY CERTIFY that on this 9th day of August, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ C. Benjamin Cooper