**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**OPAWL – Building AAPI Feminist**
**Leadership, et al.,**

        **Plaintiff,**

    **v.**

**Dave Yost, in his official capacity**
**as Ohio Attorney General, et al.**

        **Defendant.**

**Case No. 2:24-cv-3495**

**Judge Michael H. Watson**

**Magistrate Judge Kimberly Jolson**

## OPINION AND ORDER

This case is about the scope of a State's power to restrict noncitizens from engaging in political speech.  Plaintiffs are two continuing associations with noncitizen donors, two individual noncitizens, and one individual U.S. citizen married to a noncitizen.

Plaintiffs move to enjoin Ohio Attorney General Dave Yost and Secretary of State Frank LaRose ("Defendants") from enforcing a recently enacted Ohio law ("Section 121") that restricts noncitizen political spending.  Plaintiffs argue that the law violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.  Defendants argue that the law violates neither because states may exclude noncitizens from the processes of democratic self-government to prevent foreign influence on the American political process.

The issue of foreign influence is not new.  George Washington, in his famous Farewell Address, warned our nascent democracy about the threat of

"foreign influence." George Washington, *Washington's Farewell Address 1796*, Yale Law School Lillian Goldman Yale Library (last visited Aug. 29, 2024). President Washington exhorted the country to "be constantly awake, since history and experience prove that foreign influence is one of the most baneful foes of republican government." *Id.*

Given Washington's warning, and the similar warnings of his fellow founding fathers,[1] it should come as no surprise that the First Amendment permits the Federal Government to guard against "the insidious wiles of foreign influence," *id.* Indeed, as the United States Supreme Court affirmed in *Bluman v. Fed. Election Comm'n*, "[i]t is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government." 800 F. Supp. 2d 281, 288 (D.D.C. 2011), *aff'd*, 565 U.S. 1104.

But when President Washington cautioned the country against foreign influence, did he have noncitizen individuals like Casimir Pulaski and Bernardo de Galvez in mind? No; he certainly did not, you might say, because both Pulaski and Galvez fought heroically for the United States in the Revolutionary War. Pulaski died fighting for American independence.

---

[1] *See, e.g.*, Letter from Thomas Jefferson to William Short, October 3, 1801, reprinted in Andrew A. Lipscomb, The Writings of Thomas Jefferson 10 (284) (1903): 287; Alexander Hamilton, "Federalist No. 68: The Mode of Electing the President," Congress.gov, available at https://www.congress.gov/resources/display/content/The+Federalist+Papers#TheFederalistPapers-68.

Noncitizen American heroes are not a thing of the past.  Congress recognized this when it *rejected* a proposed amendment to include lawful permanent residents ("LPR") in the *federal* prohibition on foreign national campaign spending.   *See* 148 Cong. Rec. H369-01, H448–52.  During that process, one representative shared the story of Alfred Rascon, who earned a Congressional Medal of Honor for his actions as a medic during the Vietnam War while he was a LPR.  *Id.* at 449 (statement of Sen. Silvestre Reyes) went on to become the Director of the Selective Service Commission.  *Id.*

Yet Defendants ask this Court to hold that individual LPRs—who the Federal Government allows to fight and die in the U.S. Armed Forces—present such a high risk of "foreign influence" on Ohio's political processes that Ohio may prohibit them from speaking on Ohio politics.  The Court declines to do so, as a matter of first impression.

Instead, the Court holds that Plaintiffs are likely to succeed on the merits of their First Amendment challenge to Section 121, at least in part.[2]  The provision of Section 121 that extends to LPRs, Ohio Rev. Code § 3517.121(A)(2)(a), is likely unconstitutional.  Because the other preliminary injunction elements are also met, the Court enjoins Defendants from enforcing Section 121 under its current definition of "foreign national" individuals.  However, because that definition is severable from the rest of Section 121, Defendants may enforce all

---

[2] Because Plaintiffs are likely to prevail on First Amendment grounds, the Court will not address Plaintiffs' Equal Protection Clause arguments.

provisions of Section 121 consistent with the other defined categories of "foreign national." *Id.* § 3517.121(A)(2)(b)–(d). Plaintiffs' motion is thus **GRANTED IN PART**.

## I. BACKGROUND

### A. Legal Background

**1. The Federal Government restricts foreign national political spending pursuant to 52 U.S.C. § 30121, part of which the Supreme Court has summarily upheld.**

Before turning to the Ohio statute, it helps to look at analogous federal law, because the differences between the two are crucial.

Federal law, specifically the Federal Election Campaign Act ("FECA"), generally prohibits "foreign nationals" from donating or spending money in connection with any U.S. election. 52 U.S.C. § 30121 ("Section 30121").

FECA defines a "foreign national" as a foreign government, a foreign political party, an entity organized or created under a foreign country's laws, an entity with its principal place of business in a foreign country, and foreign citizens. *Id.* § 30121(b) (adopting the definition in 22 U.S.C. § 611). Importantly for this case, FECA's foreign-citizen definition of "foreign national" expressly excepts individuals admitted as LPRs of the United States (also known as green card holders). *Id.* § 30121(b)(2) (referencing 8 U.S.C. § 1101(20)).

In plain terms, Section 30121 prohibits so-defined foreign nationals ("Non-LPR Foreign Nationals") from "directly or indirectly" making an expenditure or

contribution[3] (of money "or other thing of value") in connection with any U.S. election or promising to do so (expressly or impliedly). *Id.* § 30121(a)(1). Section 30121 also prohibits any "person" from "soliciting, accepting, or receiving" a contribution from a Non-LPR Foreign National. *Id.* § 30121(a)(2).

Section 30121(a) is constitutional according to binding U.S. Supreme Court precedent. The Supreme Court summarily affirmed a three-judge federal district court panel decision that upheld the prohibition on Non-LPR Foreign Nationals making candidate-campaign-related contributions and expenditures,[4]

---

[3] The words 'expenditure' and 'contribution' are terms of art. *Buckley v. Valeo*, 424 U.S. 1, 16–23, 25, 44–45 (1976) (parsing the distinction and discussing its significance). Contributions involve giving money to another entity for it to spend—be it a candidate's campaign, a political action committee, a political party, a charitable nonprofit, or just an individual. Expenditures involve spending money ones' self to directly advocate for the success or failure of something up for election (purchasing a television advertisement to support a candidate for the Ohio state house would be a paradigmatic example of an expenditure).

Expenditures can be split into sub-categories, including: independent expenditures (juxtaposed against coordinated expenditures), and electioneering communications. Independent expenditures expressly advocate for a certain clearly identified election outcome but not in coordination with a candidate or a party; coordinated expenditures are made in coordination with a candidate or party, as their name suggests. Electioneering communications similarly advocate for a clearly identified election outcome, but they do so close in time to the election.

[4] The *Bluman* district court interpreted the independent expenditure ban to apply only express advocacy and not issue advocacy. *Id.* at 288–89. Express advocacy refers to advocacy that uses "magic words" like "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," and "reject" to promote a clearly identified objective (classically, electing a candidate). *Buckley v. Valeo*, 424 U.S. 1, 40–44, 44 n.5 (1976); *see also Wisconsin Right to Life, Inc. ("WRTL") v. FEC*, 551 U.S. 449, 454 (2007) (defining express advocacy that is "susceptible of no other interpretation than as an appeal to vote for or against a specific candidate"). Issue advocacy, however, refers to advocacy that takes a position on an issue but does not identify a particular candidate to elect (or any other similar specific objective). *Bluman v. F.E.C.*, 800 F. Supp. 2d at 284. This construal of FECA means that even Non-LPR Foreign Nationals remain free

holding Section 30121(a) was narrowly tailored to the Government's compelling interest in preventing foreign influence over the U.S. political process. *See generally Bluman v. F.E.C.*, 800 F. Supp. 2d 281 (D.D.C. 2011) (Kavanaugh, J., *summ. aff'd*, 565 U.S. 1104 (2012).

### 2. Ohio's Revised Code Section 121 is broader than the federal law.

Ohio Governor Mike DeWine signed HB 1 into law on June 2, 2024. That bill enacts Section 121 of Ohio Revised Code Chapter 3517. It is set to take effect September 1, 2024.

Section 121 consists of eight divisions (A through H). Division A defines certain statutory terms. Divisions B, C, and D spell out the conduct that the section prohibits. Division E reclassifies Ohio's prior ban on Non-LPR Foreign National campaign spending as a violation of Section 121.[5] Division F specifies

---

under the federal regulation to engage in "speaking out about issues or spending money to advocate their views about issues," but not about specific candidates. *Id.* As to the parameters of express advocacy, the district court defined the term, as *WRTL* had, as an expenditure for "express campaign speech" or its "functional equivalent," meaning that it "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."

[5] Division E reads: "Any complaint that alleges a violation of division (W) of section 3517.13 of the Revised Code shall be treated as instead alleging a violation of this section." Ohio Rev. Code § 3517.121(E). Division W of Section 13, in turn, reads:

> (1) No foreign national shall, directly or indirectly through any other person or entity, make a contribution, expenditure, or independent expenditure or promise, either expressly or implicitly, to make a contribution, expenditure, or independent expenditure in support of or opposition to a candidate for any elective office in this state, including an office of a political party.

the penalties for violating the section, and Divisions G and H create enforcement mechanisms.

