**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

OPAWL – BUILDING AAPI FEMINIST
LEADERSHIP et al.,

                Plaintiffs,

     v.

DAVE YOST, in his official capacity as
Ohio Attorney General et al.,

                Defendants.

Case No. 2:24-cv-3495

Judge Michael H. Watson

Magistrate Judge Kimberly A. Jolson

<u>**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO STAY PENDING APPEAL**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD .......................................................................................................... 2

ARGUMENT ....................................................................................................................... 2

I.   Defendants fail to show that it is likely that this Court's order will be reversed. ............. 2

    A.   Heightened scrutiny applies to HB 1 ......................................................................... 2

    B.   The Court was right to conclude that HB 1's application to lawful permanent residents cannot survive strict scrutiny ....................................................................... 6

    C.   The Court cannot stay portions of the injunction or rewrite it as Defendants request. ................................................................................................................................ 8

    D.   Revising the injunction would require the Court to consider other arguments that it did not need to reach because of the effect of the injunction it issued. ................... 11

II.  The equities weigh strongly against issuing a stay. ....................................................... 15

III. Defendants' reliance on *Purcell* is misplaced ................................................................ 17

CONCLUSION ................................................................................................................. 18

**INTRODUCTION**

A stay pending appeal is an extraordinary remedy, and Defendants fail to carry their heavy burden to show they are entitled to it here. On the most important factor—likelihood of success—Defendants offer no new or compelling arguments to conclude that they are likely to obtain reversal of this Court's preliminary injunction decision. Instead, they primarily repeat their ill-founded assertion that HB 1 is subject to rational basis review, but this argument is contradicted by even the authority upon which Defendants most heavily rely. As for their request that the Court stay parts of its injunction, that, too, is unsound: This Court cannot substitute its own judgment for that of the Ohio General Assembly—which considered a version of the bill that would have excluded lawful permanent residents ("LPRs"), but declined to advance it. Moreover, revisiting the injunction would require the Court to grapple with a host of other questions about HB 1's constitutionality that it did not have to reach in its original order, given its finding that Plaintiffs were likely to succeed on their First Amendment speech claims and the relief that it issued.

On the equities, Defendants fare no better. As the Court recognized, it is *Plaintiffs* who will be irreparably harmed absent an injunction, because of the threat that HB 1 poses to their First Amendment rights; and "[t]he loss of First Amendment freedoms, for even minimal periods of time, amounts to irreparable injury." PI Opinion, ECF No. 32 at PageID 1186 (citation omitted). Defendants' arguments to the contrary are conclusory and ignore that courts have a duty to vigilantly guard against even the risk that a challenged law will infringe protected speech, because the First Amendment needs breathing space to survive. Thus, as Chief Justice Roberts emphasized: "Where the First Amendment is implicated, the tie goes to the speaker, not the censor." *Fed. Election Comm'n v. Wisc. Right to Life, Inc*. ("*WRTL*"), 551 U.S. 449, 474 (2007). Defendants' reliance on the *Purcell* principle is also misplaced. The injunction has no effect on election administration, but even if it did, *Purcell* weighs against a stay, not for it. The Court's order

maintains the status quo and, in doing so, avoids introducing chaos and confusion about who can say what in relation to ballot issues in these critical weeks before a major statewide election.

The motion for a stay should be denied.

## LEGAL STANDARD

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (cleaned up). The Sixth Circuit has explained that "a party seeking a stay must ordinarily demonstrate to a reviewing court that there is a likelihood of reversal." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). In addition, courts consider three other factors in determining whether to grant a motion to stay a preliminary injunction: "[1] the likelihood that the moving party will be irreparably harmed absent a stay; [2] the prospect that others will be harmed if the court grants the stay; and [3] the public interest in granting the stay." *Id.* Each of these factors weighs strongly against granting Defendants' motion to stay.

## ARGUMENT

## I. Defendants fail to show that it is likely that this Court's order will be reversed.

To obtain the extraordinary remedy of a stay, Defendants must, at a bare minimum, "demonstrate more than the mere 'possibility' of success on the merits." *Id.* (quoting *Mason County Medical Ass'n v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977)). Here, Defendants fail to make any showing that they are likely to succeed on appeal. Accordingly, their motion can and should be denied on this basis alone.

