### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**OPAWL – Building AAPI Feminist Leadership,** *et al.,*

        **Plaintiffs,**

      **v.**

**Dave Yost, in his official capacity as Ohio Attorney General,** *et al.*

        **Defendants.**

**Case No. 2:24-cv-3495**

**Judge Michael H. Watson**

**Magistrate Judge Kimberly Jolson**

### <u>OPINION AND ORDER</u>

Ohio Attorney General Dave Yost and Secretary of State Frank LaRose ("Defendants") move for an order staying enforcement of the preliminary injunction that this Court issued against a portion of Ohio Revised Code Section 3517.121 ("Section 121").  ECF No. 34.

That law prohibits "foreign nationals" from directly or indirectly making political expenditures or contributions, Ohio Revised Code § 3517.121(B), and persons (natural and non-natural) from receiving the same, *id.* § 3517.121(C). Section 121 defines "foreign nationals" to include:

> (a) In the case of an individual, an individual who is not a United States citizen or national;
>
> (b) A government of a foreign country or of a political subdivision of a foreign country;
>
> (c) A foreign political party;
>
> (d) A person, other than an individual, that is organized under the laws of, or has its principal place of business in, a foreign country.

*Id.* § 3517.121(A)(2).

The Court preliminarily enjoined Defendants from enforcing Section 121 in connection with only one of those definitional provisions.  *See generally* O&O, ECF No. 32.  Section 121(A)(2)(a) reaches all noncitizen individuals, including lawful permanent residents ("LPRs") also known as green-card holders.  But the Court found that LPRs, as a class, do not likely present a sufficient risk of foreign influence.  The Court thus concluded that Section 121(A)(2)(a)) is likely not sufficiently tailored to the State's interest in preventing foreign influence and so is likely unconstitutional under the First Amendment.  Consistent with this conclusion, the Court enjoined all enforcement of Section 121 based on that (and only that) definitional provision.[1]  The Court also concluded its remedy was the narrowest possible; anything narrower would involve rewriting the statute.

Defendants, in their motion to stay, primarily argue that the Court was wrong on the merits.  Specifically, Defendants reassert their arguments that (1) Section 121 should be reviewed under rational basis review and (2) Section 121 is sufficiently tailored to a sufficiently important government interest, no matter the applicable level of scrutiny.  To these arguments, Defendants add in the alternative that the Court's injunction is too broad.

The Court already considered and rejected these arguments when it partially granted Plaintiffs' motion for a preliminary injunction.  Elaborating on its reasoning, the Court does so again.  Defendants' motion is **DENIED**.

---

[1] Defendants can enforce Section 121 in accordance with the other definitional provisions.

## I.    STANDARD OF REVIEW

Defendants correctly set out the standard of review:

> When considering a motion for stay pending appeal, the Court considers "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." These factors are not each prerequisites to a stay pending appeal but are "interconnected considerations" to be balanced by the reviewing court.

Mot. 3, ECF No. 33 (quoting *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006)). This standard should be familiar. It is the same standard the Court applied in partially granting Plaintiffs' motion for a preliminary injunction. *Commonwealth v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020).

## II.    DISCUSSION

### A.    Defendants are unlikely to succeed on appeal.

#### 1.    The Sixth Circuit is unlikely to apply rational basis review to Section 121 in its entirety.

Defendants present nothing new on this score. They over-read *Bluman v. Fed. Election Comm'n* as standing for the proposition that foreign nationals—including those lawfully residing here—lack a First Amendment right to political speech. Mot. 3–4, ECF No. 32 (citing 800 F. Supp. 2d 281 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012)); *see also* Reply 1–3; ECF No. 37. Laws restricting foreign national political speech, Defendants purport, thus receive rational basis review.