Division A defines "foreign national" as any of the following: (a) "an individual who is not a United States citizen or national"; (b) "[a] government of a foreign country or of a political subdivision of a foreign country:; (c) "[a] foreign political party"; (d) "[a] person, other than an individual, that is organized under the laws of, or has its principal place of business in, a foreign country."  Ohio Rev. Code § 3517.121(A)(2).

At least two aspects of this definition are noteworthy.  One, Ohio's definition *includes* LPRs, unlike federal law.  *Compare Id.* § 3517.121(A)(2)(a) *with* 52 U.S.C. § 30121(b) ("'[F]oreign national' means . . . an individual who is not a citizen of the United States or a national of the United States . . . *and who is not lawfully admitted for permanent residence*[.]" (emphasis added)).  Two,

---

(2) No candidate, campaign committee, political action committee, political contributing entity, legislative campaign fund, state candidate fund, political party, or separate segregated fund shall solicit or accept a contribution, expenditure, or independent expenditure from a foreign national.  The secretary of state may direct any candidate, committee, entity, fund, or party that accepts a contribution, expenditure, or independent expenditure in violation of this division to return the contribution, expenditure, or independent expenditure or, if it is not possible to return the contribution, expenditure, or independent expenditure, then to return instead the value of it, to the contributor.

(3) As used in division (W) of this section, "foreign national" has the same meaning as in section 441e(b) of the Federal Election Campaign Act.

This provision is nearly identical to Section 121 in effect.  The only difference is that Section 121 extends to lawful permanent residents, but section 13, by incorporating the federal definition of "foreign national," does not.

Ohio's definition excludes corporations that are both organized under U.S. law and have their principal place of business in the U.S.—even if those corporations have foreign ownership.

Turning to the substantive prohibitions, Division B governs "foreign nationals." That Division reads:

> No foreign national shall, directly or indirectly through any person or entity, do any of the following:
>
> (1) Make a contribution, expenditure, or independent expenditure in support of or opposition to a candidate . . . ;
>
> (2) Make a contribution, expenditure, or independent expenditure in support of or opposition to a statewide ballot issue or question, regardless of whether the ballot issue or question has yet been certified to appear on the ballot;
>
> (3) Make a disbursement for the direct cost of producing or airing an electioneering communication;
>
> (4) Make a contribution . . . to the maximum extent permitted by law and by the constitutions of the United States and of this state, to a continuing association;
>
> (5) Promise, either expressly or implicitly, to make a contribution, expenditure, independent expenditure, or disbursement described in division (B)(1), (2), (3), or (4) of this section.

Ohio Rev. Code § 3517.121(B).[6]

Thus, Sub-divisions 1, 3, and 5 prohibit conduct already prohibited by federal law. *Compare id. with* 2 U.S.C. § 441e(a)(1). The only effect these Sub-

---

[6] For the definitions of "contribution," and "expenditure," and "independent expenditure" see Ohio Rev. Code § 3517.01(C)(5), (6), (17); *see also*, *supra*, note 3.

divisions have, then, is to extend the prohibition to LPRs and subject violators to the penalties and enforcement mechanisms created by Divisions F, G, and H.

Sub-divisions 2 and 4, by contrast, prohibit conduct permissible under federal law.  Specifically, those Sub-divisions extend the federal prohibition on foreign national campaign spending to prevent not only candidate-related-spending but also ballot initiative campaigns.  And, again, Sub-divisions 2 and 4 extend to LPRs, while federal law does not.

Division C also regulates conduct, but it operates on various kinds of legal persons, regardless of whether they fall under Ohio's definition of "foreign nationals."  That Division reads:

> No individual, candidate, campaign committee, political action committee, political contributing entity, legislative campaign fund, state candidate fund, political party, separate segregated fund, or committee created to support or oppose a ballot issue or question and, to the maximum extent permitted by law and by the constitutions of the United States and of this state, no continuing association[7] shall, directly or indirectly through any other person or entity, knowingly do either of the following:
>
> (1) Solicit, accept, or receive any funds from a foreign national for any purpose described in division (B) of this section;
>
> (2) Make a contribution, expenditure, or independent expenditure using any funds the person knows were received from a foreign national for any purpose described in division (B) of this section.

Ohio Rev. Code § 3517.121(C).

Sub-division 1 mostly echoes federal law.  *Compare id. with* 52 U.S.C. § 30121(a)(2).  The only significant difference is, again, that Section 121 includes

---

[7] For the definition of "continuing association" see Ohio Rev. Code § 3517.01(C)(4).

LPRs in the definition of "foreign national," while federal law excludes them. Sub-division 2 has no analog in federal law but appears mostly (if not completely) redundant to Sub-division 1.[8]

Division D also operates on all kinds of legal persons. That Division reads: "No person shall knowingly aid or facilitate a violation of division (B) or (C) of this section." Ohio Rev. Code § 3517.121(D). This provision establishes accomplice liability for violations of the crimes created by the substantive Divisions of Section 121.[9]

Division F designates penalties for violations of Divisions B, C, and D. Foreign nationals who violate Division B and other persons who violate Division C receive the same basic penalty: a fine equal to the greater of $10,000 dollars or three times the amount contributed or expended, plus a first-degree misdemeanor for a first offense or a fifth-degree felony for a repeat offense.[10] Ohio Rev. Code § 3517.121(F). Accomplices who violate Division D receive a $1,000 dollar penalty and a first-degree misdemeanor.

Divisions G and H explains who may enforce Section 121 and how they may do so. As relevant here (to Plaintiffs' standing), Division (G)(1)(a) vests

---

[8] It would be the rare instance in which a person could violate Sub-division 2 (by expending or contributing funds knowingly received from a foreign national) without also violating Sub-division 1 (by receiving those funds from a foreign national).

[9] The FECA's accomplice liability analogue is found at 11 C.F.R. § 110.20(h).

[10] For a first-degree misdemeanor, a court may impose a jail term of up to 180 days. Ohio Rev. Code. § 2929.24. For a fifth-degree felony, a court must impose a prison term of six to twelve months. Ohio Rev. Code. § 2929.14.

primary enforcement authority with the Ohio Attorney General and (G)(2) *obligates* the Ohio Attorney General to investigate whenever the governor, the secretary of state, the general assembly, the Ohio elections commission, or an elector allege a violation.

In sum, Section 121 expands upon federal limits to foreign national contributions and expenditures in three ways. One, Section 121 defines "foreign national" differently than does FECA; Section 121's definition of "foreign national" includes LPR's (green card holders), while FECA expressly *excludes* the same from the definition of "foreign national." Two, Section 121 extends the regulations to ballot initiative campaigns. And three, Section 121 empowers the Ohio Attorney General to enforce the prohibition and provides for mandatory investigations upon receipt of a violation allegation.

## B. Factual Background

A group of organizational and individual plaintiffs filed this suit, challenging Section 121 on the grounds that it will violate their First Amendment free speech and associational rights if it goes into effect.

### 1. Organizational Plaintiffs

Plaintiff OPAWL describes itself as "a nonprofit grassroots member-led community organization," operating as a "continuing association" under Ohio law, with over 350 members in Ohio. Decl. Hilario ¶¶ 3–5, ECF No. 16-1. "Although OPAWL does not require its members to disclose their citizenship status or the

status of others in their households, OPAWL knows that many of its members"
are not U.S. citizens. *Id.* ¶ 12.

OPAWL's stated mission is "to build collective power to advance social
justice and elevate the voices, visibility, and progressive leadership of Asian
American and Pacific Islander ("AAPI") and Asian women and nonbinary people
across Ohio." *Id.* ¶ 3. To advance this mission, OPAWL has engaged with ballot
issues in several ways: it has translated voter education materials into Asian
languages, hosted events to inform its members about upcoming referenda,
organized phone and text banks, purchased digital ads, and collected signatures
for ballot initiative petitions. *Id.* ¶¶ 6–9.

OPAWL funds its ballot-related advocacy with "foundation grants and
donations from individual donors, including its individual members." *Id.* ¶ 18.
OPAWL does not ask its donors "to disclose their citizenship status or affiliation
with foreign nationals[.]" *Id.* "Nor do[es it] ask [its] grant funders to track the
citizenship status of their own contributors." *Id.* OPAWL accordingly has no
system to segregate funds it receives from noncitizens. *Id.* ¶ 21.

Plaintiff NEOCH is a nonprofit charitable organization registered under
501(c)(3) and operating in Cleveland. Decl. Knestrick ¶ 2, ECF No. 16-2. It also
describes itself as a "continuing association" under Ohio law. *Id.* ¶ 7. NEOCH
provides no information about the citizenship of its directors, employees,
volunteers, or other formally affiliated individuals, but it has received contributions
from noncitizens. *Id.* ¶ 9.