### A. Heightened scrutiny applies to HB 1.

This Court got it right when it concluded that HB 1 "likely triggers some form of heightened scrutiny." PI Opinion, ECF No. 32 at PageID 1168. At the heart of Defendants'

2

argument that they are likely to succeed on appeal is their conviction that they will convince the Sixth Circuit that "foreign nationals have no constitutional rights to participate in democratic self-government," including to advocate for or against ballot issues, and that any restriction on election-related spending by noncitizens is subject to mere rational basis review. *See* Stay Motion, ECF No. 34 at PageID 1197. This argument is deeply flawed.

First, the U.S. Supreme Court has indicated that—at the very least—the First Amendment's reference to "the people" includes foreign nationals who "are a part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community," PI Opinion, ECF No. 32 at PageID 1164 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990))—a group that necessarily includes LPRs. The Court noted this in its opinion, yet Defendants do not even mention it; instead, they rest their argument that all noncitizens—including LPRs—are entirely without First Amendment protection when it comes to any election-related speech on their misreading of *Bluman v. FEC*, 800 F. Supp. 2d 281 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012). *See* Stay Motion, ECF No. 34 at PageID 1196–97. But as this Court recognized, *Bluman* did *not* hold that noncitizens have *no* First Amendment rights, even when it comes to participation in "democratic self-government." PI Opinion, ECF No. 32 at PageID 1167–68. It held only that "the United States has *a compelling interest for purposes of First Amendment analysis* in limiting the participation of foreign citizens in activities of American democratic self-government" at issue in that case—i.e., political contributions to candidates and express-advocacy expenditures that support candidates—before concluding that those restrictions could survive strict scrutiny. *Bluman*, 800 F. Supp. 2d at 288 (emphasis added).[1]

---

[1] The *Bluman* court did not define "democratic self-government" beyond stating that it includes "voting, serving as jurors, working as police or probation officers, or teaching at public schools,"

3

Defendants provide no reason to conclude that, by summarily affirming *Bluman*, the Supreme Court endorsed what would, indeed, be an "elephantine holding" that noncitizens—including LPRs—do not have First Amendment speech rights when it comes to effectively *any* spending related in any way to an election. *Id*. at PageID 1168. Nor is there any credible argument that *Bluman* may be read to precedentially hold that it reached such a conclusion as it relates to ballot issues; the court was clear that it had no opportunity to consider, and that its opinion should not be read to support, such a conclusion. *See* 800 F. Supp. 2d at 290, 291 (noting the law at issue in *Bluman* "does not restrain foreign nationals from speaking out about issues or spending money to advocate their views about issues" and that it "permits foreign nationals to make contributions and expenditures related to ballot initiatives"); *id*. at 292 ("Our holding does not address such questions, and our holding should not be read to support such bans."); *see also* PI Opinion, ECF No. 32 at PageID 1171.

Nevertheless, Defendants insist that the scrutiny question is "straightforward," and that rational basis review applies. Stay Motion, ECF No. 34 at PageID 1197. To make this argument, Defendants read a single sentence from *Bluman* out of context, ignoring even the sentence that follows directly after it, and then the entire rest of the opinion after that, which analyzes the law through the lens of strict scrutiny. *See Bluman*, 800 F. Supp. 2d at 288 ("It follows, therefore, that the United States *has a compelling interest for purposes of First Amendment analysis* in limiting the participation of foreign citizens in activities of American democratic self-government, and in thereby preventing foreign influence over the U.S. political process.") (emphasis added); *see also*

---

800 F. Supp. 2d at 283, and "[s]pending money to contribute to a candidate or party or to expressly advocate for or against the election of a political candidate," *id.* at 289–90. It also expressly stated that "democratic self-government" does *not* include "speaking out about issues or spending money to advocate [one's] views about issues." *Id.* at 290 (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 788 n. 26 (1978) (discussing issue advocacy in the context of ballot issue elections)).