Defendants' interpretation of *Bluman* relies on two things: out-of-context cases and an out-of-context quotation. Putting the cases and the quotation back

in their context, neither support the application of rational basis review to laws restricting the political speech of resident foreign nationals (let alone LPRs).[2]

Defendants invoke the "political function exception" cases as proof that rational basis review applies here. Those cases all arise in the Equal Protection context; none arise in the First Amendment context. This difference is crucial, though Defendants elide it. The "political function exception" cases prove only the limited proposition that resident foreign nationals lack a right to equally access certain public employment. But although there is a right to equal protection of the law, there is no fundamental right *to access public employment* in the first place. By contrast, the right to engage in political speech is fundamental; laws that implicate it trigger strict scrutiny. *See generally Buckley v. Valeo*, 424 U.S. 1 (1976). And the Supreme Court has extended this right to resident foreign nationals. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). So, cases on laws restricting resident foreign national public employment (which implicate the right to equal protection of the laws but no other) do not lower the standard of scrutiny for laws restricting resident foreign national political speech (which implicate a free-standing fundamental right guaranteed by the First Amendment).[3]

Nor does *Bluman* lower the standard by its own force. Defendants misconstrue the following line: "foreign citizens do not have a constitutional right

---

[2] For more on this point see O&O 24–31, ECF No. 32.

[3] Furthermore, the activities in the political function cases have little expressive value.

to participate in, and thus may be excluded from, activities of democratic self-government." *Bluman*, 800 F. Supp. 2d at 288. *Bluman* makes this statement for one purpose only: to identify the Government's compelling state interest. *See id.* ("It follows, therefore, that the United States has a compelling interest for purposes of First Amendment analysis . . . ."). Yet Defendants try to use it for a distinct purpose, for which it cannot be used: to identify the applicable standard of scrutiny.

*Bluman* explicitly ducked the standard of scrutiny question. *Bluman* declined the FEC's invitation to apply rational basis review, instead opting to "assume for the sake of argument" that banning political spending by resident foreign nationals triggers strict scrutiny. *Bluman*, 800 F. Supp. 2d at 285–86. The point here is not just that *Bluman* lacks the precedential effect Defendants implicitly ascribe it (though that is also true, as discussed below). The point is that Defendants misconstrue the line on which they fixate. If, as Defendants say, *Bluman* concluded that resident foreign nationals do not have political speech rights, then it could have just dismissed plaintiffs' claim on that basis. Why bother with strict scrutiny analysis at all? There is only one possible explanation: *Bluman* recognized that resident foreign nationals may have political speech rights warranting strict scrutiny but concluded that a ban narrowly tailored to the interest of preventing foreign influence over domestic political processes would constitutionally overcome any speech rights resident foreign nationals may have.

*Bluman*'s discussion of issue advocacy further reinforces this Court's reading.  If *Bluman*'s "essential holding" is that "by definition" foreign nationals lack political speech rights under the First Amendment, Mot. 4, ECF No. 34, then *Bluman* would unavoidably support a ban on foreign nationals' issue advocacy.  Yet *Bluman* emphatically denies that it supports a ban on issue advocacy.  800 F. Supp. 2d at 284.  In response to the "concern that Congress might bar [foreign nationals] from issue advocacy and speaking out on issues of public policy," the *Bluman* court clarified that its "holding does not address such questions, and . . . should not be read to support such bans."  *Id.* at 292.  Why not?  Again, there is only one explanation: the *Bluman* court recognized that resident foreign nationals may have a First Amendment right to engage in political speech.  *Bluman* acknowledges that, even though a law targeting express advocacy overcomes non-LPR foreign nationals' political speech right, that right might still shield their issue advocacy.

Even if Defendants' reading of *Bluman* were correct, it would not bind this Court (much less the Sixth Circuit).  As the Court explained in its prior Opinion, the binding effect of summary affirmances by the U.S. Supreme Court "extend[s] no further than the precise issues presented and necessarily decided."  *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983).  *Bluman* was summarily affirmed, 65 U.S. 1104 (2012), and expressly declined to decide what level of scrutiny applies.  *See Bluman*, 800 F. Supp. 2d at 285–86.  And, even if *Bluman* had held that temporary resident foreign nationals lack First Amendment rights (which it

did not), the rights of LPRs were not at issue in *Bluman.* *Id.* at 292 ("[W]e do not here decide whether Congress could constitutionally extend the current statutory ban to lawful permanent residents . . . ."). *Bluman* therefore has no precedential effect on the appropriate level of scrutiny.