NEOCH's mission is "to eliminate the root causes of homelessness while loving our diverse community through organizing, advocacy, education, and street outreach." *Id.* ¶ 3. In support of this mission, NEOCH expends resources "to engage[] in nonpartisan advocacy for or against policies that impact the unhoused community in Ohio." *Id.* "Some of the policies that NEOCH advocates for or against include Ohio ballot issues that stand to impact [its] mission or the communities that [it] serve[s]." *Id.* ¶ 4. For example, NEOCH participated in a 2019 ballot initiative regarding lead in houses, and, in 2023, it contributed to local ballot initiatives for participatory budgeting. *Id.*

Like OPAWL, NEOCH funded those efforts "through a combination of grants and individual donations[,]" including individual donations from non-citizens. *Id.* ¶¶ 6, 9. Also like OPAWL, NEOCH does not track or ask about the citizenship status of its donors or ask its grant funders to track the citizenship status of their contributors. *Id.* ¶ 9. NEOCH further has "no system to segregate funds received from noncitizens." *Id.*

### 2. Individual Plaintiffs

Plaintiff Elisa Bredendiek is an LPR of the U.S. and has been since 2010. Bredendiek Decl. ¶ 6, ECF No. 16-4. A German citizen, Ms. Bredendiek moved to the U.S. in 2005, after graduating high school, and has lived in Northeast Ohio ever since. *Id.* ¶¶ 2–3. She has since attended college, married, and had two children. *Id.* ¶¶ 4–5. She lives in Cleveland, teaches French and Spanish at St. Ignatius High School, and has no intention of leaving Ohio. *Id.* ¶¶ 5, 7.

Ms. Bredendiek further avers the following:

> From the time I moved to Northeast Ohio as a teenager, I have been an active member of my local community and supported causes I care about by working for nonprofit organizations including the ACLU of Ohio, volunteering my time with other organizations, lending my voice to demonstrations, and making monetary contributions where I could . . . . I have attended countless protests related to human rights, immigrants' rights, environmental justice, and anti-war efforts. . . . I have made financial contributions to the Northeast Ohio Coalition for the Homeless (NEOCH) and several other organizations that support the homeless and immigrants.

*Id.* ¶¶ 8–13.

But, if Section 121 goes into effect, Ms. Bredendiek will be forced to cease donating to organizations like NEOCH. *Id.* ¶ 14. She "will even be wary of attending protests or rallies, because [she will] have to make small expenditures for gas, parking, and supplies in order to participate in them." *Id.* ¶ 18. She believes "[t]hose expenditures would run contrary to HB 1's ban on noncitizens making an 'independent expenditure in support of or opposition to a statewide ballot issue or question,' especially since the ban applies to issues 'regardless of whether [they] ha[ve] yet been certified to appear on the ballot.'" *Id.* ¶ 18 (quoting § 3517.121(B)(2)).

Ms. Bredendiek's husband is Plaintiff Peter Quilligan. Mr. Quilligan is a U.S. citizen, originally from Ohio. Quilligan Decl. ¶ 2, ECF No. 16-5. Like his wife, Mr. Quilligan has attended countless protests and made direct financial contributions to organizations like NEOCH. *Id.* ¶¶ 8–9.

Mr. Quilligan fears that, if HB 1 is enforced, he will not be able to continue to advocate for issues or participate in organizations he cares about. *Id.* ¶ 13. Ms. Bredendiek is their family's primary earner, and the couple shares a bank account. *Id.* ¶¶ 12–13. If HB 1 goes into effect, Mr. Quilligan fears that contributing from their joint account will constitute a crime. *Id.* He also questions whether he can lawfully expend or contribute even from a separate account, given Section 121's prohibition on using funds received from a noncitizen to make contributions and the fact that his wife is the primary earner. *See id.* ¶¶ 12, 14–15.

Plaintiff John Gerrath has been an LPR of the U.S. since 2019. Gerrath Decl. ¶ 1, ECF No. 16-3. Mr. Gerrath immigrated to the U.S. from Canada with his wife and daughter in 2012. *Id.* ¶ 2. Since moving to the U.S., he and his wife had a son in Michigan. *Id.* For the past seven years, Mr. Gerrath has lived and worked in Silver Lake, Ohio, at Kent State University as a botanist and conservation biologist. *Id.* ¶¶ 6–7. Mr. Gerrath will be eligible to apply for citizenship in November 2024, and plans to do so. *Id.* ¶ 4.

Mr. Gerrath "cares greatly about the policies that affect [his] family and [him] as Ohio residents, and [he] closely follow[s] laws and public policies that develop in [Ohio] by speaking with colleagues and neighbors. [His] interest in policy includes ballot issues pending in the state." *Id.* ¶¶ 10–11. In fact, within the last year, Mr. Gerrath bought signs supporting the reproductive rights and cannabis amendments and displayed those signs in his yard. *Id.* ¶ 11.

But, "[g]iven the criminal and monetary penalties that could follow from violating HB 1, if it goes into effect, [he] would no longer feel like [he] could spend money to buy a sign on this or any future ballot issue" as a noncitizen, despite his "strong belief that publicly supporting causes [he is] passionate [about] contributes to the discourse about them." *Id.* ¶ 12. Indeed, Mr. Gerrath declared that he may have to cease contributing to nonprofit organizations out of fear of prosecution. *Id.* ¶ 16.

## II. JUSTICIABILITY

Before reaching the merits, the Court first confirms that Plaintiffs have standing.

Article III of the United States Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies[,]" U.S. Const. Art. 3 § 2, and "[t]he doctrine of standing gives meaning to these constitutional limits by 'identif[ying] those disputes which are appropriately resolved through the judicial process[,]'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (second alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

In essence, the standing doctrine prompts courts to ask "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Generally, to establish Article III standing, a "plaintiff must show (1) an injury in fact, (2) fairly traceable

to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief[.]" *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022) (internal citations omitted). A plaintiff challenging a law as unconstitutional typically cannot establish standing unless and until the State or the Government enforces the challenged law against them. Pre-enforcement standing can exist in some cases, however. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat").

Pre-enforcement standing often exists when the legal challenge arises under the First Amendment, where even the threat of enforcement curtails the would-be speaker's rights. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014); *Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010). But the threat of enforcement confers standing only if it is "certainly impending." *E.g.*, *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024) (internal quotation marks and citations omitted); *Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012) (internal quotation marks and citations omitted).

The U.S. Supreme Court has set out a three-prong test for pre-enforcement standing. The plaintiff must allege (1) "an intention to engage in a

course of conduct arguably affected with a constitutional interest," that is

(2) "proscribed by a statute," (3) under which the plaintiff faces "a credible threat

of prosecution[.]" *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979).

Translated into First Amendment terms, a plaintiff can establish pre-enforcement

standing by alleging "(1) an intent to engage in expression that the Free Speech

Clause arguably protects, (2) that this expression is arguably prohibited by [the

challenged law], and (3) that there exists a credible threat of prosecution for

engaging in that expression." *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95

F.4th 1019 (6th Cir. 2024) (internal citations and quotations omitted). To

establish the third element (credible threat of prosecution), Plaintiff must make

more than "'mere allegations of a 'subjective chill' on protected speech[.]" *McKay*

*v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (quoting *Berry v. Schmitt*,

688 F.3d 290, 296 (6th Cir. 2012)), but subjective chill is sufficient when

combined with any of the four "*McKay*" factors:

> (1) "a history of past enforcement against the plaintiffs or others";
> (2) "enforcement warning letters sent to the plaintiffs regarding their
> specific conduct"; (3) "an attribute of the challenged statute that
> makes enforcement easier or more likely, such as a provision allowing
> any member of the public to initiate an enforcement action"; and
> (4) the "defendant's refusal to disavow enforcement of the challenged
> statute against a particular plaintiff."

*Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (quoting

*McKay*, 823 F.3d at 869).

Plaintiffs' allegations here satisfy all three elements.

First, all Plaintiffs allege an intent to engage in expression that the Free Speech Clause arguably protects.  Both Organizational Plaintiffs OPAWL and NEOCH allege an intent to continue expending on ballot issues.  *See* Hilario Decl. ¶ 9, ECF No. 16-1; Knestrick Decl. ¶ 17–18, ECF No. 16-2.  And each Individual Plaintiff alleges an intent to do the same, an intent to contribute to organizations that regularly expend on ballot issues, or both.  *E.g.*, Compl. ¶ 138, ECF No. 1; Gerrath Decl. ¶ 22, ECF No. 16-3; Bredendiek Decl. ¶ 15, ECF No. 16-4; Quilligan Decl. ¶ 17, ECF No. 16-5.  The Free Speech Clause arguably protects those intended expenditures and contributions.  *See generally Buckley*, 424 U.S. at 14–15; s*ee also, infra*, III. A. 1 (holding that the First Amendment does, indeed, protect Plaintiffs' expenditures and contributions).

Second, Plaintiffs' expenditures and contributions would arguably be prohibited by Section 121.