PI Opinion, ECF No. 32 at PageID 1164 n.14 (recognizing that just because the government may have a compelling government interest that may allow it to restrict foreign nationals' political speech in ways it could not restrict citizen speech "does not mean that foreign nationals lack a full right to political speech in the first instance").[2]

Endorsing Defendants' argument would also lead to absurd results. Unlike *Bluman*, this case *does* involve a law that "restrain[s] foreign nationals from speaking out about issues or spending money to advocate their views about issues." 800 F. Supp. 2d at 290. As the Supreme Court held nearly fifty years ago, spending to promote or oppose direct democracy measures *is* core political speech. *See Bellotti*, 435 U.S. at 776; *see also* PI Opp., ECF No. 29 at PageID 1064 (Defendants acknowledging the "rich tradition of federal courts recognizing that spending money on ballot issues is core political speech"). But if noncitizens—including LPRs—are entirely outside of the First Amendment's protections in a case like this, nothing would seem to limit states from entirely prohibiting noncitizen speech that could influence voters—including a noncitizen speaking in public about a ballot issue, or even having conversations about their views with citizen friends.

Defendants' argument that the Court is likely to be reversed on the issue of the proper level of scrutiny also ignores the Court's finding that—in addition to the rights that the speakers likely have under the First Amendment—U.S. citizens also have a "right to hear" that speech. PI Opinion,

---

[2] Defendants also ignore that the FEC asked that the *Bluman* court apply rational basis review, and that the court rejected that invitation. The basis for the FEC's argument that rational basis review could apply in *Bluman*, moreover, could not possibly apply to HB 1. This is because the FEC argued that the federal law at issue there should be treated as a special case because it "manifest[ed] a *congressional* judgment on a matter of foreign affairs and national security," *id.* (emphasis added), something that HB 1, as a state law, cannot possibly do. *See* PI Opinion, ECF No. 32 at PageID 1165 (explaining that the Ohio General Assembly, unlike Congress, cannot displace the default standard of heightened scrutiny).

ECF No. 32 at PageID 1164; *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 335, 340, 350–51, 354, 367, 369 (2010) (striking down corporate expenditure limits under strict scrutiny based in part on the theory that "[b]y suppressing the speech of manifold corporations . . . , the Government prevents their voices and viewpoints from reaching the public and advising voters," and thereby engages in unlawful "censorship"); *Suster v. Marshall*, 149 F.3d 523, 533 (6th Cir. 1998) (applying strict scrutiny to affirm preliminary injunction of campaign expenditure limitation where one plaintiff's injury was based on "First Amendment right to receive information" as a voter). The Court found that this was another reason why HB 1 was likely subject to heightened scrutiny, yet Defendants' motion fails to address that conclusion entirely.[3]

In short, Defendants' stay motion is largely based on their contention that the Sixth Circuit is likely to apply rational basis review to Plaintiffs' First Amendment claim. But Defendants provide no credible basis for reaching such a conclusion, failing to carry their burden that they are likely to succeed on appeal.

### B. The Court was right to conclude that HB 1's application to lawful permanent residents cannot survive strict scrutiny.

The Court also correctly found that, even if Ohio has a compelling interest in preventing undue foreign influence, it is plain that "preventing LPR political spending cannot be closely drawn to" that interest. PI Opinion, ECF No. 32 at PageID 1182. Defendants' argument is effectively that, because the court in *Bluman* concluded that the federal law at issue in that case survived strict scrutiny, so, too, must any "ban[] on election spending by foreign nationals." Stay

---

[3] Defendants' arguments also ignore the broad chilling effect that HB 1 has on citizens—not only LPRs and other noncitizens. *See* PI Opinion, ECF No. 32 at Page ID 1182–83. Because the Court enjoined the law as it applies to HB 1's individual definition of foreign national, it did not have to consider whether this impact may also require heightened scrutiny, or if, as discussed *infra* at I.D., HB 1 may be void for vagueness. But before Defendants may succeed on appeal, they will have to show that these issues, too, are not likely to result in a ruling that HB 1 is unconstitutional.

Motion, ECF No. 34 at PageID 1198. But this rewrites longstanding precedent on strict scrutiny and ignores the careful analysis—and distinct features—of the law in *Bluman* itself. Where *Bluman* recognized that carving LPRs *out* of a political spending ban could make a law "more narrowly tailored to the precise interest that it is designed to serve—namely, minimizing *foreign* participation in and influence over American self-government," 800 F. Supp. 2d at 291, Defendants argue that by doing the opposite and including LPRs *in* HB 1's spending ban, Ohio has somehow tailored its law even more narrowly. This is illogical.[4]