Other cases—which the Court discussed in its Opinion, but which Defendants mostly ignore[4]—do have precedential effect on the appropriate level of scrutiny, however. *See, e.g.*, *Bridges*, 326 U.S. at 148. *Bridges* involved an Australian citizen lawfully residing in the U.S. who published literature affiliated with the Communist Party of the United States and in support of Communist candidates. *Id.* The Supreme Court held that "[f]reedom of speech and of press is accorded aliens residing in this country," and the Australian citizen's communist political speech was therefore "entitled to that protection." *Id.* Defendants' reading of *Bluman* is in stark tension with this "well settled" point of law. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring in part); *see also* O&O 30, ECF No. 32 (questioning whether the Supreme Court would abrogate this point of law with a summary affirmance).

---

[4] In their Reply, Defendants acknowledge Plaintiffs' argument that restrictions on resident foreign national political speech receive heightened scrutiny because they are part of "the people" protected by the First Amendment, under *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). Reply 2–3, ECF No. 37. Rather than refute this premise, Defendants retreat to the position that the Court's injunction is too broad. *Id.*

Even if resident foreign nationals lack political speech rights, their political speech might still be protected by U.S. citizen's right to hear their speech.[5] *See* O&O 26–27, ECF No. 32 (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 335, 350–51, 354, 367, 369 (2010)); *Citizens United*, 558 U.S. at 351 ("[T]he First Amendment generally prohibits the suppression of political speech based on the speaker's identity."); *Suster v. Marshall*, 149 F.3d 523, 533 (6th Cir. 1998) (applying strict scrutiny to affirm a preliminary injunction of a campaign expenditure limitation where one plaintiff's injury was based on "First Amendment right to receive information" as a voter); *Abrams v. United States*, 250 U.S. 616, 630–31 (1919) (Holmes, J. dissenting).

In sum, Defendant's argument for rational basis review is unlikely to persuade the Sixth Circuit. It rests on a strained—one might say "selective"[6]—reading of *Bluman* and the "political function exception" cases. And that reading crashes against "well settled" Supreme Court precedent without any precedential effect of its own.

---

[5] In their Reply, Defendants acknowledge that *Citizens United* "extensively discussed the right of the public to hear the 'voices and viewpoints' of all kinds of speakers." Mot. 3, ECF No. 37. Again, Defendants do not dispute the validity of this premise. Instead, based on *Bluman*, Defendants argue *Citizens United* is entirely consistent with a ban on foreign political spending. The Court agrees, as should be obvious from the partial nature of its injunction. But here is where the Court disagrees: a ban on foreign political spending is inconsistent with the *Citizens United* right to hear voices and viewpoints if the ban fails strict scrutiny. *Bluman* offers Defendants no refuge; the law it faced survived strict scrutiny.

[6] *See* O&O 40–41, ECF No. 32 (discussing the constitutional concerns Representative Seitz voiced about extending Section 121 to LPRs based on *Bluman*) (quoting Jasrasaria Decl. 25:12–25:18, ECF No. 16-7, PAGEID # 905–06).

**2.     Section 121's bar on LPR political speech is unlikely to survive heightened scrutiny.**

Defendants take issue with how the Court frames its tailoring analysis. On their view, the tailoring inquiry is not whether the law prevents foreign influence but whether the law limits participation in an activity closely related to democratic self-government. *See* Mot. 4–6, ECF No. 34. Their view depends on another selective reading of *Bluman*, fixed on the underlined in the following quotation:

> [T]he United States has a compelling interest for purposes of First Amendment analysis <u>in limiting the participation of foreign citizens in activities of American democratic self-government</u>, and in thereby preventing foreign influence over the U.S. political process.

800 F. Supp. 2d at 288. No doubt "limiting participation . . . in . . . democratic self-government" is part of the interest *Bluman* identified. But, as this quote makes clear, the interest *Bluman* identified is in limiting participation *that carries a risk of foreign influence*. A law does not further the compelling interest identified in *Bluman* unless it prevents foreign influence.