The noncitizen Plaintiffs' expenditures and contributions are prohibited by Section 121.  Section 121 prohibits "foreign nationals" from "directly or indirectly" making "a contribution, expenditure, or independent expenditure in support of or opposition to a statewide ballot issue or question[.]"  Ohio Rev. Code § 3517.121(B)(2).  Plaintiffs Elisa Bredendiek and John Gerrath, as LPRs, qualify as "foreign nationals."  Ohio Rev. Code § 3517.121(A)(2)(a).  They would thus violate the statute by continuing to contribute to organizations that support or oppose ballot issues or questions, as they intend to.  They would also violate the

statute by following through on their intent to expend in direct support of or opposition to a statewide ballot issue or question.

The same goes for the organizational and U.S. citizen Plaintiffs. Section 3517.121(C) prohibits "individuals" and "continuing associations"—regardless of their citizenship—from "directly or indirectly" either "[s]olicit[ing], accept[ing], or receiv[ing] any funds from a foreign national [for certain purposes]" or "mak[ing] a contribution, expenditure, or independent expenditure using any funds the person knows were received from a foreign national [for certain purposes]." Supporting or opposing a ballot issue or question is a prohibited purpose. Ohio Rev. Code § 3517.121(C)(1), (2) (designating prohibited purposes with a reference to division B); *id.* § 3517.121(B)(2) (designating supporting or opposing a ballot issue or question as a prohibited purpose). OPAWL and NEOCH aver that they have knowingly received donations from non-citizen members in the past. OPAWL Decl. ¶ 12, ECF No. 16-1; NEOCH Decl. ¶ 9, ECF No. 16-2. They imply that they will not track noncitizen donations or prevent noncitizens from donating unless Section 121 goes into effect, and even then, may be unable to do so.[11] OPAWL Decl. ¶¶ 21–23, ECF No. 16-1; NEOCH Decl. ¶¶ 10–13, ECF No. 16-2. Yet, OPAWL and NEOCH also avow that they would like to continue supporting or opposing ballot issues and questions with expenditures and contributions.

---

[11] Organizational Plaintiffs also plead facts suggestive of a "diversion of resources" theory of standing, but the Court does not assess this theory because it finds they have standing on other grounds.

*See, e.g.*, OPAWL Decl. ¶ 9, ECF No. 16-1.  Expending and contributing in this way would therefore likely violate Section 121(C) because OPAWL and NEOCH would be using some "funds [it] knows were received from a foreign national" for prohibited purposes.[12]

Third and finally, all Plaintiffs face a credible threat of prosecution if they expend or contribute in connection with ballot issues and questions after Section 121 becomes effective.  Plaintiffs all show their speech would be subjectively chilled. See OWPAL Decl. ¶ 27, ECF No. 16-1; NEOCH Decl. ¶ 18, ECF No. 16-2; Bredendiek Decl. ¶¶ 15, 17–18, ECF No. 16-4, Quilligan Decl. ¶¶13–14, ECF No. 16-5," Garrath Decl. ¶ 21, ECF No. 16-3.  On top of subjective chill, Plaintiffs satisfy the third *McKay* factor (an attribute of the challenged statute that makes enforcement easier or more likely) as well as the fourth (refusal to disavow enforcement of the challenged statute against the particular plaintiffs).

As to the third *McKay* factor (an attribute of the challenged statute that makes enforcement easier or more likely), Section 121 essentially allows any member of the voting-eligible public to initiate an enforcement action by filing a complaint with the attorney general, who "shall investigate" that complaint.  *See* Ohio Rev. Code § 3517.121(G)(2)(b).  An equivalent provision "bolstered" the

---

[12] Even if OPAWL created a separate bank account to hold donations it knowingly received from noncitizens, that still would not remove OPAWL from Section 3517.121(C)(2)'s crosshairs.  So long as OPAWL receives donations from noncitizens, expenditures of funds received from U.S. citizens still might be "using funds received from noncitizens" on the theory that every dollar received from a noncitizen permits a dollar received from a citizen to be spent on a ballot issue.

U.S. Supreme Court's finding of a "substantial," credible threat of future enforcement in *Susan B. Anthony List*, 573 U.S. at 164. The Ohio statute challenged in that case permitted "any person" to file a violation complaint with the Ohio Election Commission. Ohio Rev. Code § 3517.153(A). The Court in *Susan B. Anthony List* reasoned that "[b]ecause the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents." 573 U.S. at 164. The Court found that risk to be "of particular concern" because it would burden "electoral speech." *Id.* at 165. The same risk and a similar concern apply here, and so this Court finds the third *McKay* factor met.

As for the fourth *McKay* factor (defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff), the Sixth Circuit Court of Appeals has found it satisfied when "although government officials had not threatened to enforce a statute against a particular party, 'they also have not explicitly disavowed enforcing it in the future.'" *Friends of George's*, 108 F.4th at 451–52 (Mathis, J., dissenting) (quoting *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015)); *see also Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022). Here, the Attorney General has not disavowed enforcing Section 121 against Plaintiffs. Rather, the Attorney General has staunchly defended his authority to enforce Section 121 against Plaintiffs. This factor is therefore also satisfied.

Having established that Plaintiffs meet all three elements to bring a pre-enforcement challenge to Section 121 under the First Amendment, the Court concludes Plaintiffs have Article III standing.  The Court turns now to the merits of Plaintiffs' First Amendment challenge.

### III.    PRELIMINARY INJUNCTION FACTORS

Plaintiffs move for a preliminary injunction.  In determining whether to grant such a motion, the Court must consider four factors: (1) the moving party's likelihood of success on the merits; (2) the moving party's likelihood of suffering irreparable injury absent the injunction; (3) the probability that granting the injunction will cause substantial harm; and (4) the degree to which the injunction would serve the public interest.  *E.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).   When the potential constitutional violation is of the First Amendment, "only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim?"  *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).  To establish the requisite likelihood of success, the plaintiff need not "establish his right to an injunction wholly without doubt," *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 924 (6th Cir. 1978) (internal quotation marks and citation omitted)

**A.     Plaintiffs are likely to partially succeed on the merits.**

**1.  The First Amendment subjects Section 121 to heightened scrutiny because the law restricts political speech.**

No court has yet addressed the level of scrutiny courts must apply to laws that restrict foreign nationals' political speech.[13]  Indeed, *Bluman* sidestepped the level-of-scrutiny issue, concluding that the federal ban would pass muster even under strict scrutiny.  800 F. Supp. 2d at 285–86.  *Bluman* therefore assumed, without deciding, that bans on foreign national political contributions and expenditures are subject to strict scrutiny.  *Id.*

This Court cannot operate on a similar assumption because the level of scrutiny may be decisive here.  The Court ultimately concludes that Section 121 is likely not, in all respects, closely drawn to the State's interest in preventing foreign influence over Ohio's political processes, but it would likely be rationally related to the same.  The Court must therefore determine whether heightened scrutiny applies to Section 121.

The level-of-scrutiny question is "complex" because "the statute implicates both the First Amendment and national security."  *Bluman*, 800 F. Supp. 2d at 285.  The Court first resolves that tension before deciding which specific level of heightened scrutiny (strict or exacting) applies to each portion of Section 121.

---

[13] *But cf. Minnesota Chamber of Com. v. Choi*, No. 23-CV-2015 (ECT/JFD), 2023 WL 8803357 (D. Minn. Dec. 20, 2023) (applying heightened forms of scrutiny to a Minnesota state statute that limits corporate spending based on a foreign ownership threshold).

      **a.    State regulation of citizens' and resident foreign nationals' political speech is subject to heightened scrutiny because the First Amendment protects their speech.**

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend I, and the Fourteenth Amendment applies that prohibition to the States, *see, e.g.*, *Gitlow v. New York*, 268 U.S. 652 (1925). "Political speech is the primary object of First Amendment protection." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 228 (2014) (Thomas, J., concurring). Political expenditures and contributions qualify as political speech. *See Buckley*, 424 U.S. at 14–17. The First Amendment generally protects political speech by subjecting laws that regulate it to heightened scrutiny.

The First Amendment's protections naturally cover U.S. citizens like Plaintiff Peter Quilligan, *see id.*, and U.S. corporate entities like Plaintiffs OPAWL and NEOCH, *see Citizens United*, 558 U.S. at 365. Insofar as Section 121 restricts their political speech, the law should therefore be subject to heightened scrutiny, by default.

Lawfully resident foreign nationals also generally enjoy First Amendment rights. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (holding that a foreign national who published communist literature was protected by First Amendment); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (noting that the First Amendment does not distinguish between citizens and "resident

aliens"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 270, 271 (1990) (confirming that resident aliens "enjoy certain constitutional rights," including "First Amendment rights"). And the Supreme Court has never held that the First Amendment fails to protect their political speech to the same extent it protects citizens' political speech.[14] Indeed, Chief Justice Rehnquist's opinion for the Court in *Verdugo-Urquidez* suggests that lawfully resident foreign nationals' First Amendment rights are on par with citizens'. *Verdugo-Urquidez*, 494 U.S. at 265 (interpreting the First Amendment's reference to "the people," as including foreign nationals lawfully residing in the U.S., at least those who are "are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.").