So, too, is Defendants' contention that allowing LPRs to spend money to advocate for or against ballot issues is akin to allowing them to vote. As *Bluman* recognizes, "many groups of people who are not entitled to vote may nonetheless make contributions and expenditures related to elections—for example, minors, American corporations, and citizens of states or municipalities other than the state or municipality of the elective office." 800 F. Supp. 2d at 290. These groups, just like lawful permanent residents, are part of the "American political community," even though they cannot vote. *Id.* at 290–91 (finding that LPRs "have a long-term stake in the flourishing of American society"). Nor have other courts had any trouble striking down restrictions on voting-related expression by noncitizens, even as they recognized that the same noncitizens cannot vote. *See Fla. State Conf. of Branches & Youth Units of the NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1314 (N.D. Fla. 2023) (enjoining ban on all noncitizens collecting or handling voter registration forms and rejecting state's justification of ban based on concerns about noncitizen voting). This Court's decision is well in line with these decisions, and Defendants provide no reasonable basis for concluding otherwise.

---

[4] While Defendants note that the *Bluman* plaintiffs argued that the federal spending ban was not narrowly tailored because it did not apply to LPRs, Stay Motion, ECF No. 34 at PageID 1198 n.1, they fail to also note that the court *rejected* that argument. *Bluman*, 800 F. Supp. 2d at 290–91.

**C.** **The Court cannot stay portions of the injunction or rewrite it as Defendants request.**

In the alternative, Defendants ask that this Court revisit its injunction and limit its application to only LPRs. Stay Motion, ECF No. 34 at PageID 1199–1201. Yet the General Assembly already considered a bill that would have excluded LPRs, but affirmatively amended HB 1 to include them. This Court rightly held that "it may not re-write the statute" passed by the General Assembly to effectively put in place legislation that that legislative body itself declined to advance. PI Opinion, ECF No. 32 at PageID 1190; *see also id.* at PageID 1178–80 (discussing the legislative history). But that is exactly what Defendants in effect ask this Court to do—to surgically rewrite the law by excising the part that the legislature consciously and deliberately added by amendment and pretend that the pre-amendment version passed.

If the General Assembly wishes to reconsider the affirmative policy decisions that it made in drafting, amending, and enacting the law, it may do so through the legislative process. Asking that the Court do so in fashioning its relief is clearly outside of this Court's "constitutional mandate and institutional competence." *Liberty Coins, LLC v. Goodman*, No. 2:12-cv-998, 2012 WL 13026818, at *1 (S.D. Ohio Dec. 28, 2012) (Watson, J.) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006)[5]; *see also Eubanks v. Wilkinson*, 937 F.2d 1118, 1127 (6th Cir. 1991) (explaining federal court may not "assume the task of making . . . choices for the state legislature"). *Ayotte* does not help Defendants here. Indeed, this Court hewed closely to that decision's principles in issuing the injunction:

- *First*, "the 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may be declared invalid to the extent that it reaches too far, but otherwise left intact.'" *Ayotte*, 546 U.S. at 328–29 (quoting *Brockett v. Spokane Arcades,*

---

[5] Indeed, in *Liberty Coins*, this Court declined, in part, the defendants' motion to modify the scope of its preliminary injunction because it recognized it cannot rewrite state law. *See* 2012 WL 13026818, at *1–6.

*Inc.*, 472 U.S. 491, 504 (1985)). Here, the Court did not enjoin the entire statute—only a single definition provision.

- *Second*, courts must "restrain [them]selves from 'rewrit[ing] state law to conform it to constitutional requirements' even as [they] strive to salvage it." *Id.* at 329 (quoting *Virginia v. Am. Booksellers Assn., Inc.*, 484 U.S. 383, 397 (1988)). The Court did not insert any words or phrases of its own in issuing its injunction; it would have to do so, however, to grant the relief Defendants now request.

- *Third*, "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'" *Id.* at 330 (quoting *Califano v. Westcott*, 443 U.S. 76, 94 (1979)). Given that the General Assembly adopted an amendment specifically to ensure that HB 1 would regulate LPRs' spending, PI Opinion, ECF No. 32 at PageID 1178–80, the Court was right to not read into HB 1 a distinction between LPRs and other noncitizens.

The Court's approach to the injunction also complied with Ohio law, which is what courts look to in circumstances like these: "[w]hether a portion of a state's statute is severable is determined by the law of that state." *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th Cir. 2018) (quoting *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 371 (6th Cir. 2006)). Under Ohio law, "three questions determine the propriety of severance" when issuing injunctive relief:

> (1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intent of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?