That rule follows directly from language in *Bluman*. That is the import of the "and in thereby preventing foreign influence" in the quotation above. The rest of *Bluman* reinforces this reading. Every time *Bluman* refers to the Government's compelling interest after its initial formulation (quoted above), it mentions "preventing foreign influence." The same is not true for "limiting foreign participation"; sometimes the court describes the interest as only "preventing

foreign influence."[7]  And when "limiting foreign participation" does get mentioned, it is always alongside "preventing foreign influence."[8]  All in all, at a minimum, "preventing foreign influence" is an essential aspect of the compelling government interest recognized in *Bluman*.  It is so essential that a law limiting resident noncitizen participation can be narrowly tailored to that interest only if the law thereby prevents foreign influence.

Many lines from *Bluman* would be senseless if the rule were otherwise. For example, in response to the argument that the federal ban is not narrowly tailored because it permits foreign nationals to spend on ballot initiatives, the *Bluman* court reasoned that "Congress could reasonably conclude that the *risk of undue foreign influence* is greater in the context of candidate elections than it is in the case of ballot initiatives."  800 F. Supp. 2d at 291.  That is, *Bluman* focused its narrow tailoring analysis on the risk of foreign influence, not the degree of connection to democratic self-government.  Notably, *Bluman* maintained this focus for ballot initiatives—the quintessential activity of democratic self-

---

[7] *See, e.g.*, *Bluman*, 800 F. Supp. 2d at 289 n.3 ("Here, the government's interest is in *preventing foreign influence* over U.S. elections." (emphasis added)); *id.* at 290 ("The compelling interest that justifies Congress in restraining foreign nationals' participation in American elections—*namely, preventing foreign influence* over the U.S. government—does not apply equally to minors, corporations, and citizens of other states and municipalities." (emphasis added)).

[8] *See id.* at 288 ("[T]he government may bar foreign citizens (at least those who are not lawful permanent residents of the United States) from participating in the campaign process *that seeks to influence* how voters will cast their ballots in the elections" (emphasis added)); *id.* at 291 ("Congress's carve-out for lawful permanent residents makes the statute more narrowly tailored to the precise interest that it is designed to serve—namely, minimizing foreign participation in *and influence over* American self-government" (emphasis added)).

government. If narrow tailoring turned instead on the degree of connection to democratic self-government (as Defendants would have it), then *Bluman* would have determined that the federal ban is underinclusive insofar as it permits foreign national spending on ballot initiatives. But it did not; it found that excluding ballot initiatives "does not undermine the validity of the statutory ban on contributions and expenditures." *Id.* From *Bluman* it therefore follows that courts should focus the First Amendment narrow tailoring inquiry on the risk of foreign influence, as this Court did in its prior opinion and as it does again here.

None of Defendants' other criticisms deter the Court from focusing on the risk of foreign influence. Defendants find it "ironic" that the plaintiffs in *Bluman* argued that federal law was *underinclusive* because it did not apply to LPRs but that this Court found Section 121 *overinclusive* for that exact same reason. Mot. 5 n.1, ECF No. 32. The true irony is that Defendants continue to push the theory that including LPRs makes Section 121 more narrowly tailored, even though *Bluman* specifically rejected it. 800 F. Supp. 2d at 291 (intimating that "Congress's carve-out for lawful permanent residents makes the statute more narrowly tailored to the precise interest that it is designed to serve . . . ."). The Court finds Defendants' theory just as unconvincing as it did before and as the court did in *Bluman*.

Defendants conclude their criticism of the Court's foreign-influence-focused frame with a baffling non sequitur: "under the Court's analysis, it is doubtful that a State's ban on voting by lawful permanent residents could be

upheld." **This is simply not true.**[9] A State ban on LPR voting can straightforwardly be upheld under this Court's analysis—just as a ban on corporate voting can be upheld under *Citizens United*, 558 U.S. 310 (2010) (striking down restrictions on corporate political speech), and a ban on minor-age children voting can be upheld under *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 231–32 (2003) (striking down restrictions on minors' political speech). Defendants' slippery slope argument lacks grease because the First Amendment right to engage in political speech is simply not co-extensive with the right to vote. *See Bluman*, 800 F. Supp. 2d at 290.