Not only does the First Amendment protect lawful resident foreign nationals as speakers, but it also protects U.S. citizens' right to hear those foreign nationals' political speech. The "right to hear" certain speech flows from Justice Holmes's famous "marketplace of ideas" metaphor, reaffirmed by the Supreme Court in *Citizens United*, 558 U.S. at 335, 350–51, 354, 367, 369 (striking down corporate expenditure limits based in part on the theory that "[b]y suppressing the speech of manifold corporations . . . , the Government prevents

---

[14] This proposition is compatible with *Bluman*. To say that foreign nationals enjoy a right is to say nothing about whether the states have a compelling interest to overcome that right in certain circumstances. Therefore, just because the Government has a compelling government interest that allows it to restrict foreign nationals' political speech (where it could not restrict citizens' political speech) does not mean that foreign nationals lack a full right to political speech in the first instance.

their voices and viewpoints from reaching the public and advising voters," and thereby engages in unlawful "censorship.").

Regulations barring certain foreign speakers from sharing their "voices and viewpoints" distorts "the open marketplace of ideas" much like barring corporate voices. Foreign speakers occupy a similar spot in the marketplace as Corporations: their booths are probably next to each other in the "distrusted source" corner. *Id.* at 356. And just as corporations might nonetheless "possess valuable expertise" in their areas, *id.* at 364, so too might foreign nationals have valuable perspectives stemming from their familiarity with different political communities.

In sum, either because it directly protects lawful resident foreign nationals as speakers or because it protects their speech, the First Amendment likely requires courts to review laws like Section 121 (laws that restrict the political speech of lawful resident foreign nationals) with heightened scrutiny, at least as a default.

Congress may displace the default of heightened scrutiny, but the Ohio state legislature cannot. When Congress makes laws concerning foreign nationals that implicate "national security," courts review those laws with great deference. *See, e.g.*, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950). This is because Congress has plenary power to make laws concerning foreign nationals. *See id.* Ohio's power in this realm is not similarly plenary. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003); *Crosby v. Nat'l*

*Foreign Trade Council*, 530 U.S. 363 (2000); *Zschernig v. Miller*, 389 U.S. 429 (1968).

Even so, Defendants argue that Section 121 should be evaluated under rational basis review because it governs foreign citizens, who "do not have a constitutional right to participate in . . . activities of democratic self-government." Resp. 4, ECF No. 29 (quoting *Bluman*, 800 F. Supp. 2d at 288).

Before considering the merits of this argument, it is important to point out that Section 121 does not govern only foreign citizens. Division C acts directly upon U.S. citizens and U.S. corporate entities, such as Plaintiffs Peter Quilligan, OPAWL, and NEOCH. These Plaintiffs assert that Section 121 violates their own First Amendment rights, not just the First Amendment rights of others. Parts of Section 121 trigger heightened scrutiny for this reason alone.

Defendants rely on "political function exception" cases to support their request for rational basis review.[15] Those cases lower the standard of review for laws that exclude foreign nationals from the "most important" government positions. *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991). But all those cases

---

[15]See *Cabell v. Chavez–Salido*, 454 U.S. 432 (1982) (upholding a law barring foreign citizens from working as probation officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding a law barring foreign citizens from teaching in public schools unless they intend to apply for citizenship); *Foley v. Connelie*, 435 U.S. 291 (1978) (upholding a law barring foreign citizens from serving as police officers); *Perkins v. Smith*, 370 F. Supp. 134 (D.Md.1974), *aff'd*, 426 U.S. 913 (1976) (upholding a law barring foreign citizens from serving as jurors); *Sugarman v. Dougall*, 413 U.S. 634, 648–49 (1973) ("citizenship is a permissible criterion for limiting" the "right to vote or to hold high public office").

arise under the Equal Protection Clause alone; none arise under the First Amendment.

That difference matters. The First Amendment establishes an affirmative, substantive right to engage in political speech. The Equal Protection Clause, however, does not establish an affirmative right to be a schoolteacher (*Ambach*) or a probation officer (*Chavez–Salido*); it establishes a right not to be discriminated against based on citizenship. So, although the "political function" exception lowers the standard of review for some State laws that discriminate based on citizenship, it does not lower the standard when the state law prohibits activity—like political speech—that the Constitution otherwise affirmatively protects with heightened scrutiny. Section 121 infringes on lawful resident foreign nationals' First Amendment right to political speech and therefore, triggers heightened scrutiny notwithstanding the political-function exception.

Nor does *Bluman* suggest otherwise. After examining the political function cases, the *Bluman* court stated: "It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government." 800 F. Supp. 2d at 288. But that quotation does not stand for the radical proposition that lawful resident foreign nationals lack a First Amendment right to engage in political speech. Rather, it stands for the more limited proposition that the U.S. Government's compelling interest in defining the

national political community trumps their right to engage in political speech. The Court interprets *Bluman* this way for two reasons.

First, *Bluman* includes the quote in its discussion of the compelling government interest, not a discussion of the appropriate level of scrutiny (an issue which the court dodged).[16] The sentence following the quoted sentence underscores this point: "It follows, therefore, that the United States has a compelling interest for purposes of First Amendment analysis . . . ." *Id.*

Second, this Court doubts that the U.S. Supreme Court would answer such a major question via a summary affirmance. The Supreme Court generally "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Assn's, Inc.*, 531 U.S. 457, 468 (2001) (Scalia, J.). This Court suspects that the Supreme Court did not intend to hide the elephantine holding that lawful resident foreign nationals do not have First Amendment political speech rights in the mousehole of summarily affirming *Bluman*.

Because this Court finds the narrower reading of *Bluman* to be the better reading, it reaffirms that lawful resident foreign nationals have First Amendment rights to political speech that can trigger heightened scrutiny. Section 121 restricts such speech and so likely triggers some form of heightened scrutiny. The next issue is *which* form(s) of heightened scrutiny Section 121 triggers.

---

[16] This makes sense given, as discussed above, the "political function" exception cases from which *Bluman* derived the interest do not analyze laws that implicate constitutional rights other than that guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

### b. Section 121's expenditure bans warrant strict scrutiny; its contribution bans warrant exacting scrutiny.

This which-form-of-heightened-scrutiny issue is much easier to resolve. Since *Buckley v. Valeo*, the U.S. Supreme Court has distinguished between expenditure limits, which receive strict scrutiny on the one hand, and contribution limits, which receive a more forgiving form of heightened scrutiny, on the other. The distinction rests on the rationale that expenditures constitute "core" political expression, while contributions amount to speech that falls "closer to the edges" of political expression. *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161 (2003). Courts therefore review expenditure limits under strict scrutiny and contribution limits according to "exacting scrutiny," under which "the challenged law must advance a sufficiently important state interest and employ means closely drawn to avoid unnecessary abridgment of First Amendment freedoms." *Buckley*, 424 U.S. at 25.

### c. Conclusion on standard of scrutiny

In sum, lawful resident foreign nationals have political speech rights, meaning abridgements of those rights are, by default, subject to a heightened scrutiny. And, separately, regulations on political expenditures and contributions (no matter the source) are, by default, subject to heightened scrutiny. These principles lead this Court to conclude that more than rational basis review applies here.

And, because Section 121 limits both expenditures and contributions, this Court applies two different levels of heightened scrutiny. The Court reviews Section 121's expenditure bans under strict scrutiny and its contribution bans under exacting scrutiny. The test for Section 121's expenditure bans is whether they are narrowly tailored to a compelling state interest. And the test for Section 121's contribution bans is whether they are closely drawn to a sufficiently important state interest.

### 2. Ohio has a compelling interest in preventing foreign influence over state political processes.

*Bluman* leaves little for this Court to analyze on the "compelling state interest" question. As mentioned above, *Bluman* reads the "political function" exception cases to

> set forth a straightforward principle: . . . the United States has a compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process.

800 F. Supp. 2d at 288.

*Bluman*'s holding is binding on this Court.[17]  *See United States v. Singh*, 979 F.3d 697 (9th Cir. 2020) (holding that *Bluman* bound the district court below).

---

[17] Plaintiffs imply that the State does not have a compelling government interest in preventing foreign influence over state politics.  *See* Reply at 6, ECF No. 31.  The Court finds that *Bluman* cannot be plausibly read as Plaintiffs read it.  However, the Court considers Plaintiffs' arguments on this point in determining whether Section 121's provisions are narrow tailored or closely drawn.

*Bluman* does not completely resolve the issue, though. Because *Bluman* was summarily affirmed, its "precedential effect . . . extends no further than the precise issues presented and necessarily decided." *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983). *Bluman* did not decide two compelling state interest issues presented here.

First, *Bluman* did not decide whether *states* have a compelling interest in preventing foreign influence over *state* political processes; it decided that the *federal government* has a compelling interest in preventing foreign influence over the *federal* political process.