*Liberty Coins*, 2012 WL 13026818, at *2 (quoting *Cincinnati Women's Servs.*, 468 F.3d at 371); *see also J.L. Spoons, Inc. v. O'Connor*, 190 F.R.D. 433, 444–45 (N.D. Ohio 1999) (applying same factors to determine scope of preliminary injunction). Consequently, this Court may not do what Defendants ask it to do—"insert[] words or terms" to rewrite a statute in which "the constitutional and the unconstitutional parts [do not] each . . . read and stand by itself." *Liberty Coins*, 2012 WL

13026818, at *2; *see id.* at *3-4 (denying motion to "effectively rewrit[e] the definition" in a state statute); *id.* at *6 (denying motion to enforce enjoined provision where it "relies on the definition . . . which is the very provision the Court found Plaintiffs are likely to show is unconstitutional"); *cf. id.* at *5 (granting motion to allow enforcement of exemption provision only where "there is no need to insert words or terms to give effect to the . . . provision"). None of the cases Defendants cite suggests otherwise.[6]

Furthermore, if the Sixth Circuit takes a different view on the strength of Plaintiffs' First Amendment claims, it is far more likely to find that HB 1's restrictions on noncitizens with a connection to the United States—not limited to solely LPRs—violate the First Amendment, whether because it concludes that ballot issue-related speech and spending is more properly understood as pure issue speech and may not be restrained under the democratic self-government theory discussed in *Bluman*; that noncitizens other than LPRs do have First Amendment rights to

---

[6] In *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2409 (2024), the Supreme Court simply held that courts must evaluate the full scope of a law's coverage even in the First Amendment context, which Defendants acknowledge this Court did. Stay Motion, ECF No. 34 at PageID 1199. *United States v. Arthrex, Inc.*, 594 U.S. 1, 23–24 (2021), involved federal court review of a *federal* statute as applied to an individual federal government official; it is thus inapposite here, where this Court is limited by principles of federalism and state sovereignty. *See Boos v. Barry*, 485 U.S. 312, 330 (1988) (holding federal courts reviewing a state law cannot "adopt a narrowing construction . . . unless such a construction is reasonable and readily apparent"). Justice Thomas's concurrence in *New Jersey Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 488 (2018), underscores that severability is "in tension with traditional limits on judicial authority" and thus does not help Defendants here. And *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006), is a standing case, which holds only that plaintiffs' injury with respect to their municipal taxes does not give them standing to seek a remedy as to their state taxes. *League of Women Voters v. LaRose*, No. 1:23-cv-02414, 2024 WL 3495332 at *22 (N.D. Ohio July 22, 2024), is a federal preemption case in which the court found that a state law was preempted under Section 208 of the federal Voting Rights Act, which covers only voters who need assistance with voting and thus could only be enjoined as to those voters on that basis. *Id.* at *22. Finally, *Byrd*, 883 F.3d at 627–28, and *Foster v. Dilger*, No. CIV.A. 3:10-41-DCR, 2010 WL 3620238, at *7 (E.D. Ky. Sept. 9, 2010), enjoined specific language within provision of state statutes but did not insert any additional words or terms themselves.

engage in such speech; or that attempting to restrain such speech will impact the First Amendment rights of citizens, LPRs, and others.

Indeed, even as this Court indicated that it believed Ohio might have been able to more directly target noncitizens other than LPRs, it acknowledged that "[t]he constitutional propriety of banning any Non-LPR Foreign National political spending on ballot measure advocacy is a close question." PI Opinion, ECF No. 32 at PageID 1174. And given the precedent holding that "there is no significant state or public interest in curtailing debate and discussion of a ballot measure," *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley, Cal.*, 454 U.S. 290, 299 (1981), the Sixth Circuit could easily conclude that Ohio could not restrict this speech even beyond LPRs. *See, e.g.*, *Bellotti*, 435 U.S. at 775; *Michigan State Chamber of Com. v. Austin*, 832 F.2d 947, 949–50 (6th Cir. 1987). Alternatively, the Sixth Circuit could conclude that HB 1 or its subparts are unconstitutional based on any of the several claims that this Court did not need to decide because of the relief it issued. *See* Complaint, ECF No. 1 at PageID 33–47. This Court should not take Defendants' bait and upset the "narrowest remedy" that it already imposed. PI Opinion, ECF No. 32 at PageID 1190.