Defendants' perplexing and alarmist aspersions aside, all told, this Court applied the correct method of analysis in partially granting Plaintiffs' motion for a preliminary injunction. A law restricting political speech must "prevent foreign influence" to be narrowly tailored to the interest identified in *Bluman*. Having clarified the proper method, the Court now (re)applies it.

LPRs likely present an insufficient risk of foreign influence. The rights and privileges that the U.S. Federal Government extends to LPRs—most notably, the privilege to serve in the U.S. military—belies any notion that LPRs present an

---

[9] Defendants' motion misrepresents what this Court held. Defendants seem to believe the Court held (i) "lawful permanent residents has First Amendment rights to political participation" and (ii) "the States' interests in limiting foreign influence cannot apply to them." The Court held neither. First, the Court held that LPRs have a First Amendment right to engage in political *speech*; not a separate right to "political participation." Second, the Court held that although the State has a compelling interest in limiting foreign influence (which could theoretically be applied to LPRs), Section 121 is not sufficiently tailored to that end insofar as it extends to LPRs because there is no evidence that LPRs present a risk of foreign influence.

appreciable risk of foreign influence. *See* O&O at 42–43, ECF No. 32. And, in

any event, Defendants fail to offer a scintilla of evidence that LPRs in fact present

such a risk, despite their burden to do so, *Republican Party of Minnesota v.*

*White*, 536 U.S. 765, 774 (2002) (placing the burden of proof on the state), and

despite *Bluman*'s remark that LPRs might not be "foreign" at all, 800 F. Supp. 2d

at 291 ("[L]awful permanent residents can be viewed as more similar to citizens

than they are to temporary visitors.").

In sum, the arguments that Defendants raise in their motion do nothing to

sway the Court from its prior conclusion that Section 121 is not likely sufficiently

tailored because it prohibits LPR political speech.

### 3. The scope of the Court's injunction is appropriate because a narrower injunction would require "rewriting" the statute.

Defendants argue in the alternative that the Court's injunction goes too far.

Mot. 6–8, ECF No. 34. The Court should stay its injunction insofar as it applies

to all non-LPR individual foreign nationals, Defendants contend, because the

Court determined that banning those foreign nationals' political speech is likely

constitutional. The Court might have limited its injunction to LPRs if it could

have, but it cannot because of the way the statute is written.

At least in the context of First Amendment overbreadth, courts generally

sever provisions, rather than applications.[10] Courts sometimes sever whole

---

[10] The cases Defendants cite do not set forth a contrary rule. In fact, none do what
Defendants ask the Court to do: enjoin applications (rather than provisions) of an
overbroad speech restriction. Most of the cases Defendants cite enjoin a whole

provisions even when doing so is "overinclusive."  *See, e.g.*, *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) (affirming an injunction that encompasses constitutional applications of a statute).  This limit on federal courts' equitable power derives from the "obligation to avoid judicial legislation."  *Id.* at 479; *see also, e.g.*, *Virginia v. Am. Booksellers Assn.*, 484 U.S. 383, 397 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements" (omission in original)).

*United States v. Stevens* illustrates the operation of the provisions-over-applications rule.  559 U.S. 460 (2010).  In *Stevens*, the Supreme Court confronted a First Amendment overbreadth challenge to a statute prohibiting depictions of animal cruelty.  18 U.S.C. § 48.  The Supreme Court agreed that the statute was unconstitutional as applied to hunting magazines (for example) but constitutional as applied to dog fighting videos (for example).  The Supreme Court in *Stevens* enjoined the whole statute (not just its unconstitutional applications), 559 U.S. at 481, notwithstanding the axiom that "[w]hen confronting a constitutional flaw in a statute, [federal courts] try to limit the solution to the

---

provision, as this Court has, s*ee, e.g.*, *Foster v. Dilger*, No. 3:10-cv-41, 2010 WL 3620238, at *23 (E.D. Ky. Sept. 9, 2010), or review a lower court that did so, *see, e.g.*, *United States v. Arthrex, Inc.*, 594 U.S. 1, 23–24 (2021).  Defendants get closer to the mark with *League of Women Voters of Ohio v. LaRose*, No. 1:23-CV-02414, 2024 WL 3495332 (N.D. Ohio July 22, 2024) (enjoining applications of a statute preempted by federal law), and *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017) (staying a preliminary injunction for some applications of an executive order).  But, to say nothing of the many other points of distinction, those cases do not involve First Amendment overbreadth.  That doctrinal context matters for the scope of the injunction (as the Court explains below).

problem," *Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th Cir. 2018) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006)).  It did so because limiting its remedy to only unconstitutional applications of the statute would require "rewriting" the statute. *Stevens*, 559 U.S. at 481.