States' interest in defining their political community is equivalent to the Federal Government's interest in defining the national political community. And, given that the "political function" exception cases involve state laws, those cases put Ohio's interest here on even firmer doctrinal footing than the federal government interest identified in *Bluman*. The Court accordingly concludes that Ohio has a compelling interest in limiting the participation of foreign nationals in activities of democratic self-government, and in thereby preventing foreign influence over state political processes.[18]

---

[18] *Bluman* also suggests governments have a compelling interest in ensuring that political expenditures "reflect actual public support for the political ideas espoused." *Austin v. Michigan Chamber of Com.*, 494 U.S. 652, 660 (1990), *overruled by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). In this sense, *Bluman* could be understood as reviving the "anti-distortion principal" in the context of foreign nationals' political speech. *Compare* 800 F. Supp. 2d at 291 ("[t]emporary resident foreign citizens by definition have primary loyalty to other national political communities, many

Second, *Bluman* did not deal with ballot issues. *Bluman* only held that candidate-related expenditures implicated the Government's interest in preventing foreign influence over political processes. *Bluman*, 800 F. Supp. 2d at 292 ("Our holding does not address such questions, and our holding should not be read to support such bans."). Plaintiffs here argue that ballot issues do not implicate any state interest. The Court disagrees.

The question is essentially whether ballot initiatives "constitute part of the process of democratic self-government." *Bluman*, 800 F. Supp. 2d at 288. As it was in *Bluman*, *id.*, the answer to that question here is straightforward. Ballot initiatives are perhaps the purest, most democratic "process of . . . self-government." Ballot initiatives are more directly democratic than candidate elections, in that the people make law for themselves, instead of their elected representatives making it for them. Ohio's interest in preventing undue foreign influence is thus at or near its zenith in the context of ballot initiatives. Ohio's compelling interest in protecting its political process from foreign influence thus extends to the ballot initiative process.

Having concluded that Ohio has a compelling state interest, the next question is whether Section 121 is narrowly tailored or closely drawn (depending on the precise provision at issue) to advancing that interest.

---

of which have interests that compete with those of the United States.") *with Austin*, 494 U.S. at 660 (finding immense corporate expenditures distorted the political arena in that they do not "reflect actual public support for the political ideas espoused.").

### 3. Section 121 is not sufficiently tailored to prevent foreign influence in political processes.

#### a. Banning Non-LPR Foreign Nationals from expending or contributing to influence an election is likely narrowly tailored by force of *Bluman*.

*Bluman* renders some—but not all—of Section 121's provisions constitutionally unproblematic. Division B of Section 121 bans foreign nationals from expending or contributing for various purposes, including to influence a candidate election. *Bluman* held that banning Non-LPR Foreign Nationals from expending or contributing to influence a candidate election is narrowly tailored to the compelling government interest in preventing foreign influence in U.S. politics. 800 F. Supp. 2d at 286. Because this Court concludes that an analogous Ohio interest undergirds Section 121, it also concludes that Section 121's ban on Non-LPR Foreign National candidate-related spending is constitutional.

*Bluman* is also controlling as to the narrow tailoring of Division C. That provision prohibits people (both natural and corporate) from receiving funds from foreign nationals. Courts construe limits on the receipt of funds as contribution limits.[19] *See, e.g.*, *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc), *cert. denied on unrelated issue sub nom. Keating v. FEC*, 562 U.S. 1003 (2010). The Court does the same for Division C. *Bluman* upheld the federal

---

[19] The Court understands Division (C)(2) to be effectively coterminous with Division (C)(1). *See*, *supra*, note 7. For this reason, the court treats all of Division C as a contribution limit, even though it also nominally limits expenditures.

contribution limit on Non-LPR Foreign Nationals,[20] finding it narrowly tailored to the compelling government interest in preventing foreign influence in U.S. politics. 800 F. Supp. 2d at 286.[21] Because this Court concludes that an analogous interest also undergirds Division C, it also concludes that provision is constitutional (as to Non-LPR Foreign Nationals).

Section 121 presents two remaining tailoring issues that *Bluman* did not decide, however. First, *Bluman* did not decide whether restricting Non-LPR Foreign National spending on ballot measures is sufficiently. Nor, second, did *Bluman* decide whether infringing on LPR's political speech rights is sufficiently tailored. The Court addresses the first issue in terms of Non-LPR Foreign Nationals, and then addresses Section 121's application to LPRs generally. For the following reasons, the Court holds that the first is sufficiently tailored, but the second is not.

> ### b. Banning Non-LPR Foreign Nationals from expending or contributing for the purpose of express ballot measure advocacy is likely narrowly tailored.

The constitutional propriety of banning any Non-LPR Foreign National political spending on ballot measure advocacy is a close question. As the Court concluded above, ballot initiatives are democratic self-government in its purest

---

[20] The plaintiffs in *Bluman* wanted to make contributions to certain candidates, political parties, and an "independent organization that advocates with respect to certain issues, and candidates." 800 F. Supp. 2d at 285.

[21] The propriety of Division B's limit on what (Non-LPR) foreign nationals may contribute necessitates the propriety of Divisions C's limit on what persons may receive. Contributing and receiving are two sides of the same coin.

form, and Ohio's interest in preventing foreign influence is thus at its zenith in the ballot initiative context. But although Ohio's interest is at its zenith, the risk of foreign influence might be at its nadir in that context. *See Bluman*, 800 F. Supp. 2d at 292 ("Congress could reasonably conclude that the risk of undue foreign influence is greater in the context of candidate elections than it is in the case of ballot initiatives. Congress's determination that foreign contributions and expenditures pose a greater risk in relation to candidate election than such activities pose in relation to ballot initiatives is a sensible one[.]").

That the risk of foreign influence may be at its lowest in the ballot initiative context is also the most forceful thrust of Plaintiffs' argument on narrow tailoring. As they write:

> [I]n ballot issue elections, any speech in favor or against the issue is just more speech. There is no risk that it will alter the issue citizens will vote on, and no one is arguing voters are being bribed to vote a certain way; the only "influence" the speech could have is persuasion. But "the fact that advocacy may persuade the electorate is hardly a reason to suppress it." And the Supreme Court has found that "the direct participation of the people in" an issue-election "increases the need for the widest possible dissemination of information from diverse and antagonistic sources."

Reply at 6, ECF No. 31 (cleaned up) (quoting *Bellotti*, 435 U.S. at 790, 790 n.29). In short, Plaintiffs argue that the "marketplace" for ideas on ballot initiatives should generally be left unregulated under the First Amendment. Couched in narrow tailoring terms, Plaintiffs argue that restricting speech in the ballot initiative context does little to advance the compelling state interest of preventing foreign influence on state politics.

But the same argument could be said of a ban on independent expenditures, yet *Bluman* holds it is constitutional to ban Non-LPR Foreign Nationals from making independent expenditures. So, unless there is a reason to treat independent expenditures differently from ballot-measure expenditures, this Court must hold that banning at least Non-LPR Foreign Nationals from one is just as constitutional as banning them from the other.

And aside from *Bluman*'s force on the issue, this Court finds no reason to treat independent expenditures and ballot issue expenditures differently. Both kinds of spending pose an equivalent risk of "influencing" the Ohio political process.[22] Just like independent expenditures, ballot expenditures can buy "influence over or access to" elected officials, *see Bellotti*, 435 U.S. at 788 n.26; *Citizens United*, 558 U.S. at 359–60 (Kennedy, J.); *id.* at 447–52 (Stevens, J., joined by Ginsburg, Breyer, and Sotomayor, JJ., concurring in part and dissenting in part),[23] or otherwise "distort" Ohio politics. *Austin*, 494 U.S. at 660.

Seeing no principled reason that independent expenditures should be treated differently than ballot initiatives vis-à-vis their ability to "influence the

---

[22] That is why bribery law treats independent expenditures and ballot issue expenditures the same. *See* 18 U.S.C. § 201(b)(2) (forbidding a public official from corruptly seeking "anything of value personally or for any other person or entity" in exchange for official action (emphasis added)); *compare United States v. Menendez*, 132 F. Supp. 3d 635, 640 (D.N.J. 2015) (bribery prosecution based on a contribution to an independent expenditure organization) *with United States v. Siegelman*, 640 F.3d 1159, 1169 n.13 (11th Cir. 2011) (conviction of a former governor for soliciting a donation to an issue-advocacy organization).

[23] True, independent expenditures might buy more influence, dollar-for-dollar, than ballot expenditures. But consider the influence a foreign national could exert by spending unlimited amounts of money on hotly contested partisan ballot initiatives.

political process," the Court treats them alike and finds that, generally, Section 121's expansion to spending on ballot initiatives is more likely than not narrowly tailored.

This conclusion comes with an important caveat, however.  This Court construes Section 121's ban on ballot-issue-related spending as a ban on only express advocacy, not a ban on issue advocacy.  *See Bluman*, 800 F. Supp. 2d at 284–85 (citing *WRTL*, 551 U.S. at 456).  In other words, under the Court's interpretation of Section 121, even Non-LPR Foreign Nationals remain free to "speak[] out about issues or spend[] money to advocate their views about issues."  *Id.* at 290.  Section 121 "restrains them only from a certain form of expressive activity closely tied to the voting process": providing or spending money for the purpose of expressly advocating for or against *a ballot initiative*. And this Court adopts the same guideposts to define "express advocacy" as the U.S. Supreme Court did in *WRTL*: for ballot-related spending to be "express advocacy," the spending must be "susceptible of no reasonable interpretation other than as an appeal to [enact or defeat a certain ballot initiative]."  551 U.S. at 469–70.