> **D.      Revising the injunction would require the Court to consider other arguments that it did not need to reach because of the effect of the injunction it issued.**

Because the Court enjoined HB 1 as it applies to the General Assembly's definition of individual foreign nationals, it did not have to reach several alternative arguments that Plaintiffs made as to the constitutionality of the law, beyond the First Amendment speech claim on which the Court found Plaintiffs were likely to succeed. If the Court limited the injunction in the way that Defendants now urge, it would have to grapple with several of those alternative arguments, which may provide alternative grounds for an injunction with the same effect.

Chief among them are Plaintiffs' arguments that HB 1 is void for vagueness. The Court did not address this claim in its preliminary injunction order because it did not need to, having granted the relief that it did. But if that relief is revised and Plaintiffs are left without protection in full or in part, the Court would need to consider whether those arguments separately require an injunction. It is well established that a law may be unconstitutionally vague either because it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or, independently, because it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). In concluding Plaintiffs have standing, this Court already recognized that HB 1 "allows any member of the voting-eligible public to initiate an enforcement action by filing a complaint with the attorney general, who 'shall investigate' that complaint." PI Opinion, ECF No. 32 at PageID 1159 (quoting HB 1, § 3517.121(G)(2)(b)). And "[b]ecause the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents." *Id.* at PageID 1160 (quoting *Susan B. Anthony List*, 573 U.S. 149, 164 (2014)).

This in and of itself raises a clear (and unacceptable) risk of arbitrary and discriminatory enforcement in violation of the First and Fourteenth Amendments, rendering the law void for vagueness. The Court's injunction currently protects Plaintiffs against that risk, because it renders unenforceable the "foreign national" definition that threatens Plaintiffs. But if the Court were to revise the injunction to protect only LPRs, it would revive this different, but equally unconstitutional, threat of arbitrary and discriminatory enforcement inherent in the text of HB 1, which requires that investigations must follow from any complaint, filed by any elector, without any threshold basis of proof. The threat would follow not only to noncitizens other than LPRs, but

12

also to citizens and LPRs, who could be accused of violating HB 1 in myriad ways involving receipt or facilitation of noncitizen spending—all without requiring any showing of any evidence of an actual violation. As courts have recognized, the mere threat of an investigation is, on its own, a constitutional injury. *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1226 (9th Cir. 2000); *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521, 1530 (10th Cir. 1994).

Beyond the issue of the guarantee that HB 1, as written, threatens Plaintiffs with arbitrary or discriminatory enforcement, several of its other provisions fail to provide people of ordinary intelligence a reasonable opportunity to understand what it prohibits—another, independent basis for finding the law unconstitutionally vague. Plaintiffs will not repeat all of these infirmities here, but they include a complete lack of clarity as to when HB 1's restrictions on ballot issue-related spending are triggered. On its face, HB 1 prohibits political spending "in support of or opposition to a statewide ballot issue or question, *regardless of whether the ballot issue or question has yet been certified to appear on the ballot*." HB 1, § 3517.121(B)(2) (emphasis added). This language is temporally limitless, making it impossible for persons of ordinary intelligence to know when they need to stop engaging in speech or spending that could be deemed to advocate for or against issues that may someday become certified ballot issues.[7] And because the law prohibits not just noncitizen spending but also acceptance, use, aid, and facilitation of the same, this lack of clarity threatens citizens and LPRs, as well as noncitizens with other immigration statuses.[8]

---

[7] Although this Court "construes [HB 1's] ban on ballot-issue-related spending as a ban on only express advocacy," PI Opinion, ECF No. 32 at PageID 1177, it would have to grapple with the vagueness of the language as written if HB 1 were to apply to individual noncitizens who could be subjected to investigation by the Attorney General on the basis of a single complaint by any Ohio elector. HB 1, § 3517.121(G)(2).