The same is true here.  Section 121(A)(2)(a) defines "foreign national" to mean, "in the case of an individual, an individual who is not a United States citizen or national."  The Court concluded, analogous to *Stevens*, that this definitional provision was likely constitutional as applied to some individuals who are not citizens or nationals, but not as applied to LPRs.[11]  In other words, "a substantial number of [Section 121(A)(2)(a)'s applications] are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Id.* at 473 (internal citation and quotation marks omitted).

And so, just like the provision in *Stevens*, Section 121(A)(2)(a) does not permit a narrower remedy.  Section 121(A)(2)(a) is not subdivided such that the Court could sever and strike the part of the definitional provision that reaches LPRs while leaving the rest intact.  Nor could the Court adopt a limiting construction excluding LPRs from this definition: the term "not a United States citizen or national" is not "readily susceptible" to such a construction.  *American*

---

[11] This Court concluded that Section 121's bans are likely constitutional for all defined "foreign nationals" aside from individual foreign nationals, and it did not enjoin the statute vis-à-vis those likely unproblematic definitional provisions.

*Booksellers*, 484 U.S. at 397; *see also Boos v. Barry*, 485 U.S. 312, 330 (1988). Nor is the Court willing to rewrite the definition of individual "foreign national" by "inserting words or terms necessary in order to separate the constitutional part from the unconstitutional part." *See Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 202 (6th Cir. 1997) (quoting *Geiger v. Geiger*, 160 N.E. 28, 33 (1927) (cleaned up)). The Court must therefore sever and strike Section 121(A)(2)(a). To do otherwise would constitute "a serious invasion of the legislative domain." *Treasury Employees*, 513 U.S. at 479 n.26.

The provisions-over-applications rule has exceptions, to be sure, even in the First Amendment overbreadth context. But none apply here. Courts are comfortable drawing lines between applications in the overbreadth context when those lines are "based on settled First Amendment principles" that are "intimately familiar," *see id.*, like the distinction between a building and a public sidewalk, *see United States v. Grace*, 461 U.S. 171, 180–183 (enjoining the application of a statute to the public sidewalks around the Supreme Court but not to the Supreme Court building itself). But line-drawing here is not such a simple matter; it is more like the line-drawing that the Supreme Court avoided in *Stevens* and *Treasury Employees*, for two reasons.

First, and most fundamentally, the Court cannot be sure that its attempt to redraft the statute would draw the line in the same place as the Ohio Legislature. *See Treasury Employees*, 513 U.S. at 479. Would the Legislature attempt to reach some subset of LPRs who it believes pose a heightened risk of foreign

influence?  Would it set a net worth threshold to target enforcement on "foreign

billionaires"?  Some other criterion?  Would it do so for just LPRs, or other

individual foreign nationals too?  Would it set a limit (rather than a ban) on LPR

contributions?  On expenditures?  On ballot expenditures?  What would the limit

be?  The Court does not know the answers and will not venture to guess.

Second, as these questions show, this line drawing process "would likely

raise independent constitutional concerns whose adjudication is unnecessary to

decide this case."  *Id.* at 479, n.26.  That is because the extent to which a State

Legislature may constitutionally limit LPR political speech is a complicated matter

of first impression—a far cry from public sidewalk jurisprudence.  *Compare id.* at

479 *with Grace*, 461 U.S. at 180–83.  And, as Plaintiffs point out, if the Court

narrowed its injunction any further, then it may have to reach issues that the

Court avoided at the preliminary injunction stage (Plaintiffs' highlight their void-

for-vagueness arguments).[12]