### c. Banning LPRs from expending or contributing to either candidates or ballot initiatives is likely not closely drawn (let alone narrowly tailored) to preventing foreign influence.

A statute is not sufficiently tailored if it (i) does not actually advance the state's interest to a significant extent, (ii) sweeps too broadly, or (iii) leaves

significant influences bearing on the interest unregulated.  *See Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (collecting cases).  Section 121's definition of foreign national does all three by including LPRs but not foreign-owned U.S. corporations.

*(i.) Restricting LPRs' political speech likely does not prevent foreign influence.*  For a court to find that a law advances a compelling state interest, "[t]here must be a direct causal link between the restriction imposed and the injury to be prevented."  *United States v. Alvarez*, 567 U.S. 709, 725 (2012).  That is, Defendants must link prohibiting LPRs' political speech to preventing foreign influence.  Defendants have not shown such a link, and neither did the Ohio State Legislature.

To the contrary, Representative Seitz correctly pointed out that only a "selective reading" of *Bluman* could support restricting LPRs' political speech, and he expressed constitutional concerns with amending the original bill to

include LPRs within the definition of "foreign national."[24]  Ohio State Senator

Antani echoed Rep. Seitz's constitutional concerns.[25]

---

[24] Representative Seitz read the following passage from *Bluman*:

> we do not here decide whether Congress could constitutionally extend the current statutory ban to lawful permanent residents who have a more significant attachment to the United States than the temporary resident plaintiffs in this case. Any such extension would raise substantial questions not raised by this case.

Jasrasaria Decl. 25:12–25:18, ECF No. 16-7, PAGEID # 905 (quoting *Bluman*, 800 F. Supp. 2d. at 292).  Adding his gloss on this quote, the Representative continued

> Now, why would they have said that if they meant to say that jurisdictions, states and federal government could bar lawful permanent residents from any form of political participation? Why would they say it was a substantial question? They are trying to tell us something by saying that."

*Id.* at 25:18–26:3, PAGEID # 905–06  And, after assuaging concerns that President Biden could fast-track green cards for liberal foreigners, Rep. Seitz concluded by acknowledging:

> I think it would be a mistake to pass the amendment today. I personally would not have a problem banning green card holders from contributions on the rationale advanced by my friend. But it is not Judge Seitz who makes that decision. It will ultimately be the judges of the federal district, circuit and Supreme Courts of this country. . . . So if we want to get something done and have it be effective in time for the upcoming election, prudentially, we should leave the definition of foreign national alone. . . .

*Id.* at 27:8–27:16.

[25]

> "[T]he bill coming back from the house, goes a step further, which is to say that the definition of foreign national includes lawful permanent residents commonly known as green card holders. That is a big departure from longstanding federal law and presents an incredible issue to this bill . . . . [P]ermanent lawful residents have the right to freedom of speech. That is going to get sued over in this bill. And the entire thing is going to get struck down because we as the legislature are overreaching. Lawful permanent residents have the right to free speech, donating to candidates and campaigns . . . And so, this is going to get mucked up in the courts. I want

This legislative history shows that some members of the Ohio State Legislature knew extending Section 121's reach to LPRs' political speech raised major questions under the First Amendment. But no legislator assuaged those concerns. No one, for example, discussed any actual evidence of undue foreign influence from LPRs. This lack of evidence pushes toward a finding that Section 121 is not narrowly tailored. *McCutcheon*, 572 U.S. at 219–21 (considering evidence of the harm the Government sought to prevent); *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) (same); *Cruz*, 596 U.S. at 306–08 (same). The most the Ohio State Legislature offered was "selective readings" of *Bluman*.

The legislators' "selective readings" aside, *Bluman* expressly declined to decide whether it advanced the Government's interest in preventing foreign influence to ban LPRs' political contributions. If anything, as Rep. Seitz suggested, *Bluman* hints that bans on political spending by LPRs would not be constitutional. In response to the argument that the federal definition of "foreign national" was underinclusive because it excludes LPRs, the *Bluman* court wrote:

> Congress may reasonably conclude that lawful permanent residents of the United States stand in a different relationship to the American political community than other foreign citizens do. Lawful permanent

---

to see a bill that goes into law. I want to see a bill that prohibits foreign nationals from donating to ballot issue campaigns as they are prohibited from donating the candidates. But changing this long departure from federal law, a -- a critical free speech issue is going to cause this bill to get struck down[.]"

*Id.* at 19:11–21:11.

> residents have a long-term stake in the flourishing of American society . . . [L]awful permanent residents share important rights and obligations with citizens; for example, lawful permanent residents may—and do, in large numbers—serve in the United States military. In those two ways—their indefinite residence in the United States and their eligibility for military service—lawful permanent residents can be viewed as more similar to citizens than they are to temporary visitors, and thus Congress's decision to exclude them from the ban on foreign nationals' contributions and expenditures does not render the statute underinclusive.  In fact, one might argue that Congress's carve-out for lawful permanent residents makes the statute more narrowly tailored to the precise interest that it is designed to serve— namely, minimizing *foreign* participation in and influence over American self-government.

*Bluman*, 800 F. Supp. 2d at 290–91 (emphasis in original).  This Court agrees that LPRs' indefinite residence and military service justify sorting them with citizens for First Amendment political spending purposes.

Bolstering the *Bluman* Court's recognition of the "permanent" in "lawful permanent resident," this Court adds that LPRs pay income tax.  Paying taxes is a fundamental civic duty.  In fulfilling this duty, LPRs concretely manifest a commitment to the country's long-term collective well-being.  Taxes paid by LPRs fund all manner of public services (education, healthcare, national defense), including those oriented toward the long-term.  LPRs' long-term stake is what distinguishes them from other non-citizen residents.  That stake fully crystallizes if, after five years, LPRs opt to become full U.S. citizens, but their stake is no less real in the interim.

The Court finds it to be even more significant that LPRs may serve in the U.S. military service and must register for the selective service (depending on

their age).  It would be absurd to allow (or force) LPRs to fight and die for this country, on the one hand, and to prohibit them from making incidental expenditures for a yard-sign that expresses a view on state or local politics, on the other.[26]  This is more than mere rhetoric.  Where is the danger of people beholden to foreign interests higher than in the U.S. military?  Nowhere.  So, if the U.S. Federal Government trusts LPRs to put U.S. interests first in the military (of all places), how could this Court hold that it does not trust them to promote U.S. interests in their political spending?  It cannot.

LPR political spending does not carry a risk of undue foreign influence.  And, so, preventing LPR political spending cannot be closely drawn to Ohio's interest in preventing undue foreign influence.

*(ii.) Whether restricting LPRs' indirect political speech is overinclusive.*  A statute may fail narrow tailoring for being overinclusive—that is, infringing on more First Amendment rights than is necessary to advance the compelling interest.  *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 122 n.* (1991).  Section 121 sweeps in U.S. citizens who share finances with noncitizens.

Plaintiff Peter Quilligan's situation illustrates the statute's overbreadth.  If he were to expend or contribute with money from the joint bank account he

---

[26] Many congresspeople pointed out this absurdity when they considered amending the federal prohibition on foreign national political spending to extend to lawful permanent residents.  *See* 148 Cong. Rec. H369-01, H448–52.

shares with his noncitizen, LPR, wife, then he would have violated Division C of Section 121.  *See* Ohio Rev. Code § 3517.121(C).  No one denies that Mr. Quilligan has a First Amendment right to make expenditures and contributions. By restricting Mr. Quilligan's ability to make expenditures and contributions with money he shares with his noncitizen spouse, Division C therefore impinges these First Amendment rights.  This impingement might be necessary when a U.S. citizen shares finances with a foreign national other than an LPR, but, for the reasons discussed above, it is not necessary when a U.S. citizen shares finances with an LPR.

  *(iii.) Whether restricting LPRs' political speech is underinclusive.*

"[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'"  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (quoting *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011)).  And "[u]nderinclusiveness can also reveal that a law does not actually advance a compelling interest."  *Id.* at 449.  A "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited."  *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) (cleaned up).

Section 121's definition of "foreign national" is underinclusive in that the risk of foreign influence posed by foreign-owned U.S. corporate entities',[27] whose spending Section 121 leaves unfettered, likely qualitatively and quantitively exceeds the same risk posed by LPRs (if LPRs pose any risk at all).

Foreign-owned U.S. corporations have interests "that compete with those of the United States," *Bluman*, 800 F. Supp. 2d at 291, and, by extension, Ohio. This is especially true on matters such as tax, foreign investment, national security, the environment, and labor.  Policies on these matters could benefit persons with a long-term stake in Ohio and the U.S. (like an LPR) but could never benefit a corporation's foreign owners in the same way.

Not only do foreign investors have interests that will diverge from the interests of Ohioans, but corporate directors have fiduciary obligations to consider and possibly pursue those interests.  These duties would require corporate directors to pursue interests at odds with Ohio's, if doing so would maximize profit for the corporation's foreign owners.  Which in turn, may involve political spending on candidates or ballot issues that would promote foreign interests.  All in all, foreign-owned corporations likely pose a much higher risk of

---

[27] By foreign-owned U.S. corporation, the Court means corporations that are both incorporated in the U.S. and have their principal place of business in the U.S., but in which foreign individuals, foreign governments, or foreign entities have an ownership interest.

undue foreign influence over Ohio politics than LPRs,[28] but Section 121 does not regulate them. This reinforces the Court's conclusion that Section 121's definition of foreign national is underinclusive, and thereby not sufficiently tailored to the interest of preventing foreign influence.