[8] Subdivision (C)(2) creates a similar temporal issue. Although this Court reads (C)(2) as "redundant" to (C)(1), PI Opinion, ECF No. 32 at PageID 1148, that provision could be applied retroactively where a person expends or contributes funds knowingly received from a foreign

Other major issues with HB 1 that the Court did not have to address based on its decision to issue the injunction at issue include the lack of a *mens rea* requirement in division (B)'s restrictions on political spending, which is likely to "have a profound chilling effect," *Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 205–06 (6th Cir. 1997), particularly here, where the Attorney General is required to investigate any complaint filed by *any* elector alleging a violation of HB 1, § 3517.121(G)(2). Modifying or lifting the injunction would also threaten to impinge the speech and associational rights of citizens and LPRs who share finances with those individuals, just as this Court recognized that enforcing HB 1 against Plaintiff Elisa Bredendiek would impinge the First Amendment rights of her citizen spouse Plaintiff Peter Quilligan. PI Opinion, ECF No. 32 at PageID 1182–83. Again, HB 1's novel and broad investigation and enforcement provisions make the risk of chilling far more palpable here than under the analogous, pre-existing prohibition on candidate-related spending. *See* Ohio Rev. Code § 3517.13(W)(2).

The same is true of the implications for the speech and associational rights of U.S. entities that include any foreign nationals in a decision-making or ownership capacity, however small. Although "foreign organizations operating abroad have no First Amendment rights," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020), domestic corporations are protected under the First Amendment, *Citizens United*, 558 U.S. at 342 (collecting cases). Indeed, *Bluman* itself recognized that "American corporations . . . [are] members of the American political community." 800 F. Supp. 2d at 290. "There is no support for the proposition that corporations lose their First Amendment protections merely because a foreign national purchases some share or interest, no matter how small . . . . And no case holds that a corporation ceases to be 'American'

---

national *after* HB 1 takes effect, that it received from a foreign national *prior* to HB 1 taking effect and thus that did not violate subdivision (C)(1). *But see id.* at PageID 1148 n.8.

by virtue of any quantum of foreign ownership." *Minnesota Chamber of Com. v. Choi*, 707 F. Supp. 3d 846, 858 (D. Minn. 2023) (citing *Citizens United*, 558 U.S. at 342). The Court also did not reach Plaintiffs' separate associational claims, *see* PI Motion, ECF No. 16 at PageID 90–92; PI Reply, ECF No. 31 at PageID 1127–28.

In sum, HB 1's countless constitutional infirmities make it far more likely that the Sixth Circuit will affirm the injunction, either on the grounds upon which it was issued, or any number of alternative grounds. Yet Defendants address none of these arguments in their motion for a stay.

## II.     The equities weigh strongly against issuing a stay.

Although the stay inquiry ends when movants fail to show, at a bare minimum, that there are "serious questions going to the merits," *Griepentrog*, 945 F.2d at 153–54, Defendants also fail to establish that they would suffer irreparable harm without a stay. They "have articulated no irreparable harm that will befall the State in the absence of a stay, excepting the general harm of being enjoined from effectuating its statutes." *Graveline v. Johnson*, 747 F. App'x 408, 415 (6th Cir. 2018) (denying stay motion). But a state is only harmed by enjoining enforcement of *lawful* provisions. *See Abbott v. Perez*, 585 U.S. 579, 602 (2018) (recognizing that injunction could not cause harm if the statute is "unconstitutional"); *Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., concurring) (explaining that injunction implicated Idaho's "sovereign interest in the enforcement of initiative requirements that are likely consistent with the First Amendment" (emphasis added)). Defendants' broad claim that "the State always suffers irreparable harm when its lawful regulations are enjoined," Stay Motion, ECF No. 34 at Page ID 1201, moreover, relies on a case that did not implicate the First Amendment, and fails to grapple with the risk that the law may chill even speech that Defendants acknowledge is protected.

On the flip side, Defendants blithely assert that "no one will suffer if HB 1 goes into effect" and that it will not "harm the American Plaintiffs." Stay Motion, ECF No. 34 at PageID 1202. But