The provisions-over-applications preference exists for good reason,

especially in the First Amendment overbreadth context.  The absence of such a

preference would "sharply diminish [the Legislature's] 'incentive to draft a

---

[12] Defendants view Plaintiffs' vagueness arguments as irrelevant to the injunction's
scope because baseless complaints could be filed against even citizens.  Reply 8–9,
ECF No. 37.  This contention is confusing (because the risk of citizens' political speech
being chilled by false accusations would tend to support a broader injunction, for
starters).  But, all the same, the Defendants' arguments fail to refute the argument that
Court would have to address otherwise unnecessary constitutional issues if it narrowed
the injunction.

narrowly tailored law in the first place.'" *Stevens*, 559 U.S. at 481 (quoting

*Osborne v. Ohio*, 495 U.S. 103, 121 (1990). Expounding on this point, Justice

Antonin Scalia once observed:

> The overbreadth doctrine serves to protect constitutionally legitimate speech not merely *ex post*, that is, after the offending statute is enacted, but also *ex ante*, that is, when the legislature is contemplating what sort of statute to enact. If the promulgation of overbroad laws affecting speech was cost free . . . that is, if no conviction of constitutionally proscribable conduct would be lost, so long as the offending statute was narrowed before the final appeal . . . then legislatures would have significantly reduced incentive to stay within constitutional bounds in the first place . . . . [And] a substantial amount of legitimate speech would be 'chilled' . . . .

*Massachusetts v. Oakes*, 491 U.S. 576, 586 (1989) (Scalia, J., joined by

Blackmun, Brennan, Marshall, and Stevens, JJ., concurring in part and

dissenting in part.). Injunctions may therefore be justified even though

"convictions of constitutionally proscribable conduct" may be lost.

That medicine is called for here. Given that some legislators raised

concern about Section 121(A)(2)(a)'s overbreadth but were dismissed, *see* O&O

40–42, ECF No. 32, courts have reason to be anxious about whether the Ohio

Legislature has enough "incentive to draft a narrowly tailored law in the first

place." *Osborne*, 495 U.S. at 121. The need to preserve the overbreadth

doctrine's *ex ante* protection accordingly warrants the loss of some "convictions

of constitutionally proscribable conduct" here. *Oakes*, 491 U.S. at 586.

Even so, the injunctive medicine prescribed here is not especially bitter.

The Court expects that few "convictions of constitutionally proscribable conduct"

will be lost under its injunction. *Id.* All non-LPR foreign nationals are still prohibited from spending in candidate elections under federal law. 52 U.S.C. § 30121. And Defendants may still enforce Section 121 in connection with non-individual foreign nationals.[13] The only constitutionally proscribable conduct that is not already prohibited under federal law and now cannot be prosecuted under the Court's injunction is individual foreign nationals' political spending on ballot questions (and other persons' receipt of the same).

In fact, the injunctive medicine prescribed here might not be bitter at all. On Plaintiffs' view, no convictions of constitutionally proscribable conduct will be lost. Plaintiffs maintain that spending on ballot initiatives by foreign nationals is not constitutionally proscribable conduct. So, according to them, enjoining the prosecution of individual foreign nationals presents no issue. To be clear, the Court disagrees. It doubts that the Sixth Circuit will side with Plaintiffs on ballot initiative spending by non-LPR foreign nationals. As the Court explained in its prior Opinion, banning non-LPR foreign nationals from spending on ballot initiatives is narrowly tailored to the interest of preventing foreign influence.[14]

---

[13] This includes foreign governments, subdivisions of foreign governments, foreign political parties, corporations organized under the laws of a foreign country, and corporations with their principal place of business in a foreign country. Ohio Rev. Code § 3517.121(A)(2)(b)–(d). Note also that Section 121 prohibits political spending both "direct[] and indirect[] through any person or entity[.]" *Id.* § 3517.121(B), (C).

[14] By spending on ballot initiatives, non-LPR foreign nationals could influence voters. *Bluman*, 800 F. Supp. 2d at 288 (expressing concern with foreign national spending that "influence[s] how voters will cast their ballots"); *see also Austin v. Michigan Chamber of Com.*, 494 U.S. 652, 659–60 (1990). They could also influence candidates. *See Bluman* 800 F. Supp. 2d at 291 (noting the heightened risk of foreign spending in candidate elections); *Citizens United*, 558 U.S. at 456 (Stevens, J., concurring in part

That said, though unlikely to be accepted, Plaintiffs' argument stands for the possibility that the Court's injunction prevents effectively no "convictions of constitutionally proscribable conduct."