*(iv.) Conclusion.* The restrictions imposed by Section 121 on LPRs' political speech are likely not closely drawn to Ohio's interest in preventing foreign influence. Plaintiffs have thus met their burden to show that Section 121 is unconstitutional, at least with respect to its definition of "foreign national."

## B. Plaintiffs have also satisfied the other preliminary injunction factors.

The Court touches only briefly upon the remaining preliminary injunction criteria: irreparable harm, harm to third parties, and the balance of harms with the public interest. *See Fischer*, 52 F.4th at 307 ("[I]n First Amendment cases, only one question generally matters to the outcome: Have the plaintiffs shown a likelihood of success on the merits of their First Amendment claim?"); *Schimmel*, 751 F.3d at 430 (en banc).

---

[28] Foreign-influenced money in U.S. state politics is not a hypothetical concern. *See Minnesota Chamber of Com. v. Choi*, No. 23-CV-2015 (ECT/JFD), 2023 WL 8803357, at *7–8 (D. Minn. Dec. 20, 2023) (discussing evidence of foreign-owned U.S. corporate entities spending in state and local election); Jimmy Cloutier et al., OpenSecrets, *A Case Study of State-Level Corporate Political Contributions in Colorado, Michigan, Minnesota, Montana, New York & Washington*, available at https://www.opensecrets.org/news/reports/foreign-influenced-corporate-money. Foreign-influenced corporate spending occurs in Ohio too. *See* Katz Decl. ¶ 20–27, ECF No. 29-3]. In fact, foreign-influenced corporate money was a primary concern of the Ohio state legislature. Jasrasaria Decl., ECF No. 16-7, PAGEID # 557, 559, 564–66, 574 (discussing the "Sixteen Thirty Fund"); *id.* at PAGEID # 667, 710–14 (referencing a letter and testimony by Professor Lawrence Tribe about "Regulating political spending by corporations with significant foreign ownership").

Because Plaintiffs are likely to succeed on the merits and because "'[t]he loss of First Amendment freedoms, for even minimal periods of time,' amounts to irreparable injury," the irreparable harm factor favors an injunction. *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 408 (6th Cir. 2022) (quoting *Roman Cath. Diocese v. Cuomo*, 592 U.S. 14 (2020) (per curiam)).

The third and fourth preliminary injunction requirements "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors, like the second, turn on whether Plaintiffs are likely to succeed. *See Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001) ("[I]t is always in the public interest to prevent violation of a party's constitutional rights." (quoting *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994))). Plaintiffs' likely success on the merits thereby also pushes the third and fourth factors in favor of an injunction.

Overall, the Court thus concludes that a preliminary injunction is needed to remedy the likely unconstitutional parts of Section 121. The Court now turns to the appropriate scope of that injunction.

## IV. REMEDIES

Plaintiffs brought a facial challenge to Section 121. "A facial challenge to a law is no small matter." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009). At stake is not an attempt to invalidate the law in a discrete setting but an effort "to leave nothing standing." *Id.* (quoting *Warshak v. United*

*States*, 532 F.3d 521, 528 (6th Cir.2008) (en banc)). Before courts order such a remedy, they must determine whether: (1) there truly are "no" or at least few "circumstances" in "which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008); or (2) that a court cannot sever the unconstitutional textual provisions of the law or enjoin its unconstitutional applications. "To do otherwise would amount to a judicial trespass—a court's striking of a law in all of its applications even though the legislature has the prerogative and presumed objective to regulate some of them." *Connecting Distribution*, 557 F.3d at 335. This Court thus considers these two prongs in turn.

Courts modify the few-valid-applications prong of the severability inquiry when the Constitutional provision at issue is the First Amendment. In facial challenges arising under the First Amendment, a law may be invalidated for overbreadth if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n.6 (2008) (internal quotation marks omitted); *see also United States v. Stevens*, 559 U.S. 460, 473 (2010).

As discussed above, much of Section 121 is constitutional. The First Amendment does not protect several of the kinds of "foreign nationals" included in Section 121's definition (foreign governments, foreign political parties, persons organized under foreign law, and persons with their principal place of business in

a foreign country). *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591
U.S. 430, 433–434 (2020) ("[I]t is long settled as a matter of American
constitutional law that foreign citizens outside U.S. territory do not possess rights
under the U.S. Constitution."). Even if it did, banning their political speech would
likely be narrowly tailored to Ohio's compelling interest in preventing foreign
influence on the Ohio political process.

And, for the reasons discussed above, Section 121 also legitimately
sweeps in individual temporary-resident foreign nationals and non-natural
persons that receive funding from foreign nationals (of all kinds other than LPRs).

The Court has found only that Section 121 is overbroad insofar as it
sweeps in LPRs and those who receive money from them.

Thus, the ratio of legitimate-to-illegitimate applications of Section 121 does
not justify blanketly invalidating Section 121. So, the Court turns to the
severability inquiry.

In a case that presents a partial conflict between the Constitution and a
statute, courts are to give "full effect" to the Constitution and to whatever portions
of the statute are "not repugnant" to the Constitution, effectively severing the
unconstitutional portion of the statute. *United States v. Arthrex, Inc.*, 594 U.S. 1,
24 (2021) (Roberts, C.J.) (quoting *Bank of Hamilton v. Lessee of Dudley*, 2 Pet.
492, 526 (1829) (Marshall, C. J.)). To determine severability, courts consider
three things. "First, the Court seeks to avoid 'nullify[ing] more of a legislature's
work than is necessary,' because doing so 'frustrates the intent of the elected

representatives of the people.'"  *Northland Fam. Plan. Clinic, Inc. v. Cox*, 487

F.3d 323, 333 (6th Cir.2007) (quoting *Ayotte v. Planned Parenthood of Northern

New Eng.*, 546 U.S. 320, 329 (2006)).  Second, "mindful that [the Court's]

constitutional mandate and institutional competence are limited, [the Court]

restrain[s] [itself] from rewriting state law to conform it to constitutional

requirements even as [the Court] strive[s] to salvage it."  *Ayotte*, 546 U.S. at 329

(internal alteration and quotation marks omitted).  And third, "the Court considers

legislative intent, and inquires whether the legislature would prefer to have part of

the statute remain in force." *Id.*  This third factor is usually the most important.

*Buckley v. Valeo*, 424 U.S. at 108 (quoting *Champlin Refin. Co. v. Corp. Comm'n

of Oklahoma*, 286 U.S. 210, 234 (1932)).  Courts also generally presume a

provision is severable.  *Id.*

Finding it to be the narrowest remedy available, the Court nullifies Section

121's definition of foreign national individuals (Ohio Rev. Code

§ 3517.121(A)(2)(a)).  To be clear, this means that Defendants are enjoined from

enforcing any of Section 121's provisions in connection with an individual's

political spending.  While the injunction is in effect, Defendants may not enforce

Division B against an individual (LPR or otherwise) who expends or contributes

for any of the listed purposes.  Nor may Defendants enforce Division C against a

person who solicits, accepts, receives, expends, or contributes funds from an

individual foreign national.  Nor may Defendants enforce Division D against

anyone who knowingly aids or facilitates an individual foreign national's political spending.

The Court acknowledges that this injunction prevents Defendants from enforcing Section 121 against temporary resident foreign nationals even though the Court concludes that Ohio generally has the power to do so. The Court is mindful, however, that it may not re-write the statute. Enjoining Defendants from enforcing Section 121 against only LPRs would require the Court to effectively re-write the statute. Preliminarily striking the definitional provision that encompasses foreign nationals is therefore the narrowest remedy the Court can impose.

The Court is also convinced that the legislature would prefer this narrow invalidation to an injunction of Section 121 in its entirety. The remaining portions of the statute hang together without issue. Portions of Section 121 itself reveal an intent that the law apply "to the maximum extent permitted by law and by the constitutions of the United States and of this state." § 3517.121(B)(4), (C). Neither party presents evidence or argument that the Ohio State Legislature would not have enacted Section 121 but for its extension to LPRs. In view of nothing that could overcome the presumption of severability, the Court finds that Division (A)(2)(a) in severable.

## V. CONCLUSION

For these reasons, Plaintiffs' motion is **GRANTED IN PART**.  Defendants, in their official capacities, and their officers, agents, servants, employees, and attorneys, along with other persons who are in active concert or participation with Defendants, are enjoined from pursuing civil or criminal liability for any alleged violations of Ohio Rev. Code § 3517.121 based on the definition of a "foreign national," in Division (A)(2)(a).  Given the strong First Amendment interests at stake and the little harm to Defendants, the Court declines to require Plaintiffs to post security pursuant to Federal Rule of Civil Procedure 65(c).

**IT IS SO ORDERED.**

 _s/ Michael H. Watson_____
**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**