this is assuredly wrong. In support, Defendants simply repeat arguments rejected by this Court and ignore this Court's findings. But as this Court found, Plaintiffs' briefing and supporting declarations detail the many ways HB 1's enforcement would cause them irreparable harm. *See* PI Motion, ECF No. 16 at PageID 97–98; PI Reply, ECF No. 31 at PageID 1133–35. And that harm would continue, even if this Court were to grant Defendants' alternative relief and stay just the portion of its injunction that applies to individual noncitizens who are not LPRs. *See, e.g*., Hilario Decl., ECF No. 16-1 at PageID 104 (explaining OPAWL has members and contributors who are not citizens or LPRs, as well as citizen and lawful permanent resident members with family members who are not); Imran Decl., ECF No. 16-6 at PageID 131–35 (declaration from OPAWL member on student visa). As a practical matter, the harm that could follow if the injunction were stayed cannot be overstated. Literally overnight, thousands of unverified complaints could be submitted by electors to the Attorney General targeting American citizens and domestic organizations—including "the American Plaintiffs"—involved in pure issue advocacy right now in Ohio. Because an elector's complaint need only "alleg[e] a violation" of Section 3517.121 and need not specify the basis of such allegation to trigger a mandatory investigation by the Attorney General, *see* HB 1, § 3517.121(G)(2)(b), targeted citizens and domestic organizations could be subjected to having their constitutionally-protected issue advocacy invaded and interrupted by an investigation without any advance specification as to what they are charged with, much less whether it purportedly relates to LPRs or non-LPR foreign nationals, until long after this election is over. That is the essence of harm, indeed irreparable harm.

Defendants' public interest arguments are equally unavailing. They mistakenly assert it is "always" in the "public interest" to "give effect to the will of the people by enforcing the laws . . . their representatives enact." Stay Motion, ECF No. 34 at PageID 1202. But that is not universally

16

true; "the public is certainly interested in the *prevention* of enforcement of ordinances which may

be unconstitutional." *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d

1390, 1400 (6th Cir. 1987) (emphasis added). If the public interest always weighed in favor of a

state's right to enforce its laws, this factor would be rendered meaningless. Defendants also repeat

a refrain about "election integrity," without any indication as to how HB 1 affects it. Stay Motion,

ECF No. 34 at PageID 1202.

### III.    Defendants' reliance on *Purcell* is misplaced.

Finally, Defendants are wrong to invoke the *Purcell* principle as a reason to stay this

Court's injunction. *Purcell* urged courts to consider whether a last-minute change is likely to sow

widespread voter confusion, undermine confidence in the election, or create insurmountable

administrative burdens on election officials. *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006). There is

no evidence of any of that here, nor could there be: HB 1 does not concern the administration of

elections but instead regulates only political spending, including related to issue advocacy.

Moreover, here, unlike in *Purcell*, the "status quo is one in which the challenged requirement has

not been in effect," *Republican Nat'l Comm. v. Common Cause Rhode Island*, 141 S. Ct. 206, 206

(2020) (denying application for stay).

Thus, if *Purcell* has any application here, it favors the maintenance of the injunction, which

maintains the status quo; staying it would *cause* confusion rather than assuage it. Federal courts

regularly reject *Purcell* arguments offered in similar circumstances. *See, e.g*., *Feldman v. Arizona

Sec'y of State's Off*., 843 F.3d 366, 368–69 (9th Cir. 2016) (distinguishing *Purcell* because the

"injunction does not affect the state's election processes or machinery" and it "restores the status

quo ante to the disruption created by the . . . legislature"). The Sixth Circuit is no different: it has

consistently denied stay motions where the "case does not involve the potential disruption of

complicated election-administration procedures on the eve of Election Day." *Michigan State A.*

*Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016). And it has found it "[o]f particular significance" where "the district court's grant of a preliminary injunction maintained the status quo." *Id.* Here, the injunction maintains the status quo regarding noncitizens' political spending in Ohio. Adopting Defendants' *Purcell* arguments would contravene Supreme Court and Sixth Circuit precedent that warn *against* changing practices too close to elections, and it would instead allow sweeping restrictions on election-related speech to take effect just weeks before general election voting in Ohio begins.

## CONCLUSION

Defendants' motion to stay the injunction pending appeal should be denied.

/s/ C. Benjamin Cooper
C. Benjamin Cooper      (0093103)
   *Trial Attorney*
Kaela King (0100098)
COOPER ELLIOTT
305 West Nationwide Boulevard
Columbus, Ohio 43215
(614) 481-6000
(614) 481-6001 (fax)
benc@cooperelliott.com
kaelak@cooperelliott.com

Elisabeth C. Frost*
Jyoti Jasrasaria*
Melinda K. Johnson*
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: 202-968-4490
efrost@elias.law
jjasrasaria@elias.law
mjohnson@elias.law

*Attorneys for Plaintiffs*

\* *Admitted pro hac vice*

18

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 65.1(b), I HEREBY CERTIFY that on this 5th day of September, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>/s/ C. Benjamin Cooper</u>