In the end, the Court's injunction does not "extend far beyond the infirmity it identified." Reply 5, ECF No. 37. It bears repeating that all non-LPR foreign national spending on Ohio politics remains banned under either Federal or Ohio law, except for spending on *Ohio ballot initiatives* by *individual* foreign nationals. Although this spending likely constitutes "constitutionally proscribable conduct," enjoining Defendants from prosecuting it raises the Ohio Legislature's incentive to craft narrowly tailored laws and reaffirms the *ex ante* protections of the overbreadth doctrine. And, even more important, the Court cannot craft a remedy that would permit such prosecutions without rewriting Section 121(A)(2)(a)—without exceeding its own competencies and invading the Ohio Legislature's domain.

### 4.    Conclusion

Defendants are unlikely to prevail on appeal. The Sixth Circuit will likely agree with this Court's view of the merits, as explained in this Opinion and its prior Opinion. Section 121 triggers heightened scrutiny insofar as it applies to resident foreign nationals. The First Amendment protects their right to political speech, and it protects citizens' right to hear that speech. Section 121 is mostly

---

and dissenting in part) (discussing evidence that independent expenditures influence candidates). For more on this point see O&O 33 n.18, 36–39, ECF No. 32.

narrowly tailored to the compelling interest identified in *Bluman*. But, because LPRs generally do not present a sufficient risk of foreign influence to justify restricting their political speech, Section 121 is not narrowly tailored to that interest insofar as it regulates LPRs. Section 121(A)(2)(a) therefore violates LPRs' First Amendment rights.

This conclusion compels the Court to sever Section 121(A)(2)(a) in its entirety. The Court recognizes that this remedy enjoins some likely constitutional applications of Section 121. But, mindful of the limits on its remedial power and the need to maintain the *ex ante* protections of the First Amendment overbreadth doctrine, the Court denies Defendants' request for a narrower injunction.

## B.   The remaining factors also disfavor a stay.

The Court's conclusion that Defendants are unlikely to prevail on appeal decides the remaining stay criteria (irreparable harm, harm to third parties, and the public interest)—they rise and fall depending on the merits. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 602 (2018); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).

There is one exception: Defendants—for the first time—argue that the Court's injunction "subject[s] the public to a serious risk of voter confusion." Mot. 9–10, ECF No. 34 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006)). But the *Purcell* principle does not apply here. That principle applies to "election rules." *See Tennessee Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Lee*, 105 F.4th 888, 897 (6th Cir. 2024) (collecting cases). Unlike every

recognized "election rule," Section 121 is not directed at voting. *See Boone Cnty. Republican Party v. Wallace*, No. 24-5783, 2024 WL 4048630 (6th Cir Sept. 5, 2024) (reversing a district court's denial of a motion to preliminarily enjoin a campaign finance regulation days *after* this Court partially enjoined Section 121). Section 121 is not even directed at *voters.* This Court can hardly imagine how an order on a law directed at nonvoters could "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 459 U.S. at 4–5.

If anything, the *Purcell* principle (broadly construed) weighs against a stay. HB1—not the Court's injunction—effected a change in the law. The Court's injunction merely makes Ohio law consistent with the federal law and consistent with *what Ohio law has been*. Unlike in *Purcell*, here the "status quo is one in which the challenged [law] has not been in effect." *Republican Nat'l Comm. v. Common Cause Rhode Island*, 141 S. Ct. 206, 206 (2020) (denying application for stay). The Court would only increase confusion by contradicting itself now with a stay. *Purcell*, 459 U.S. at 4–5 (noting the "especially" high risk of confusion with "conflicting orders.").

Neither their *Purcell* argument nor any other argument on the remaining stay factors tips the scales in Defendants' favor.

### III.    CONCLUSION

All factors disfavor a stay.  Defendants' motion to stay the Court's

preliminary injunction pending appeal is therefore **DENIED**.

The Clerk shall terminate ECF No. 34 as a pending motion.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**